Annick M. Persinger (State Bar No. 272996)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
*apersinger@tzlegal.com*

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA ISGUR, individually and on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>    Defendant. | Case No. 3:24-cv-06559<br><br>**CLASS ACTION COMPLAINT** |

1    Plaintiff Sara Isgur, individually and on behalf of all others similarly situated, hereby brings

2    this Class Action Complaint against Defendant Meta Platforms, Inc. ("Defendant" or "Meta") and, in

3    support thereof, alleges as follows:

4    **PRELIMINARY STATEMENT**

5    1.    Meta owns and operates Facebook, one of the most popular social media platforms

6    that has a userbase of billions of people. In violation of express terms of Meta's Facebook Terms of

7    Service and Privacy Policy (the "Contract") Meta has allowed hackers to abscond with hundreds of

8    thousands of Facebook accounts, and the personal information therein, with impunity—while it

9    continues to deny Plaintiff and similarly situated non-business Facebook users access to their own

10   accounts.

11   2.    As a result of Facebook's systematic unlawful conduct, users' inability to regain access

12   to their accounts is pervasive. Plaintiff and tens of thousands of Facebook and users who rely on

13   access to these accounts to maintain relationships, access other online portals and communicate with

14   friends and family, have not only been unable to access their own content—including stored personal

15   information, payment information, photographs, and communication—or to use the platform as

16   promised and intended. To make matters worse, as a result of Meta's continued failure to allow

17   Plaintiff and similarly situated users access to their accounts, users have been subjected to further

18   harm by hackers posting inappropriate content, soliciting those in their social networks under false

19   pretenses by masquerading as the users, and causing harm to users' goodwill and reputations. As

20   such, Meta's notorious and repeat failure to protect users' data is a core problem worsened by Meta's

21   recent and total failures to assist users who were locked out of other own accounts.

22   3.    Meta promises in its Terms of Service that it "work[s] hard to maintain the security

23   (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and

24   services." See Exhibit A at 3.

25   4.    Similarly, Meta promises in its Privacy Policy that "it will Investigate suspicious

2

activity, . . . Detect, prevent and combat harmful or unlawful behavior, . . . Detect and prevent spam, other security matters and other bad experiences, Maintain the integrity of [Meta's] Products."[1] See Exhibit B.

5.    But, contrary to its express promises, Meta knows (i) that hackers target Facebook to access the wealth of information related to users' accounts that Meta stores and profits from, and (ii) that hackers breach Meta's security and gain unauthorized access to users' accounts. Despite its promises, Meta lets hackers take control of consumer accounts with impunity because Meta fails to provide any recourse for consumers to take their accounts back from hackers.

6.    Plaintiff and similarly situated Class members Facebook accounts were compromised by hackers who took over their accounts and blocked them out. Meta turned a blind eye to these systematic security breaches on its platform—allowing hackers to steal their valuable user accounts. Instead of providing customer support to take stolen accounts back from hackers, Meta denies Plaintiff and similarly situated Class members access and prevents Plaintiff and similarly situated Class members from re-gaining access to their Facebook accounts while hackers continue their unauthorized use of the accounts unabated. Unlike many other consumer goods, where a consumer can simply switch to another product, users' Facebook profiles are no longer accessible to them. They are thus effectively held hostage by Facebook's failure to allow them access.

7.    Indeed, in breach of its express promises, Meta does nothing for users who lose access to their accounts and information due to hacking because Meta decimated its customer support team in mass layoffs in late 2022 and early 2023. Critically, data reflects that hacking activity has increased dramatically following the time period during which these mass layoffs occurred. According to a letter sent by certain State Attorneys General to Meta on March 6, 2024, account takeover complaints rose from 270% to 740% in just one year. With no recourse available through

[1] Meta's Terms of Service and Privacy Policy are referred to collectively herein as the "Contract."

CLASS ACTION COMPLAINT

1    customer support, users affected by hacking cannot regain access to their accounts, while hackers

2    continue to use them. Without its customer support team, which Meta cut to increase its bottom

3    line, Meta only provides a circular process that allows hackers to continue to maintain control of

4    Plaintiff's and Class members' accounts.

5    　　　　8.　　　Meta breached its Contract when it prevented Plaintiff and Class members from

6    regaining the use of their valuable non-commercial Facebook accounts, including the personal

7    information stored on those accounts, while hackers continue to use them. As a result of Meta's

8    breach of its promises, Plaintiff and Class members lost access to their user-generated content,

9    including photographs and posts, and their networks of "friends" and "followers" on their

10    compromised personal Facebook accounts.

11    　　　　9.　　　Plaintiff and Class members also continue to be harmed by Meta's failure to provide

12    recourse for hacking as Plaintiff and Class members continue to be victimized by hacking as they

13    cannot regain access to their accounts while hackers continue to use the stolen accounts, as well as

14    the stolen personal information associated with that account.

15    　　　　10.　　　Accordingly, Plaintiff brings this action on behalf of herself and other similarly

16    situated Facebook users for damages for Meta's breach of its Contract, and for injunctive relief to

17    regain access to their Facebook under California's Unfair Competition Law (the "UCL"), Bus. &

18    Prof. Code §§ 17200 *et seq.*

19    　　　　　　　　　　　　　　　　　**PARTIES**

20    　　　　11.　　　Plaintiff Sara Isgur is, and at all relevant times, was a citizen of the State of California

21    residing in San Diego. As set forth more fully in paragraphs 41-51, Plaintiff Isgur had a personal

22    account on Facebook, and was a Facebook user for many years. She originally signed up with

23    Facebook to stay in touch with family and friends on the East Coast, where she is originally from.

24    She also used her Facebook account to make connections with others in the real estate industry and

25    her local community in San Diego. As a result of a failure by Meta's security system, in June 2023,

4

1   Plaintiff Isgur's longstanding personal Facebook accounts were compromised by hackers in minutes.

2   When Meta's security system failed and hackers stole her account, she lost access to years of photos,

3   posts, personal messages, business and personal connections, and more. Plaintiff Isgur attempted to

4   follow all account retrieval steps provided by Meta's computer-based customer support system, but

5   could not do so, as the hacker or hackers had already changed the email and phone number associated

6   with her account. When that effort to regain access to her accounts failed, she reported the hacking

7   via her partner's separate Facebook account and did not receive a response. Plaintiff Isgur also sent

8   a letter to Meta Headquarters, pleading for help with her hacked account, and did not receive a

9   response. Plaintiff Isgur has still not regained access to her Facebook account. Instead of assisting

10  or enabling Plaintiff Isgur to regain access to and use her account, Meta turns a blind eye as the

11  hacker or hackers of Plaintiff Isgur's account continue to use her account to try to financially scam

12  her friends and family. Plaintiff Isgur has repeatedly contacted Meta to regain access to her Meta

13  account to no avail. Instead, Meta allows hackers to control the account with impunity while

14  preventing Plaintiff from regaining access herself.

15      12.    Defendant Meta is a California corporation with its principal place of business located

16  at 1 Hacker Way, Menlo Park, CA 94025. Meta is a leading global social media and social networking

17  company. Meta is a Fortune 500 company with an annual revenue of 134.9 billion in 2023, and

18  market capitalization of 1.3 trillion as of March 2024. As part of its operations, Meta owns and

19  operates the website www.facebook.com, and the associated Facebook application. At all relevant

20  times, Meta was, and is, engaged in business in San Mateo County and throughout the United States

21  and the world.

22                          **JURISDICTION AND VENUE**

23      13.    This Court has subject matter jurisdiction under the Class Action Fairness Act

24  ("CAFA"), 28 U.S.C. § 1332(d)(2)(A) because there are 100 or more Class members, at least one

25  Class member is a citizen of a state that is diverse from Defendant's citizenship, and the matter in

controversy exceeds $5 million, exclusive of interest and costs.

14.     This Court also has subject matter jurisdiction over the equitable injunctive relief claims at issue as legal damages cannot remedy future harm.

15.     This Court has personal jurisdiction over Meta because Meta is a corporation that resides in this District.  Defendant operates, conducts, and engages in substantial business in this judicial district; Defendant caused injury to persons within this State; and a substantial portion of the actions giving rise to the claims took place in this State.

16.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the vents or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, and pursuant to Meta's Terms of Service which designate the Northern District of California as the appropriate venue for a federal action.[2]

## FACTUAL ALLEGATIONS

### A.     Meta's vast Facebook platform is a routine target for hackers.

17.     Facebook is amongst the most popular social media platforms in the world. For example, Meta's Facebook platform has roughly 3.049 billion monthly average users and 2.085 billion daily users. In fact, 57.53% of the world's active internet users access Facebook every month.[3]

18.     Because Meta encourages users to share information on its platforms—so it can profit from that information—hackers routinely target and successfully access the valuable information Meta stores related to users' accounts.

19.     Hackers accomplish account takeovers in multiple ways, including gaining access to

---

[2] *See* Ex. A at 10 ("You and Meta each agree that any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County.")

[3] *Facebook User & Growth Statistics,* BLACKLINKO, https://backlinko.com/facebook-users (last updated Feb. 23, 2024).

an account through password breaking (whereby a password is guessed), cookie theft, phishing, or impersonation of Meta support professionals. Once the account has been taken over, hackers will change passwords, phone numbers, and email addresses, and add security keys and two-factor authentication to lock out the rightful owner.[4]

20.     After an account takeover, a hacker can access and misuse private information, including users' full names, birth dates, and credit card information, read the users' private communications, make public posts to scam the user's contacts or the public at large, and take other nefarious actions.[5]

21.     Indeed, compromised Meta accounts are so valuable that they can sell on the dark web for $50 - $75 or more depending on how long the account has been active.[6]

22.     After hackers stole Plaintiff's and Class members' accounts with account takeovers, Meta breaches its Contract by failing to oust the hackers and return access to Plaintiff and Class members.

**B.     Meta breaches its promises in its Contract that it will maintain the security and availability of its Facebook platform—and Plaintiff and Class members were harmed as a result.**

23.     Meta is the unilateral author of its Contract, which Meta claims governs the course of conduct between Facebook users and itself. In the Contract Meta expressly promises that it will maintain the security and availability of its platform. Breaching its promises to keep users' information secure, Meta allows hackers to takeover accounts with impunity while preventing rightful holders from regaining access. As a result of these breaches of Contract, Plaintiff and Class members have been harmed by the loss of their accounts and because they are left vulnerable to hackers'

---

[4] Amanda Florian, *The anatomy of a Facebook account heist*, VOX, https://www.vox.com/technology/2023/9/28/23892964/facebook-account-hacked-theft-stolen-online-scams-meta (Sept. 29, 2023).
[5] *Id.*
[6] *Your Hacked Facebook Account Goes for $75 on the Dark Web*, Bitdefender, https://www.bitdefender.com/blog/hotforsecurity/your-hacked-facebook-account-goes-for-75-on-the-dark-web/ (June 18, 2020).

nefarious use of their accounts and identities. Plaintiff and Class members are thus entitled to damages in the $100 aggregate amount set by Meta's Terms of Service.[7]

### i. Meta promises that it will maintain the security and availability of its platforms.

23. Meta's various user agreements, community standards, and privacy policies promise that it will keep users' accounts secure.

24. Meta's Facebook Terms of Service ("Terms") state that Meta will "Promote the safety, security, and integrity of [its] services, combat harmful conduct, and keep [Meta's] community of users safe: . . . [Meta] work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and services[.]"

25. The Contract promises the support of Meta's "dedicated teams around the world, with external service providers, partners, and other relevant entities" that "develop advanced technical systems to detect potential misuse of [Meta's] Products, harmful conduct towards others, and situations where [Meta] may be able to help support or protect [its] community, including to respond to user reports of potentially violating content."

26. The Contract also states that Meta "may disable or delete your account if after registration your account is not confirmed, your account is unused and remains inactive for an extended period of time, or if we detect someone may have used it without your permission and we are unable to confirm your ownership of the account. Learn more about how we disable and delete accounts." Following the link associated with "Learn more," leads to another settings page where Meta states it "may disable or delete your account if it appears to have been hacked or compromised

---

[7] *See* Ex. A at 9 ("**3. Limits on liability**.... We cannot predict when issues might arise with our Products. Accordingly, our liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Meta Products (however caused and on any theory of liability, including negligence), even if we have been advised of the possibility of such damages. Our aggregate liability arising out of or relating to these Terms or the Meta Products will not exceed the greater of $100 or the amount you have paid us in the past twelve months.").

and we are unable to confirm ownership of the account after a year, or if the account is unused and remains inactive for an extended period of time."[8] It further promises that, in such a case, there are "steps you can take to unlock your account."[9]

27.    Meta's Privacy Policy, which is a part of the Contract, states that it will work to do a number of things including the following to "promote safety, security and integrity":

A.  "Verify accounts and activity;"

B.  "Investigate suspicious activity;"

C.  "Detect, prevent and combat harmful or unlawful behavior;"

D.  "Detect and prevent spam and other bad experiences;"

E.  "Detect and stop threats to our personnel and property;"

F.  "Maintain the integrity of [Meta's] Products[.]"

28.    Despite these promises, after hackers accomplish an account take over Meta does not offer reasonable means to allow users in regaining access to their accounts. Instead, Meta allows hackers to continue their access to misappropriated user accounts.

### ii.    Meta breached its promises to maintain the security and availability of its platforms.

29.    In violation of its contractual agreement to maintain the security and availability of its platform for its users, Meta intentionally abandoned users to victimization by hackers. Specifically, in late 2022, Meta laid off approximately 11,000 people, or about 13% of its workforce.[10] Then, in early 2023, after declaring 2023 to be Meta's "year of efficiency", Meta laid off another 10,000 employees concentrated in the customer service and support communities, removing opportunities for human intervention and abandoning users ineffective automated support systems that have already been shown to cause cascading harms to victims, their contacts, and their customers and no

---

[8] *Facebook's policies on disabling or deleting hacked, unused or unconfirmed accounts*, META, https://www.facebook.com/help/3434203120011796 (last accessed July 29, 2024).
[9] *Id.*
[10] *Meta Lays Off More Than 11,000 Employees*, The New York Times, https://www.nytimes.com/2022/11/09/technology/meta-layoffs-facebook.html (November 9, 2022) (discussing layoffs of approximately 11,000 people or 13% of its workforce in November 2022).

remedy.[11] Following these massive layoffs, Meta does not provide sufficient customer support to assist consumers in regaining access to their personal accounts that have been stolen by hackers.

30.    The results were predictable and immediate—a substantial increase in the number of account takeover complaints was observed by 41 state attorneys general in the months following Meta's announced layoffs.  For example, the New York Attorney General's office received 73 account takeover complaints in 2019 and that number grew to 783 in 2023. As of January 2024, New York had already received 128 complaints; Vermont reported a 740% increase in complaints from 2022 to 2023, North Carolina reported a 330% increase from 2022 to 2023; Pennsylvania reported a 270% increase from 2022 to 2023; and Illinois reported a 256% increase from 2022 to 2023.[12]

31.    While Facebook users were met with diminished customer support options, Meta's financials flourished as predicted. In an 8K filed contemporaneously with the public disclosure of the layoffs, Meta projected that its operating expenses would drop some $3 billion dollars for 2023.[13] Likewise, Meta's share price closed up 7% on the date of the disclosure of the additional layoffs.[14] Meta's "year of efficiency" paid off, after Q4 of 2023, Meta "tallied its most profitable quarter—and

---

[11]  *Meta to lay off 10,000 more workers after initial cuts in November*, CNBC, https://www.cnbc.com/2023/03/14/meta-layoffs-10000-more-workers-to-be-cut-in-restructuring.html (last updated March 14, 2023) (reporting that CEO Mark Zuckerberg communicated to analysts that Meta planned "on cutting projects that aren't performing or may no longer be crucial" and declaring 2023 to be a "year of efficiency"); *Meta's job cuts are gutting customer service, leaving influencers and businesses with nobody to call*, CNBC, https://www.cnbc.com/2023/04/05/meta-layoffs-gut-customer-service-leaving-influencers-without-reps.html (last updated April 5, 2023) (reporting additional layoffs of nearly 10,000 employees around March 13, 2023).

[12]  Ltr. Re: *Meta Account Takeovers and Lockouts*, NAT'L ASS'N OF ATTORNEYS GENERAL, *available at* https://www.naag.org/wp-content/uploads/2024/03/Policy-Letter-to-Meta-on-Account-Takeover-2024-03-06.pdf (Mar. 5, 2024) ("State AG Ltr."), at 3.

[13]  *Form 8K, Current Report Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934, Meta Platforms, Inc.*, United States Securities and Exchange Commission, https://www.sec.gov/ix?doc=/Archives/edgar/data/1326801/000132680123000035/meta-20230314.htm (Mar. 14, 2023).

[14]  *Meta to lay off 10,000 more workers after initial cuts in November*, CNBC, https://www.cnbc.com/2023/03/14/meta-layoffs-10000-more-workers-to-be-cut-in-restructuring.html (Mar. 14, 2023).

CLASS ACTION COMPLAINT

year—ever ."[15]

32.    By slashing its customer service teams, Meta has left its billions of users unable to access basic support functions, including regaining access to accounts that have been taken over by nefarious actions.

33.    Meta's inability to restore its users' accounts since the layoffs has been well-documented,[16] and Meta is aware of the same.

34.    Following the layoffs, those who have had their accounts compromised do not have clear, adequate recourse.[17] As the number of account takeovers increase, many victims left confused and frustrated by Meta's reporting systems are turning to lawmakers, state attorneys general, the Federal Trade Commission, and even the FBI[18] to restore their accounts, placing an unnecessary burden on these public resources.[19] Meta's decision to delegate customer support to an ineffective web form and alleged "support emails" that go unanswered has, in fact, allowed yet further hacking—as it gives hackers the opportunity to pose as Meta employees in the gap left by Meta's deleted customer service operation.[20]

---

[15] Derek Saul, Forbes, *Meta Earnings: Zuckerberg's 'Year of Efficiency' Nets Greatest Profits Ever* (Feb. 1, 2024), *available at* https://www.forbes.com/sites/dereksaul/2024/02/01/meta-earnings-zuckerbergs-year-of-efficiency-nets-greatest-profits-ever/.

[16] See, *e.g.*, State Ag Ltr.; Rosa Marchitelli & Jean Blair, *Facebook account takeovers are targeting people you know, turning friendship into fraud*, CANADA BROAD. CORP. NEWS (May 27, 2024), https://www.cbc.ca/news/canada/new-brunswick/facebook-account-taken-over-friends-scam-1.7205356; Lauren Strapagiel & Tanya Chen, *Influencers Are Taking Desperate Measures To Recover Their Instagram Accounts*, BUZZFEED NEWS (Aug. 24, 2021); https://www.buzzfeednews.com/article/laurenstrapagiel/creators-instagram-dealers-restore-accounts; ; Anthony Schoettle, *Hackers Increasingly Target Instagram Accounts*, INDIANA CHAMBER OF COMMERCE (May 11, 2022), https://www.indianachamber.com/hackers-increasingly-target-instagram-accounts/.

[17] Florian, *supra* note 4.

[18] *Id.*

[19] State AG Ltr. at 3.

[20] *See id.* ("In the absence of help from Meta, thousands of victims of account theft have come together in Facebrook groups, on X, and in reddit threads, where they share tips and information about the hacks. The groups are filled with concerned users, but they're also filled with even more hackers hiding behind AI-generated photos and stock images."); *see also* Adi Robertson, *Meta reportedly punished dozens of employees for offering an inside line to account recovery*, THE VERGE (Nov. 17, 2022), https://www.theverge.com/2022/11/17/23464297/meta-allegedly-fired-contractors-employees-oops-account-recovery-abuse; Strapagiel & Chen, *supra* note 16.

35.     While Meta's decision to remove all pretense of customer support improved its bottom line,[21] Plaintiff and Class members have paid the price because Meta's inability to allow users to regain access to accounts where their personal information is stored—including *inter alia* full names, dates of birth, credit card numbers, biological information, education information, and job history—allows users to continue to be victimized by hacking to and puts them at risk for additional fraud as information could be used to gain access to the victim's other accounts.

iii.     *Plaintiff and Class members are owed damages for Meta's breach of its Contract.*

36.     Facebook's Terms contain a damages limitation provision stating that aggregate liability will not exceed the greater of $100 or the amount the user paid Facebook in the past twelve months.[22]

37.     Plaintiff and Class members are each entitled to Meta's $100 aggregate liability as they have suffered immeasurable harm as a result of Meta's breach when it failed to live up to its promises that users would be able to maintain access to its accounts.

38.     To Plaintiff and similarly situated Class members, the data on Meta's platforms is priceless as users place a high value on their user-generated content.

39.     Plaintiff and Class members have all lost access to their accounts, including photos, posts, personal messages, business and personal connections, and more, while hackers benefit unabated from the unauthorized use of their accounts. For example, Plaintiff Isgur has lost access to the online repository of her memories, including her friends list, photos and records of her communications with friends and family, including a deceased loved one, has missed a memorial

---

[21] Derek Saul, Forbes, Meta Earnings: Zuckerberg's 'Year of Efficiency' Nets Greatest Profits Ever (Feb. 1, 2024) (following Q4 of 2023, Meta "tallied its most profitable quarter—and year—ever").

[22] *See* Ex. A at 9 ("**3. Limits on liability**…. We cannot predict when issues might arise with our Products. Accordingly, our liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Meta Products (however caused and on any theory of liability, including negligence), even if we have been advised of the possibility of such damages. Our aggregate liability arising out of or relating to these Terms or the Meta Products will not exceed the greater of $100 or the amount you have paid us in the past twelve months.").

service for that loved one, as well as lost a means of communicating with friends and family members that rely on Facebook to keep in touch. For other people, loss of access to their Facebook accounts has resulted in consequences including loss of evidence contained in messages for a custody dispute, losing access to photos of deceased loved ones.

40.     Plaintiff and Class members are also harmed because they are left vulnerable to nefarious uses of their identity and information as hackers operate their account. For example, hackers often use stolen accounts to publicize scams and to prey on users' contacts by impersonating the user.

**C.      Meta failed to restore Plaintiff's access to her non-commercial Facebook account.**

41.     After hackers took over Plaintiff Isgur's non-commercial Facebook accounts, Meta failed to restore her access to her accounts and she lost access to years of photos, posts, personal messages, business and personal connections, and more, while hackers benefit unabated from the unauthorized use of her accounts.

42.     Prior to Plaintiff Isgur losing access to her Meta accounts, she had previously used Facebook for many years. Plaintiff Isgur had one personal account on Facebook.

43.     On the evening of June 21, 2023 Plaintiff Isgur's Facebook and Instagram accounts were hacked by an unknown user. The hacker immediately changed the password, mobile phone number, and email address associated with her accounts.

44.     Plaintiff Isgur received a notification from Facebook that the email and phone number associated with her account had been changed; she tried to log in and was unable to do so.

45.     Because Plaintiff Isgur's Facebook account was so swiftly compromised, she lost access to the online account reporting menu features that Meta's platform users can access through the platform when logged in. That same evening, Plaintiff Isgur used the automated support options that were available to her without having a logged in account including submitting a copy of her

1  driver's license to confirm her identity, but none of these measures were successful at restoring

2  Plaintiff's access to her accounts. The day after her account was hacked, Plaintiff Isgur used her

3  partner's account to report that Plaintiff's account had been hacked; however, neither she nor her

4  partner ever received a response.

5       46.    Realizing that she could not access automated user support because it was only

6  accessible through the account she no longer had access to, Plaintiff Isgur called a Facebook

7  Headquarters phone number she had found on the internet by searching "how to contact Facebook,"

8  and left a message asking for help retrieving her hacked account. She did not receive a response.

9  Next, Plaintiff sent a letter to Meta's Headquarters at 1 Hacker Way in Menlo Park, again asking for

10  assistance with her hacked account. She did not receive a response.

11       47.    Approximately a week after she was hacked, Plaintiff Isgur received a phone call from

12  a friend, who reported that the hacker had posted a link on Plaintiff Isgur's Facebook page pretending

13  to be Plaintiff Isgur, and that the friend had provided the hacker with her own email, phone number,

14  and list of contacts through the link. It was only when the hacker requested the friend's Social

15  Security Number did the friend realize that she was not communicating with Plaintiff and that this

16  was part of a financial scam.

17       48.    Soon after Plaintiff Isgur's account was hacked, other friends notified her that the

18  hacker had posted a financial scam using Plaintiff Isgur's account. Plaintiff encouraged her friends

19  to report the hacked account using Facebook's user support system. Plaintiff's friends did so but

20  never received a response from Facebook. The hacker or hackers posted a financial scam using

21  Plaintiff Isgur's account at least two more times after the hacked account had been reported to

22  Facebook by Plaintiff's friends.

23       49.    In late October 2023, Plaintiff Isgur learned that her cousin, with whom she

24  maintained a close connection by communicating on the Facebook platform, had died on October

25  6, 2023. She was late to learn this news, and also missed her cousin's memorial service, because the

information had only been shared on Facebook and could not be viewed by Plaintiff Isgur because she was locked out of her compromised account. The memorial service had been held quickly after her cousin's death, following Jewish religious practices, so timely notification of his passing was vitally important. Plaintiff was devastated at the belated news of her cousin's death and that she had missed the chance to honor his passing.

50.     In November 2023, frustrated with the lack of assistance or even a response from Facebook to her account hacking, Plaintiff Isgur contacted the Office of California's Attorney General and used their online Consumer Complaint system to submit a complaint about Meta's failure to protect user accounts from hacking. Plaintiff also contacted the Federal Bureau of Investigation to report the Facebook account hacking.

51.     Plaintiff Isgur spent countless hours trying to navigate Defendant's support mechanisms with no success whatsoever. Plaintiff eventually learned that Facebook had eliminated its customer support team. Defendant continues to deny her access to her Meta accounts causing her harm while Meta continues to profit from the information collected from Plaintiff Isgur's use of her accounts as well its decision to eliminate its customer support team.

**D.     Forty State Attorney Generals Demand a Conversation with Meta**

52.     On March 5, 2024, the issues described herein were recognized by a group of 40 state attorney generals and the attorney general for the District of Columbia in a letter to Meta detailing their concern with the sharp increase in complaints regarding Facebook account takeovers and lockouts (the "State AG Letter").

53.     The State AG Letter emphasized the utter panic of consumers in their states, noting that "[u]sers spend years building their personal and professional lives on [Meta's] platforms, posting intimate thoughts, and sharing persona details, locations, and photos of family and friends. To have it taken away from them through no fault of their own can be traumatizing. Connections they made

1   and friendships that they forged become threatened."[23]

2       54.     The State AG Letter also focused on the increased risk of financial harm to those

3   users whose accounts were taken over and to their contacts.[24]

4       55.     The State AG Letter acknowledged that the sharp uptick in consumer complaints to

5   their offices happened around the time Defendant laid off 11,000 employees concentrated in the

6   security and privacy and integrity sector in 2022.[25]

7       56.     These attorney generals requested that Defendant "take immediate action and

8   substantially increase its investment in account mitigation tactics, as well as responding to users

9   whose accounts were taken over . . . [p]roper investment in response and mitigation is mandatory."[26]

10      57.     The attorney generals further noted the substantial resource burdens that is being

11  placed on their offices in having to respond to the large (and increasingly so) volume of user

12  complaints and underscored their "refus[al] to operate as the customer service representatives of

13  [Meta]."[27]

14          **A.      Meta personal user accounts are valuable to Meta and its users.**

15      58.     Personal user accounts are of immense value to Meta even if users do not pay Meta a

16  dollar amount for account access.

17      59.     This is because Meta receives ad revenue for advertisements that third parties take that

18  are then directed towards its users. This is particularly true of advertisements targeted at users based

19  on the information Meta collects from their use of the platforms.

20      60.     For example, in 2023, Meta's average revenue per user worldwide was $40.60,[28] while

21

22  [23] State AG Ltr. at 1.
    [24] State AG Ltr. at 1-2.

23  [25] Catherine Thorbecke, *Facebook parent company Meta will lay off 11,000 employees*, CNN BUS., https://www.cnn.com/2022/11/09/tech/meta-facebook-layoffs/index.html (last updated November 9, 2022).

24  [26] State AG Ltr. at 3.
    [27] State AG Ltr. at 3.

25  [28] Stacy Jo Dixon, *Average revenue per user (ARPU) of Meta Platforms from 2011 to 2023*, STATISTA (Feb.

1   the total revenue per Facebook user based in the United States and Canada was $68.44.[29]

2       61.    In fact, Meta's advertisement revenue of approximately $113.6 billion in 2022

3   accounted for approximately 97% of its profits.[30]

4       62.    To Plaintiff and similarly situated Class members, the data on Meta's platforms is

5   priceless as users place a high value on their user-generated content.[31]

6       63.    For example, Plaintiff Isgur has lost access to treasured memories and opportunities,

7   including photos and records of her communications with a deceased loved one, a missed memorial,

8   as well as a means of communicating with friends and family members that rely on Facebook to keep

9   in touch.

10      64.    For other people, loss of access to their Facebook accounts has resulted in

11  consequences including loss of evidence contained in messages for a custody dispute,[32] losing access

12  to photos of deceased loved ones.[33]

13      65.    Moreover, it is by now incontrovertible that there is a robust market for this data. The

14  robust market for user data has been analogized to the "oil" of the tech industry. A 2015 article from

15  TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire

16  or maintain a competitive edge." That article noted that the value of a single Internet user—or really,

17  a single user's data—varied from about $15 to more than $40.

18      66.    One study by content marketing agency Fractl has found that an individual's online

19

20  ────────────────────────────

    12, 2024), https://www.statista.com/statistics/234056/facebooks-average-advertising-revenue-per-
21  user/#:~:text=In%202023%2C%20Meta's%20average%20revenue,
    from%2039.63%20USD%20in%202022.
22  [29] Gennaro Cuofano, *The Facebook ARPU Explained*, FOURWEEKMBA (Feb. 6, 2024),
    https://fourweekmba.com/facebook-arpu/.
23  [30] Stacy Jo Dixon, *Annual revenue generated by Meta Platforms from 2009 to 2023, by segment*, STATISTA
    (Feb. 12, 2024), https://www.statista.com/statistics/267031/facebooks-annual-revenue-by-
24  segment/.
    [31] *See* Cuofano, *supra* note 29.
    [32] Florian, *supra* note 4.
25  [33] *Id.*

1   identity, including hacked financial accounts, can be sold for $1,200 on the dark web. Other reports

2   show that the value of a hacked Facebook account to be $45.[34]

3       67.    As a result, Plaintiff and Class members have suffered an economic injury by the loss

4   of their valuable Meta accounts while Meta still unfairly gets the benefit of the profit generated from

5   leveraging Plaintiff and Class members' user-generated information with advertisers. Further, Plaintiff

6   and Class members were denied the benefit of knowledge that Defendant would not provide adequate

7   assistance for users in regaining access to their accounts. Therefore, they were unable to mitigate harms

8   they incurred because of Defendant's actions. That is, Defendant's lack of transparency prevented and

9   still prevents Plaintiff's and Class members' ability to mitigate. They have also suffered a loss of a

10  personal property interest, as the accounts have personal value to the users who spent hours of their

11  time building the sites for their personal use.

12      **<u>CLASS ALLEGATIONS</u>**

13      68.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action for herself

14  and all members of the following Class of similarly situated individuals (the "Class"):

15      **<u>Nationwide Class</u>:** All persons subject to Meta's Terms of Service who lost access to

16      their personal Facebook account used for personal or non-commercial purposes and

17      have not regained access to their account(s) after March 2023 through the date of class

18      certification.

19      69.    Excluded from the Class is the Defendant, any entities in which Defendant has a

20  controlling interest, the Defendant's employees, any Judge to whom this action is assigned, and any

21  member of such Judge's staff and immediate family.

22      70.    Plaintiff reserves the right to amend or modify the Class definition after having an

23  opportunity to conduct discovery.

24  

25  [34] Patricia Ruffio, *Dark Web Price Index 2022*, PRIVACYAFFAIRS.COM (June 10, 2023), https://www.privacyaffairs.com/dark-web-price-index-2022/.

71.    California law applies to a nationwide Class because Meta's Terms contain a choice of law clause designating California law.[35]

72.    The Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff and all members of the Class have been harmed by the acts of the Defendant. Class-wide adjudication of Plaintiff's claims is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

73.    Numerosity. Fed. R. Civ. P 23(a)(1). The members of the Class are so numerous that individual joinder of all Class members is impracticable. Hundreds of thousands, if not millions, of Class members' accounts have been taken over by hackers while Meta systematically fails to provide any recourse for re-gaining access such that the Class is so numerous that joinder of all members of the Class is impracticable.

74.    Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3). Common questions of law and fact exist as to all members of the putative Class that will drive the litigation and predominate over any questions affecting only individual Class members. Common questions include, but are not limited to:

> A.    Whether Meta promised to maintain the security and availability of its platforms in its Contract;
>
> B.    Whether Meta breached its Contract when it failed to re-authorize Plaintiff's and Class members' access to their accounts after hackers effected account take overs;
>
> C.    Whether Plaintiff and Class members suffered harm as a result of Meta's breach of its Contract;

---

[35] Ex. A at 10 ("You also agree . . . that the laws of the State of California will govern these terms and any claim, cause of action, or dispute without regard to conflict of law provisions."

1              D.      Whether Meta owes damages for its breach of Contract in the aggregate

2                       amount set forth in its Terms of Service;

3              E.      Whether Meta's conduct violates the Unfair Competition Law;

4              F.      Whether Plaintiff and Class members are entitled to an injunction; and

5              G.      Whether Plaintiff and Class members are entitled to other appropriate

6                       remedies.

7       75.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of each

8 putative Class member and are based on the same facts and legal theories as each of the Class

9 members. Plaintiff, like all members of the Class, had her Facebook account hacked and taken over.

10 Plaintiff, like all Class members, was unable to regain access to her Facebook account because Meta

11 does not facilitate their users' ability to regain control of their accounts. Plaintiff is entitled to relief

12 under the same causes of action as the other members of the putative Class.

13       76.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate

14 representative of the putative Class because her interests coincide with, and are not antagonistic to,

15 the interests of the members of the Class that she seeks to represent. Plaintiff has retained counsel

16 competent and highly experienced in complex consumer class action litigation, who intend to

17 prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the

18 interests of the members of the Class.

19       77.    Superiority. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available

20 methods for fair and efficient adjudication of the controversy. The amounts sought by each member

21 are such that individual prosecution would prove burdensome and expensive. It would be virtually

22 impossible for members of the Class individually to effectively redress the wrongs done to them.

23 Even if the members of the Class themselves could afford such individual litigation, it would be an

24 unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for

25 inconsistent or contradictory judgments and increases the delay and expense to all parties and to the

court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof. Plaintiff is not aware of any other current pending litigation against Defendant to which any Class member is a party involving the subject matter of this suit, and the Action presents no difficulties that will impede its management by the Court as a class action.

78.     Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2). Class certification is appropriate because Defendant acted on grounds generally applicable to the Class, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to Plaintiff and putative Class members. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that could establish incompatible standards of conduct for Defendant. Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendant.

**<u>COUNT I</u>**
**Breach of Contract**
**On behalf of a nationwide Class of Meta account users.**

79.     Plaintiff hereby repeats, realleges, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

80.     Defendant's Terms of Service provide that the laws of California will apply to any disputes between users, including Plaintiff and Class members, and Defendant.

81.     Defendant Meta, in its agreements with users, provides users with access to its social media platforms and their capabilities. Users agree to the conditions of Defendant Meta's Contract (*i.e.* Meta's Terms of Service and Privacy Policy) to use or continue to use Defendant's social media platforms.

82.     Defendant Meta and users mutually assented to, and therefore were bound by, Meta's Privacy Policy.

83.    Meta represents in its Terms of Service that it will "Promote the safety, security, and integrity of [its] services, combat harmful conduct, and keep [Meta's] community of users safe: . . . [Meta] work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and services[.]"[36]

84.    The Terms continue to tout Meta's "dedicated teams around the world, with external service providers, partners, and other relevant entities" that "develop advanced technical systems to detect potential misuse of [Meta's] Products, harmful conduct towards others, and situations where [Meta] may be able to help support or protect [its] community, including to respond to user reports of potentially violating content."[37]

85.    Defendant Meta and users also mutually assented to, and therefore were bound by, Meta's Privacy Policy.

86.    Meta represents in its Privacy Policy that it will "investigate suspicious activity, detect, prevent and combat harmful or unlawful behavior . . . , [and] detect and prevent spam and other bad experiences[.]"[38]

87.    By denying access to user's accounts and failing to remedy any account lockouts or takeovers, Defendant Meta fails to abide by its Contract. Defendant Meta failed to prevent account lockouts and takeovers, failed to mitigate existing account lockouts and takeovers, and failed to provide customer support services to users experiencing such account lockouts and takeovers.

88.    Defendant's violations continue to this day. As a direct and proximate result of Defendant's breach of contract, Plaintiff have suffered actual harm as detailed herein. Meta's Facebook Terms of Service contain a damages limitation provision setting a presumptive damage amount of $100 as the upper limit of liability for its consumer accounts. Meta's provision setting and

[36] Ex. A at 2.
[37] Id.
[38] Ex. B at 15.

22

1   limiting its aggregate liability to $100 is a liquidated damages provision because it predetermines the

2   amount of damages in the event that Meta breaches its contract. Plaintiff thus seeks $100 for Meta's

3   breach of its Contract for herself and similarly situated Class members.

4          89.    The $100 amount that Meta unilaterally predetermined as liquidated damages is a

5   reasonable estimate of damages related to the failure to protect personal information, as nominal

6   damages are available for such breach of contract claims.

7          90.    In the alternative, Plaintiff seeks nominal damages in an amount to be determined

8   fixing the amount of actual damages is impracticable or extremely difficult. The presumptive amount

9   of any such nominal damages is $100 based on the liquidated damages provision in the Terms of

10  Service.

11                                    **<u>COUNT II</u>**
                           **Violation of California's Unfair Competition Law ("UCL") -**
12                              **(Cal. Bus. & Prof. Code §17200, et seq.)**

13                   **On behalf of a nationwide Class of Meta account users.**

14         91.    Plaintiff hereby repeats, realleges, and incorporate by reference each and every

15  allegation contained above as though the same were fully set forth herein.

16         92.    Defendant's Facebook Terms of Service provide that the laws of California will apply

17  to any disputes between users, including Plaintiff and Class members, and Defendant.

18         93.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 1720.

19         94.    By reason of the conduct alleged herein, Defendant engaged in unlawful, unfair,

20  and/or fraudulent practices within the meaning of the UCL. The conduct alleged herein is a "business

21  practice" within the meaning of the UCL.

22         95.    Defendant violated the "fraudulent" prong of the UCL by misrepresenting, both by

23  affirmative conduct and by omission, that Plaintiff and Class members can maintain access or regain

24  access to their social media accounts.

25         96.    Based on Meta's representations about the security of its platforms, see supra § B,

and Meta's omissions, as it never informed Plaintiff and Class members that their accounts could be stolen with no recourse, Plaintiff and Class members believed that they would continue to have access to their private social media accounts and that Meta would not allow hackers to continue to use their accounts with impunity. Defendant's misrepresentations and omission that hackers could steal user accounts with impunity were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of Plaintiff's and Class members' personal information. Indeed, Plaintiff's and Class members' belief that Meta would maintain the security of their accounts, and would allow them to have access to their own accounts and personal information, were substantial factors in Plaintiff's and Class members' decisions to open and use their accounts and to provide their valuable personal information.

97.     Defendant continues to fail to live up to its representations and omissions on an ongoing basis. Defendant Meta continues to fail to allow Plaintiff and Class members to maintain private access to their social media accounts as Defendant Meta continues to fail to mitigate account takeovers and lockouts because it has process or measures to allow Plaintiff and Class members to regain access to their accounts.

98.     Defendant also violates the "unfair" prong of the UCL on an ongoing basis by engaging in unfair business practices under the "balancing test" because the harm caused by their actions and omissions, as described in detail supra, greatly outweigh any perceived utility. Indeed, Defendant' withholding of account access for Class members cannot be said to have had any utility at all, beyond that of an unfair and deceptive financial savings to Defendant at the expense of Class members.

99.     Defendant engages in unfair business practices under the "tethering test" because their actions and omissions, as described in detail supra, violated fundamental public policies expressed by the California Legislature.

100.     Further, Defendant engages in "unlawful" business practices on an ongoing basis with respect to the Class as a whole by failing to implement reasonable data security measures as required under legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code § 1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100.

101.     Defendant' violations of the UCL continue to this day. As a direct and proximate result of Defendant' violations of the UCL, Plaintiff and Class members have suffered harm, *inter alia*, as detailed herein, including the loss of their valuable personal information stored in their Meta accounts and the risk that their accounts and the identities associated with those accounts will be used for nefarious purposes.

102.     Plaintiff and Class members have an ongoing property interest in the personal information lost as a result of Defendant's conduct. Meta's failure to implement reasonable security measures to allow Plaintiff and Class members to regain access to their accounts allows hackers to continue to access and seize their property. Plaintiff and Class members lack an adequate remedy at law to address the future and ongoing harm described herein and are thus entitled to seek injunctive relief. Unless restrained and enjoined, Defendant will continue to misrepresent that it will provide adequate measures to allow users to regain access to their accounts, will continue to omit the truth that it allows hackers to abscond with accounts with no recourse for the real user, and will continue to deny Plaintiff and Class members access to their accounts.  Due to the ongoing nature of the harm, damages will be insufficient to address it.

103.     Plaintiff and the Class members are entitled to injunctive relief. Accordingly, pursuant to § 17203 of the UCL, Plaintiff and the other Class members seek an order that requires Defendant to:

A.     modify Defendant's practices in a manner that allows users to regain access to their

25

1   social media accounts and/or act on reports from users of lost access as a result of hacking and

2   restore access to account;

3         B.     modify Defendant's practices in a manner that providers customer support in the

4   event of account access difficulties or loss; and

5         C.     pay attorney fees and costs incurred by counsel for Plaintiff and the proposed Class

6   in accordance with the California Code of Civil Procedure § 1021.5.

7                               **PRAYER FOR RELIEF**

8       Wherefore, Plaintiff prays for a judgment:

9         A.     Certifying the Class as requested herein;

10       B.     Awarding damages to Plaintiff and Class members in the amount set in Meta's Terms

11           of Service;

12       C.     Entering an injuncting that requires Meta to comply with the UCL;

13       C.     Awarding attorneys' fees and costs; and

14       D.     Providing such further relief as may be just and proper.

15

16   Date: September 18, 2024             */s/  Annick M. Persinger*

                                   Annick M. Persinger (State Bar No. 272996)

17                            **TYCKO & ZAVAREEI LLP**

                            1970 Broadway, Suite 1070

18                            Oakland, California 94612

                            Telephone: (510) 254-6808

19                            Facsimile: (202) 973-0950

                            *apersinger@tzlegal.com*

20

21                            Hassan A. Zavareei (State Bar No. 181547)

                            Gemma Seidita (State Bar No. 322201)

22                            **TYCKO & ZAVAREEI LLP**

                           2000 Pennsylvania Avenue, Northwest, Suite 1010

23                            Washington, District of Columbia 20006

                           Telephone: (202) 973-0900

24                            Facsimile: (202) 973-0950

                           *hzavareei@tzlegal.com*

                           *gseidita@tzlegal.com*

25

1

2                                          *Attorneys for Plaintiff and the Putative Class*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CLASS ACTION COMPLAINT