1  Annick M. Persinger (State Bar No. 272996)
   **TYCKO & ZAVAREEI LLP**
2  1970 Broadway, Suite 1070
   Oakland, California 94612
3  Telephone: (510) 254-6808
   Facsimile: (202) 973-0950
4  *apersinger@tzlegal.com*

5

6

7  *Attorneys for Plaintiffs and the Putative Class*

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11

12  SARA ISGUR, ERIK BRAND, EDDIE          Case No. 3:24-cv-06559-WHO
    EDWARDS, LINDA METZLER, and
13  RICHARD REPP individually and on behalf of   **SECOND AMENDED CLASS ACTION**
    themselves and all others similarly situated,   **COMPLAINT**
14
                Plaintiffs,
15
          v.
16
    META PLATFORMS, INC.,
17
                Defendant.
18

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs Sara Isgur, Erik Brand, Eddie Edwards, Linda Metzler, and Richard Repp,

2    individually and on behalf of all others similarly situated, hereby brings this Amended Class Action

3    Complaint against Defendant Meta Platforms, Inc. ("Defendant" or "Meta") and, in support thereof,

4    alleges as follows:

5                              **PRELIMINARY STATEMENT**

6        1.    Meta owns and operates Facebook, one of the most popular social media platforms

7    that has a userbase of billions of people.

8        2.    Meta's adhesive Terms of Service (the "Terms") for Facebook, which "govern [the]

9    . . . access and use of Facebook," detail a clear and bargained for exchange between Meta and its

10   consumer users: in exchange for allowing Meta to use personal data that generates its income, Meta

11   agrees to provide users with its service. In other words, in exchange for providing personal data that

12   is worth millions to Meta in commercial and sponsored ad content, Meta agrees to provide its users

13   its service—individual Facebook accounts that can be used to connect to other accounts on the

14   Facebook platform.

15       3.    In violation of express terms of Meta's Terms and Privacy Policy (the "Contract"),

16   Meta fails to uphold its promise to provide users its service. Instead of providing the service it

17   promised in exchange for the use of personal information, Meta allows hackers to abscond with

18   hundreds of thousands of Facebook accounts, and the personal information therein, with impunity,

19   and continues to deny Plaintiffs and similarly situated non-business Facebook users access to their

20   own accounts.

21       4.    While Meta does not meet its obligation to provide the service it promised, Meta has

22   profited and continues to profit from the use of personal information provided by Plaintiffs and the

23   Class, and retains a broad, transferrable license over the content that Plaintiffs and the Class

24   published on the Facebook platform.[1] Indeed, collection and use of this data is how Meta profits

25

26

27   [1] Per its Terms of Service, Meta is awarded a "non-exclusive, transferrable, sub-licensable, royalty-free, and worldwide license to host, use distribute, modify, publicly perform or display, translate, and create derivative works of [a user's] content." This license only ends when the user's content is

28   deleted.

SECOND AMENDED CLASS ACTION COMPLAINT

from its Facebook platform and creates profitable new tech like Artificial Intelligence ("AI"). Thus, while Meta retains the benefit of the bargain, Plaintiffs and the Class have no access to their accounts nor the ability to restrict that license by altering or deleting such content.

5.      With its conduct Meta has breached several express provisions of its Terms. Based on these express promises, Plaintiffs and the Class legitimately expected that Meta would discharge its contractual obligations in good faith.

6.      Specifically, instead of collecting payment for its services, Meta collects personal data worth millions to it in ad dollars in exchange for its promise to provide its services—but then fails to provide the promised service despite continuing to use personal data. *See* Exhibit A at 5 ("Instead of paying to use Facebook …, by using the Meta Products covered by these Terms, you agree that we can show you personalized ads and other commercial and sponsored content that businesses and organizations pay us to promote on and off Meta Company Products …. We collect and use your personal data in order to provide the services described above to you").

7.      Meta further breaches its promises in its Terms that it "work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and services." *See* Exhibit A at 3.

8.      Similarly, Meta breaches promises in its Privacy Policy that it "will Investigate suspicious activity, . . . Detect, prevent and combat harmful or unlawful behavior, . . . Detect and prevent spam, other security matters and other bad experiences, Maintain the integrity of [Meta's] Products." *See* Exhibit B.

9.      Contrary to its express promises to provide services and to combat harmful or unlawful behavior, Meta knows (i) that hackers target Facebook to access the wealth of information related to users' accounts that Meta stores and also profits from, and (ii) that hackers breach Meta's security and gain unauthorized access to users' accounts. Despite its promises, Meta lets hackers take control of consumer accounts with impunity by failing to provide any recourse for consumers to take their accounts back from hackers. While users are locked out and are denied the service that was their end of the bargain, Meta continues to help itself to the information and content on their accounts, and profits from the same.

10.    Plaintiffs and tens of thousands of Facebook users who rely on access to these accounts to maintain relationships, access other online portals and communicate with friends and family, are unable to access their own content—including stored personal information, payment information, photographs, and communications—and cannot use Facebook as promised. Plaintiffs and the Class also cannot access their accounts to delete them to prevent Meta from continuing to profit from their personal information that they stored their based on their reasonable belief that Facebook would provide its service as promised. To make matters worse, as a result of Meta's continued failure to allow Plaintiffs and similarly situated users access to their accounts, users have been subjected to further harm by hackers posting inappropriate content, soliciting those in their social networks under false pretenses by masquerading as the users, and causing harm to users' goodwill and reputations. As such, Meta's notorious and repeat failure to protect users' data is a core problem worsened by Meta's recent and total failures to assist users who were locked out of other own accounts.

11.    Indeed, in breach of its express promises to provide services and prevent harmful unlawful behavior or provide steps for users to recover their accounts, Meta does not take reasonable efforts to help users who lose access to their accounts and information due to hacking because Meta decimated its customer support team in mass layoffs in late 2022 and early 2023. Critically, data reflects that hacking activity has increased dramatically following the time period during which these mass layoffs occurred. According to a letter sent by certain State Attorneys General to Meta on March 6, 2024, account takeover complaints rose almost threefold in just one year—from 270% to 740%. With no reliable recourse available through customer support, users affected by hacking cannot regain access to their accounts, while hackers continue to use them. By essentially gutting Facebook's customer support team, which it cut to increase its bottom line, Meta only provides a circular process whereby Meta does not meaningfully investigate users' claims of being locked out of their accounts, effectively giving hackers the green light to maintain control of Plaintiffs' and Class members' accounts.

12.    Meta breached its Contract where it promised to provide services and to combat harmful activity when it failed to create a reasonable process to prevent the hijacking of consumer

SECOND AMENDED CLASS ACTION COMPLAINT

1   accounts and then failed again to create a reasonable or even minimally effective process for Plaintiffs

2   and Class members to regain the use of their valuable non-commercial Facebook accounts, including

3   the personal information stored on those accounts, while hackers continue to use them. As a result

4   of Meta's breach of its promises, Plaintiffs and Class members lost access to their user-generated

5   content, including photographs and posts, and their networks of "friends" and "followers" on their

6   compromised personal Facebook accounts.

7       13.    Accordingly, Plaintiffs bring this action on behalf of themselves and other similarly

8   situated Facebook users for Meta's breaches of the express terms in its adhesive Contract seeking

9   liquidated damages—as Meta specifies $100 in liquidated damages for a breach of its Terms. Plaintiffs

10  and the Class members also bring claims for Meta's breach of the covenant of good faith and fair

11  dealing.

12      14.    Plaintiffs and Class members bring an alternative claim of unjust enrichment and a

13  claim for restitution under California's Unfair Competition Law (the "UCL"), Bus. & Prof. Code §§

14  17200 *et seq.* because, while Plaintiffs' and Facebook's locked-out users have no recourse to regain

15  access to their accounts and their personal data therein, Meta continues to profit from the valuable

16  information on their accounts.

17      15.    Plaintiffs and Class members also continue to be harmed by Meta's failure to provide

18  recourse for hacking as Plaintiffs and Class members continue to be victimized by hacking as they

19  cannot regain access to their accounts while hackers continue to use the stolen accounts, as well as

20  the stolen personal information associated with that account. As such, Plaintiffs and Class members

21  also bring an action for injunctive relief to regain access to their Facebook accounts under the UCL,

22  Bus. & Prof. Code §§ 17200 *et seq.*

23                                  **PARTIES**

24      16.    Plaintiff Sara Isgur is, and at all relevant times, was a citizen of the State of California

25  residing in San Diego. As set forth more fully in paragraphs 46-55, Plaintiff Isgur had a personal

26  account on Facebook, and was a Facebook user for many years. She signed up with Facebook to stay

27  in touch with family and friends on the East Coast, where she is originally from. She also used her

28  Facebook account to make connections with others in the real estate industry and her local

community in San Diego. As a result of a failure by Meta's security system, in June 2023, Plaintiff Isgur's longstanding personal Facebook account was compromised by hackers in minutes. When Meta's security system failed and hackers stole her account, she lost access to years of photos, posts, personal messages, business and personal connections, and more. Plaintiff Isgur attempted to follow all account retrieval steps provided by Meta's computer-based customer support system, but could not do so, as the hacker or hackers had already changed the email and phone number associated with her account. When that effort to regain access to her accounts failed, she reported the hacking via her partner's separate Facebook account and did not receive a response. Plaintiff Isgur also sent a letter to Meta Headquarters, pleading for help with her hacked account, and did not receive a response. Plaintiff Isgur has still not regained access to her Facebook account. Instead of assisting or enabling Plaintiff Isgur to regain access to and use her account, Meta turns a blind eye as the hacker or hackers of Plaintiff Isgur's account continue to use her account to try to financially scam her friends and family. Plaintiff Isgur has repeatedly contacted Meta to regain access to her Facebook account to no avail. Instead, Meta allows hackers to control her account with impunity, profits from the data Plaintiff posted while she had access to that account, and retains a license over the information Plaintiff published on her account that Plaintiff cannot modify, while preventing Plaintiff from regaining access herself.

17.    Plaintiff Erik Brand is, and at all relevant times, was a citizen of the State of California residing in Los Angeles. As set forth more fully in paragraphs 56-69, Plaintiff Brand had a personal account on Facebook, and was a Facebook user for many years. He signed up with Facebook to stay in touch with family and friends, to post content, and view or engage with the content posted by his connections or on pages he was interested in. As a result of a failure by Meta's security system, in August 2024, Plaintiff Brand's longstanding personal Facebook account was compromised by an unauthorized user. When Meta's security system failed and the hacker or hackers stole his account, he lost access to years of photos, posts, personal messages, personal connections, and more. Plaintiff Brand has not regained access to his Facebook account. Instead, he received notifications that his personal account was suspended for a content violation, and then that an "Ad Account" connected to his email was disabled from advertising due to the content that the hacker posted; however, Plaintiff

6

1    Brand never set up an "Ad Account" so upon information and belief, this was another action taken

2    by the hacker once Plaintiff Brand's account was compromised. Plaintiff Brand attempted to follow

3    all remedial steps provided by Meta's computer-based customer support system, including by

4    providing a photograph of himself, but it did not restore his access to his Facebook account. Plaintiff

5    Brand emailed Meta multiple times in an attempt to reach a human Meta employee to receive account

6    retrieval assistance, but was unable to do so. Plaintiff Brand also filed reports with the Federal Trade

7    Commission, the Better Business Bureau, the Federal Bureau of Investigations (FBI), and his local

8    police department relating to the takeover of his Facebook account and any actions potentially taken

9    by the hacker or hackers while on his account. Instead of assisting or enabling Plaintiff Brand to regain

10   access to and use his account, Meta turned a blind eye to the hacker or hackers of Plaintiff Brand's

11   personal Facebook account, and profited from the data that Plaintiff Brand posted while he had access

12   to his account. Meta also retained a license over the content that Plaintiff Brand published on his

13   account that he could not modify while he was locked out of the account.

14         18.    Plaintiff Eddie Edwards is, and at all relevant times, was a citizen of the State of

15   Alabama residing in Prattville. As set forth more fully in paragraphs 70-84, Plaintiff Edwards had a

16   personal account on Facebook and was a Facebook user for many years. He signed up with Facebook

17   to stay in touch with family and friends. As a result of a failure by Meta's security system, in March

18   2025, Plaintiff Edwards' longstanding personal Facebook account was compromised by hackers in

19   minutes. When Meta's security system failed and hackers stole his account, he lost access to years of

20   photos, posts, personal messages, business and personal connections, and more. Plaintiff Edwards

21   attempted to follow all account retrieval steps provided by Meta's computer-based customer support

22   system, but could not do so, because the recovery link sent by Meta did not work, nor did the access

23   codes sent by Meta. When that effort to regain access to his accounts failed, he asked his wife to

24   report and comment on the fraudulent posts made by the hackers, but  Facebook took no action.

25   [Confirm if any other actions taken]. Plaintiff Edwards has still not regained access to his Facebook

26   account. Instead of assisting or enabling Plaintiff Edwards to regain access to and use his account,

27   Meta turns a blind eye as the hacker or hackers of Plaintiff Edward's account continue to use his

28   account to try to financially scam his friends and family, and attempt to open business accounts

7

1   connected to his personal account. Plaintiff Edwards has repeatedly contacted Meta to regain access
2   to his Facebook account to no avail. Instead, Meta allows hackers to control his account with
3   impunity, profits from the data Plaintiff Edwards posted while he had access to that account, and
4   retains a license over the information Plaintiff Edwards published on his account that Plaintiff
5   Edwards cannot modify, while preventing Plaintiff Edwards from regaining access himself.

6       19.     Plaintiff Linda Metzler is, and at all relevant times, was a citizen of the State of
7   Missouri residing in St. Louis. As set forth more fully in paragraphs 85-94, Plaintiff Metzler had a
8   personal account on Facebook, and was a Facebook user for many years. She signed up with
9   Facebook to stay in touch with family and friends. As a result of a failure by Meta's security system,
10  in January 2025, Plaintiff Metzler's longstanding personal Meta accounts, including her personal
11  Facebook account, were compromised by hackers in minutes. When Meta's security system failed
12  and hackers compromised her Meta accounts, Meta disabled her Facebook account and she lost
13  access to years of photos, posts, personal messages, personal connections, and more. Plaintiff
14  Metzler could not recover her account using the steps provided by Meta, nor did she receive a
15  response in the "Report a Problem" link in Meta's help center on Facebook and Instagram. Plaintiff
16  Metzler repeatedly contacted Meta to regain access to her Facebook account to no avail. While
17  Plaintiff Metzler still has access to her Instagram account, her Facebook account was ultimately
18  suspended due to actions taken by the hacker. Instead of assisting or enabling Plaintiff Metzler to
19  regain access to and use her account, Meta turned a blind eye and took no action to assist in the
20  recovery of her Facebook account. Adding insult to injury, upon deciding to suspend her account,
21  Meta provided Plaintiff Metzler a link to download her content from Facebook, but that link did not
22  work.

23      20.     Plaintiff Richard Repp is, and at all relevant times, was a citizen of the State of
24  Washington residing in Spokane. As set forth more fully in paragraphs 95-109, Plaintiff Repp had a
25  personal account on Facebook, and was a Facebook user for nearly 20 years. He signed up with
26  Facebook to stay in touch with family and friends and used it to share treasured photographs,
27  including photographs from his wedding. As a result of a failure by Meta's security system, in
28  September 2024, Plaintiff Repp's longstanding personal Facebook account was compromised by

1  hackers while he was asleep. When Meta's security system failed and hackers stole his account, he

2  lost access to years of photos, posts, personal messages and personal connections, and more. Plaintiff

3  Repp first attempted to recover his account through the automated recovery options available to him

4  on Facebook's log in page, then attempted to follow all account retrieval steps emailed to him. These

5  attempts to recover his account were unsuccessful because Facebook experienced a system error in

6  response to his efforts to upload identification documents, the links provided to him through

7  Facebook's automated email were nonfunctional or expired, and because the hacker or hackers

8  changed the contact information associated with his account. Plaintiff Repp has repeatedly contacted

9  Meta to regain access to his Facebook account to no avail, and even reached out to third party IT

10  companies for support. Plaintiff Repp has not received any notification that his account has been

11  closed, so upon information and belief, his account is still being controlled by the hacker or hackers,

12  while Meta profits from the content Plaintiff Repp posted through a license that Plaintiff Repp

13  cannot revoke. Plaintiff Repp has still not regained access to his Facebook account and fears that the

14  nearly 20 years of personal content is gone. Instead of assisting or enabling Plaintiff Repp to regain

15  access to and use his account, Meta turned a blind eye.

16       21.      Defendant Meta is a California corporation with its principal place of business located

17  at 1 Hacker Way, Menlo Park, CA 94025. Meta is a leading global social media and social networking

18  company. Meta is a Fortune 500 company with an annual revenue of 134.9 billion in 2023, and

19  market capitalization of 1.55 trillion as of January 2025. As part of its operations, Meta owns and

20  operates the website www.facebook.com, and the associated Facebook application. At all relevant

21  times, Meta was, and is, engaged in business in San Mateo County and throughout the United States

22  and the world.

23                          **JURISDICTION AND VENUE**

24       22.      This Court has subject matter jurisdiction under the Class Action Fairness Act

25  ("CAFA"), 28 U.S.C. § 1332(d)(2)(A) because there are 100 or more Class members, at least one

26  Class member is a citizen of a state that is diverse from Defendant's citizenship, and the matter in

27  controversy exceeds $5 million, exclusive of interest and costs.

28       23.      This Court also has subject matter jurisdiction over the equitable injunctive relief

1    claims at issue as legal damages cannot remedy future harm.

2        24.    This Court has personal jurisdiction over Meta because Meta is a corporation that

3    resides in this District. Defendant operates, conducts, and engages in substantial business in this

4    judicial district; Defendant caused injury to persons within this State; and a substantial portion of the

5    actions giving rise to the claims took place in this State.

6        25.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because this

7    is a judicial district in which a substantial part of the vents or omissions giving rise to the claim

8    occurred, or a substantial part of the property that is the subject of the action is situated, and pursuant

9    to Meta's Terms which designate the Northern District of California as the appropriate venue for a

10   federal action.[2]

11                              **FACTUAL ALLEGATIONS**

12   **A.    Meta's vast Facebook platform is a routine target for hackers.**

13       26.    Facebook is amongst the most popular social media platforms in the world. For

14   example, Meta's Facebook platform has roughly 3.065 billion monthly average users and 2.11 billion

15   daily users. In fact, 56.76% of the world's active internet users access Facebook every month.[3]

16       27.    Because Meta encourages users to share information on its platforms—so it can

17   profit from that information—hackers routinely target and successfully access the valuable

18   information Meta stores related to users' accounts.

19       28.    Hackers accomplish account takeovers in multiple ways, including gaining access to

20   an account through password breaking (whereby a password is guessed), cookie theft, phishing, or

21   impersonation of Meta support professionals. Once the account has been taken over, hackers will

22   change passwords, phone numbers, and email addresses, and add security keys and two-factor

23   authentication to lock out the rightful owner.[4]

24

25   [2] *See* Ex. A at 10 ("You and Meta each agree that any claim, cause of action, or dispute between us
     that arises out of or relates to these Terms or your access or use of Meta Products shall be resolved
26   exclusively in the U.S. District Court for the Northern District of California or a state court located
     in San Mateo County.")

27   [3] *Facebook User & Growth Statistics,* BACKLINK, https://backlinko.com/facebook-users (last updated
     Sep. 4, 2024).

28   [4] Amanda Florian, *The anatomy of a Facebook account heist*, VOX,

SECOND AMENDED CLASS ACTION COMPLAINT

29.    After an account takeover, a hacker can access and misuse private information, including users' full names, birth dates, and credit card information, read the users' private communications, make public posts to scam the user's contacts or the public at large, and take other nefarious actions.[5]

30.    Indeed, compromised Meta accounts are so valuable that they can sell on the dark web for $50 - $75 or more depending on how long the account has been active.[6]

31.    After hackers stole Plaintiffs' and Class members' accounts with account takeovers, Meta breached and continues to breach its Contract by failing to oust the hackers and return access to Plaintiffs and Class members.

**B.    Meta promises in its Contract that it will provide Plaintiffs and Class members its services and that it will combat harmful and unlawful conduct.**

32.    Meta is the unilateral author of its adhesive Contract, which Meta states governs the course of conduct between Facebook users and itself. In the Contract, Meta expressly details the value exchange between Meta and its users. Instead of paying cash to Meta to use Facebook, Plaintiffs and similarly situated class members paid Meta with their personal information, which is worth millions to Meta, in exchange for Meta's service:

> Instead of paying to use Facebook and the other products and services we offer, by using the Meta Products, covered by these Terms, you agree that we can show you personalized ads and other commercial and sponsored content that businesses and organizations pay us to promote on and off Meta Company Products. We use your personal data such as information about your activity and interests, to show you personalized ads and sponsored content that maybe more relevant to you.

Ex. A at 3. Meta continues to benefit from this arrangement, which provides it a broad license over all content that users "post or upload," until the user deletes the content:

> [W]hen you share, post, or upload content . . . you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use distribute, modify, run, copy, publicly perform or display, translate and create derivative works of your content. . . This license will end when your content is deleted from our system . . . You can delete individual content you share, post, and upload at any time . . . this license will continue until the content has been fully deleted.

https://www.vox.com/technology/2023/9/28/23892964/facebook-account-hacked-theft-stolen-online-scams-meta (Sept. 29, 2023).
[5] *Id.*
[6] *Your Hacked Facebook Account Goes for $75 on the Dark Web*, BITDEFENDER, https://www.bitdefender.com/blog/hotforsecurity/your-hacked-facebook-account-goes-for-75-on-the-dark-web/ (June 18, 2020).

Ex. A at 7-8.

33.     Thus, Facebook's users confer a benefit on Meta through permitting Meta to use their personal data and giving Meta an expansive license to the content they post or publish on Facebook. In exchange, the users are permitted to use Facebook's platform.

34.     Meta also promises that it will maintain the security and availability of its platform. Meta's Terms state that Meta will "Promote the safety, security, and integrity of [its] services, combat harmful conduct, and keep [Meta's] community of users safe: . . . [Meta] work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and services[.]"

35.     In its adhesive Contract, Meta promises the support of Meta's "dedicated teams around the world, with external service providers, partners, and other relevant entities" that "develop advanced technical systems to detect potential misuse of [Meta's] Products, harmful conduct towards others, and situations where [Meta] may be able to help support or protect [its] community, including to respond to user reports of potentially violating content." The Term further give Meta the sole ability to address such issues: "If we learn of conduct like this, we may take appropriate action based on our assessment that may include – notifying you [and] offering help[.]."

36.     The Contract also states that Meta "may disable or delete your account if after registration your account is not confirmed, your account is unused and remains inactive for an extended period of time, or if we detect someone may have used it without your permission and we are unable to confirm your ownership of the account. Learn more about how we disable and delete accounts." Following the link incorporated by reference in the phrase "Learn more," leads to another page where Meta states it "may disable or delete your account if it appears to have been hacked or compromised and we are unable to confirm ownership of the account after a year, or if the account is unused and remains inactive for an extended period of time."[7] It further promises that, in such a case, there are "steps you can take to unlock your account."[8]

---

[7] *Facebook's policies on disabling or deleting hacked, unused or unconfirmed accounts,* META, https://www.facebook.com/help/3434203120011796 (last accessed January 21, 2025).
[8] *Id.*

37.    Thus, per the terms of its Contract, investigating account takeovers, restoring access to locked out users, and deleting or disabling stolen accounts is within Meta's sole discretion.

38.    Meta's Privacy Policy, which is incorporated by reference in the Terms and that is thus part of the Contract, states that it will work to do a number of things including the following to "promote safety, security and integrity":

      a.    "Verify accounts and activity;"

      b.    "Investigate suspicious activity;"

      c.    "Detect, prevent and combat harmful or unlawful behavior;"

      d.    "Detect and prevent spam and other bad experiences;"

      e.    "Detect and stop threats to our personnel and property;"

      f.    "Maintain the integrity of [Meta's] Products[.]"

**C.    Meta breached its promises to provide service and to maintain the security and availability of its platforms.**

35.    Despite its promises to provide services and to combat harmful and unlawful behavior, after hackers accomplish an account takeover Meta does not actually offer reasonable means to allow users in regaining access to their accounts. Instead, Meta allows hackers to continue their access to misappropriated user accounts. As a result, locked out users are left vulnerable to hackers' nefarious use of their accounts and identities.

36.    In violation of its contractual agreement to provide service and to maintain the security and availability of its platform for its users, Meta intentionally abandoned users to victimization by hackers. Specifically, in late 2022, Meta laid off approximately 11,000 people, or about 13% of its workforce.[9] Then, in early 2023, after declaring 2023 to be Meta's "year of efficiency," Meta laid off another 10,000 employees concentrated in the customer service and support communities, removing opportunities for human intervention and abandoning users to ineffective automated support systems that have already been shown to cause cascading harms to victims, and their contacts leaving users

---

[9]    *Meta Lays Off More Than 11,000 Employees*, THE NEW YORK TIMES, https://www.nytimes.com/2022/11/09/technology/meta-layoffs-facebook.html (November 9, 2022) (discussing layoffs of approximately 11,000 people or 13% of its workforce in November 2022).

1   with no recourse.[10] Following these massive layoffs, Meta did not provide sufficient customer support

2   to assist consumers in regaining access to their personal accounts that have been stolen by hackers.

3       37.    The results were predictable and immediate—a substantial increase in the number of

4   account takeover complaints was observed by 40 state attorneys general and the attorney general for

5   the District of Columbia in the months following Meta's announced layoffs. For example, the New

6   York Attorney General's office received 73 account takeover complaints in 2019 and that number

7   grew to 783 in 2023. As of January 2024, New York had already received 128 complaints; Vermont

8   reported a 740% increase in complaints from 2022 to 2023, North Carolina reported a 330% increase

9   from 2022 to 2023; Pennsylvania reported a 270% increase from 2022 to 2023; and Illinois reported

10  a 256% increase from 2022 to 2023.[11]

11      38.    While Facebook users were met with diminished customer support options, Meta's

12  financials flourished as predicted. In an 8K filed contemporaneously with the public disclosure of the

13  layoffs, Meta projected that its operating expenses would drop some $3 billion dollars for 2023.[12]

14  Likewise, Meta's share price closed up 7% on the date of the disclosure of the additional layoffs.[13]

15  Meta's "year of efficiency" paid off, after Q4 of 2023, Meta "tallied its most profitable quarter—and

16  year—ever ."[14]

17

18  [10] *Meta to lay off 10,000 more workers after initial cuts in November*, CNBC,
https://www.cnbc.com/2023/03/14/meta-layoffs-10000-more-workers-to-be-cut-in-
19  restructuring.html (last updated March 14, 2023) (reporting that CEO Mark Zuckerberg
communicated to analysts that Meta planned "on cutting projects that aren't performing or may no
20  longer be crucial" and declaring 2023 to be a "year of efficiency"); *Meta's job cuts are gutting customer
service, leaving influencers and businesses with nobody to call*, CNBC,
21  https://www.cnbc.com/2023/04/05/meta-layoffs-gut-customer-service-leaving-influencers-
without-reps.html (last updated April 5, 2023) (reporting additional layoffs of nearly 10,000 employees
22  around March 13, 2023).
[11] Ltr. Re: *Meta Account Takeovers and Lockouts*, NAT'L ASS'N OF ATTORNEYS GENERAL, *available at*
23  https://www.naag.org/wp-content/uploads/2024/03/Policy-Letter-to-Meta-on-Account-
Takeover-2024-03-06.pdf (Mar. 5, 2024) ("State AG Ltr."), at 3.
24  [12] *Form 8K, Current Report Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934, Meta
Platforms, Inc.*, United States Securities and Exchange Commission,
25  https://www.sec.gov/ix?doc=/Archives/edgar/data/1326801/000132680123000035/meta-
20230314.htm (Mar. 14, 2023).
26  [13] *Meta to lay off 10,000 more workers after initial cuts in November*, CNBC,
https://www.cnbc.com/2023/03/14/meta-layoffs-10000-more-workers-to-be-cut-in-
27  restructuring.html (Mar. 14, 2023).
[14] Derek Saul, FORBES, *Meta Earnings: Zuckerberg's 'Year of Efficiency' Nets Greatest Profits Ever* (Feb. 1,
28  2024), *available at* https://www.forbes.com/sites/dereksaul/2024/02/01/meta-earnings-
zuckerbergs-year-of-efficiency-nets-greatest-profits-ever/.

39.     By slashing its customer service teams, and rendering them incapable of meeting the promises made to provide service or to respond to "user reports of violating content" (in this case, the account takeover) or to offer "steps you can take to unlock your account" that actually work, Meta has left its billions of users unable to access basic support functions, including regaining access to accounts that have been taken over by nefarious actions. Meta's discretionary failure to restore account access is in bad faith, and instead it impermissibly exercises discretion to benefit its bottom line.

40.     At the same time, Meta still profits from the personal data of the users who are locked out, and still retains a license over the posted content of users who cannot modify or terminate that license by deleting the content, while its users are deprived from the benefit of using the Facebook platform. Declining to restore access to locked out users while benefiting from their data and posted content frustrates the purpose of the contract and denies Plaintiffs and the Class of the benefit of the bargain.

41.     Meta's inability to restore its users' accounts since the layoffs has been well-documented,[15] and Meta is aware of the same.

42.     Following the layoffs, those who have had their accounts compromised do not have clear, adequate recourse.[16] As the number of account takeovers increase, many victims left confused and frustrated by Meta's reporting systems are turning to lawmakers, state attorneys general, the Federal Trade Commission, and even the FBI[17] to restore their accounts, placing an unnecessary burden on these public resources.[18] Meta's decision to delegate customer support to an ineffective web form and alleged "support emails" that go unanswered has, in fact, allowed further hacking—it gives hackers the opportunity to pose as Meta employees in the gap left by Meta's deleted customer

---

[15] See, *e.g.*, State AG Ltr.; Rosa Marchitelli & Jean Blair, *Facebook account takeovers are targeting people you know, turning friendship into fraud*, CANADA BROAD. CORP. NEWS (May 27, 2024), https://www.cbc.ca/news/canada/new-brunswick/facebook-account-taken-over-friends-scam-1.7205356; Lauren Strapagiel & Tanya Chen, *Influencers Are Taking Desperate Measures To Recover Their Instagram Accounts*, BUZZFEED NEWS (Aug. 24, 2021); https://www.buzzfeednews.com/article/laurenstrapagiel/creators-instagram-dealers-restore-accounts; Anthony Schoettle, *Hackers Increasingly Target Instagram Accounts*, INDIANA CHAMBER OF COMMERCE (May 11, 2022), https://www.indianachamber.com/hackers-increasingly-target-instagram-accounts/.

[16] Florian, *supra* note 4.

[17] *Id.*

[18] State AG Ltr. at 3.

15

service operation.[19]

43.    While Meta's decision to remove all pretense of customer support improved its bottom line,[20] Plaintiffs and Class members have paid the price because Meta's inability to allow users to regain access to accounts where their personal information is stored—including *inter alia* full names, dates of birth, credit card numbers, biological information, education information, and job history—results in users continued victimization by hacking, puts them at risk for additional fraud as that information could be used to gain access to the victim's other accounts, and totally frustrates the purpose of the Contract between Meta and its users.

44.    As a result of these breaches of Contract and the covenant of good faith and fair dealing within, Plaintiffs and Class members have been harmed by the loss of their accounts, the ability to use the Facebook platform, and the loss of control over the license that Meta is granted, which constitute further breaches to the Contract.

45.    Plaintiffs and Class members are thus entitled to damages in the $100 aggregate amount set by Meta's Terms.  In the alternative, Plaintiffs and the Class are entitled to nominal damages for Meta's breach, and/or restitutionary relief.

### D.    Meta failed to restore Plaintiffs' access to their non-commercial Facebook account.

#### *Plaintiff Isgur's Experience*

46.    After hackers took over Plaintiff Isgur's non-commercial Facebook account, Meta failed to restore her access to that account and she lost access to years of photos, posts, personal messages, business and personal connections, and more, Meta still benefits from the unauthorized use of her account.

---

[19] *See id.* ("In the absence of help from Meta, thousands of victims of account theft have come together in Facebook groups, on X, and in reddit threads, where they share tips and information about the hacks. The groups are filled with concerned users, but they're also filled with even more hackers hiding behind AI-generated photos and stock images."); *see also* Adi Robertson, *Meta reportedly punished dozens of employees for offering an inside line to account recovery*, THE VERGE (Nov. 17, 2022), https://www.theverge.com/2022/11/17/23464297/meta-allegedly-fired-contractors-employees-oops-account-recovery-abuse; Strapagiel & Chen, *supra* note 15.

[20] Derek Saul, FORBES, Meta Earnings: Zuckerberg's 'Year of Efficiency' Nets Greatest Profits Ever (Feb. 1, 2024) (following Q4 of 2023, Meta "tallied its most profitable quarter—and year—ever").

47.     Plaintiff Isgur had previously used Facebook for many years.

48.     On the evening of June 21, 2023 Plaintiff Isgur's Facebook and Instagram accounts were hacked by an unknown user. The hacker immediately changed the password, mobile phone number, and email address associated with her accounts.

49.     Plaintiff Isgur received a notification from Facebook that the email and phone number associated with her account had been changed; she tried to log in and was unable to do so.

50.     Because Plaintiff Isgur's Facebook account was so swiftly compromised, she lost access to the online account reporting menu features that Meta's platform users can access through the platform when logged in. That same evening, Plaintiff Isgur used the automated support options that were available to her without having a logged in account, including submitting a copy of her driver's license to confirm her identity, but none of these measures were successful at restoring Plaintiff's access to her account. The day after her account was hacked, Plaintiff Isgur used her partner's account to report that Plaintiff's account had been hacked in violation of Meta's Terms; however, neither she nor her partner ever received a response from Meta.

51.     Realizing that she could not access automated user support because it was only accessible through the account she no longer had access to, Plaintiff Isgur called a Facebook Headquarters phone number she found on the internet by searching "how to contact Facebook," and left a message asking for help retrieving her hacked account. She did not receive a response. Next, Plaintiff Isgur sent a letter to Meta's Headquarters at 1 Hacker Way in Menlo Park, again asking for assistance with her hacked account. She did not receive a response.

52.     Approximately a week after she was hacked, Plaintiff Isgur received a phone call from a friend, who reported that the hacker had posted a link on Plaintiff Isgur's Facebook page pretending to be Plaintiff Isgur, and that the friend had provided the hacker with her own email, phone number, and list of contacts through the link. It was only when the hacker requested Plaintiff Isgur's friend's social security number that the friend realized that she was not communicating with Plaintiff Isgur and that this was part of a financial scam.

53.     Soon after Plaintiff Isgur's account was hacked, other friends notified her that the hacker posted a financial scam using Plaintiff Isgur's account. Plaintiff encouraged her friends to

1  report the hacked account using Facebook's user support system. Plaintiff's friends reported the post

2  as violating Meta's Terms, but like Plaintiff Isgur and her partner, never received a response from

3  Facebook. The hacker or hackers posted a financial scam using Plaintiff Isgur's account at least two

4  more times after the hacked account had been reported to Facebook by Plaintiff's friends.

5        54.    In late October 2023, Plaintiff Isgur learned that her cousin, with whom she

6  maintained a close connection by communicating on the Facebook platform, had died on October

7  6, 2023. Because news of her cousin's death and of the memorial service was only shared on

8  Facebook and was thus inaccessible to Plaintiff Isgur who was locked out of her account, Plaintiff

9  Isgur not only learned of her cousin's death after some time, but also missed the memorial service.

10  The memorial service had been held quickly after her cousin's death, following Jewish religious

11  practices, so timely notification of his passing was vitally important. Plaintiff Isgur was devastated at

12  the belated news of her cousin's death and that she had missed the chance to honor his passing.

13        55.    In November 2023, frustrated with the lack of assistance or even a response from

14  Facebook to her account hacking, Plaintiff Isgur contacted the Office of California's Attorney

15  General and used their online Consumer Complaint system to submit a complaint about Meta's

16  failure to protect user accounts from hacking. Plaintiff Isgur also contacted the FBI to report the

17  Facebook account hacking.

18  *Plaintiff Brand's Experience*

19        56.    After hackers took over Plaintiff Brand's non-commercial Facebook account, Meta

20  failed to restore his access to that account and he lost access to years of photos, posts, personal

21  messages, personal connections, and more.

22        57.    Plaintiff Brand had previously used Facebook for at least 15 years.

23        58.    On or around August 3, 2024 while Plaintiff Brand was away from his computer, he

24  received an email from Meta's email account "security@facebookmail.com" notifying him that his

25  account was suspended and that he had 180 days to take action.

26        59.    Upon  information and belief, the actions taken by an unauthorized user resulted in

27  Plaintiff Brand's personal Facebook becoming suspended.

28        60.    Minutes after receiving an email that his personal Facebook account was suspended,

1    Plaintiff Brand received an email from Meta's "advertise-noreply@support.facebook.com" that "his"

2    Ad Account was disabled from advertising because of inauthentic behavior or violations of Meta's

3    advertising policies; however, Plaintiff Brand never linked his personal Facebook account an Ad

4    Account. Upon information and belief, the hacker or hackers who compromised his account either

5    created an Ad Account linked to his personal account or linked it to a business page or account after

6    compromising Plaintiff Brand's personal account.

7         61.    Several hours later, on or around August 3, 2024, Plaintiff Brand received an email

8    from "security@facebookmail.com" with the subject line "Did you just reset your password" and

9    notifying him that the password for his email account was changed. Then, Plaintiff Brand received a

10    different email with the Facebook account recovery code.

11         62.    Plaintiff Brand was distraught both because of his inability to access his account (and

12    memories and social connections therein) and because he was concerned with the actions that hacker

13    took in his account and resulting reputational or even legal harm. Because Plaintiff Brand could not

14    access his account, he has no idea what was posted.

15         63.    Plaintiff Brand attempted to complete the automated account recovery options

16    provided by Meta, including sending a picture of himself for verification as instructed, but was unable

17    to regain access to his account.

18         64.    This led Plaintiff Brand to reach out to other Meta email addresses including

19    "support@fb.com" and "disabled@fb.com" beginning on or around August 4, 2024. Plaintiff Brand

20    did not receive any response from Meta.

21         65.    In fact, Plaintiff Brand never once interacted with a human in his attempts to regain

22    access to his account.

23         66.    On or around August 4, 2024, Plaintiff Brand visited his local police department to

24    report the compromise of his identity through his Facebook account and his account's suspension.

25         67.    On or around August 5, 2024, Plaintiff Brand completed a IC3 Complaint Form for

26    the FBI, and subsequently visited a local FBI Field Office because he was concerned about the

27    compromise of his identity through his Facebook account and the resulting suspension of his

28    account.

SECOND AMENDED CLASS ACTION COMPLAINT

68.     Within days of his account being compromised, Plaintiff Brand also filed reports with the Better Business Bureau and the Federal Trade Commission regarding his inability to access his account.

69.     Today, Plaintiff Brand does not have access to his Facebook account. Instead of assisting Plaintiff Brand with regaining access to Facebook, and nearly two decades of personal connections, posts and other content, and community, Meta turned a blind eye while profiting on his user content and information, including by restricting his ability to modify the license Meta retains over the content associated with his profile.

*Plaintiff Edwards' Experience*

70.     After hackers took over Plaintiff Edwards' non-commercial Facebook account, Meta failed to restore his access to that account and he lost access to years of photos, posts, personal messages, business and personal connections, and more, while Meta still benefits from the unauthorized use of his account.

71.     Plaintiff Edwards had previously used Facebook for many years.

72.     On March 5, 2025 at around 3:20AM CST, Plaintiff Edwards' Facebook account was hacked by an unknown user.

73.     The unknown user set up a business account connected to Plaintiff Edwards' personal account. Plaintiff Edwards did not previously have a business account.

74.     That unknown user also enrolled the business account into "Meta Verified" and Plaintiff Edwards' personal account into "Facebook Protect." Plaintiff Edwards was not previously enrolled in either of these services.

75.     Minutes later, Plaintiff Edwards received an email from Meta's notification@facebookmail.com with text in Vietnamese and English asking him to confirm that his personal email address should be the new updated email address for a business page called "Ballers Baseball."

76.     At 3:25AM CST, Plaintiff Edwards received an email from Meta's security@facebookmail.com account asking him if he added the email "jordtoharaqg@outlook.com" to his Facebook account. That email said "If this wasn't you, we're here to help you take some simple

1    steps to secure your account." The email said that the request to change the email address came from

2    New York, NEW YORK US on Wednesday, March 5, 2025 at 4:24PM, despite the fact that the

3    email was sent at 3:25AM that same day.

4          77.    At 3:36AM CST, Plaintiff Edwards received an email from Meta's

5    security@facebookmail.com account transmitting a code to in response to a request the unauthorized

6    user made to change his password. The email said "If you got this email but aren't trying to reset

7    your password, let us know. You don't need to any further steps, as long as you don't share this code

8    with anyone."

9          78.    Seconds later, Plaintiff Edwards received a security alert email from Meta's

10    security@facebookmail.com account stating that his password has been changed. The email said that

11    the password was changed from the location New York, NEW YORK US on Wednesday, March 5,

12    2025 at 4:36PM, despite the fact that the email was sent at 3:36AM. The email further stated "if this

13    wasn't you, we're here to help you take some simple steps to secure your account."

14          79.    Plaintiff Edwards was asleep, and despite Meta's representation that Plaintiff

15    Edwards would not need to take any action to secure his account as long as he and did not make the

16    request to change the code or share the code with anyone, he still lost access to his personal Facebook

17    account in a matter of minutes.

18          80.    Plaintiff Edwards attempted to use the support options alluded in the emails sent to

19    him when he woke up and learned that his account was compromised. These support options

20    required him to take actions including uploading a picture of his driver's license and a selfie video to

21    confirm his identification.

22          81.    Despite completing the steps multiple times and receiving messages that his identity

23    had been "verified" and thanking him for letting Meta know the changes in his account were not

24    made by him, the recovery links provided by Meta were nonfunctional, as were the temporary

25    passwords provided. During his multiple attempts to complete these steps he received error

26    messages. In one instance, Plaintiff Edwards was asked to confirm his telephone number, but the

27    field for the telephone number did not populate.

28          82.    Because Plaintiff Edwards was still logged into his Facebook account on his cell

phone's Safari browser, he was able to see the actions being taken from his account but could not change the password set by the hacker, or remove the hacker's contact information associated with his personal account, because the hacker set up multifactor authentication. Plaintiff Edwards saw that the hacker was adding acquaintances from Plaintiff Edwards' "suggested friends", and that the hacker made a post on Plaintiff Edwards' personal Facebook page pretending to be Plaintiff Edwards and complaining about how it is hard to be a business person.

83.    Plaintiff Edwards was concerned that the hacker is preparing to scam his friends and family through solicitations on Plaintiff Edwards' personal Facebook account, so he asked his wife to report the post and leave a comment on the post alerting Plaintiff Edwards' Facebook friends that he did not make the post. Meta did not remove the post and notified his wife that it did not violate their community standards.

84.    Through the Safari browser on his phone, Plaintiff Edwards could see that the business account opened by the hacker was restricted from running ads or "us[ing] or shar[ing] audiences" after using an automation that does not abide by Meta's rules. Plaintiff Edwards is deeply concerned with the actions this hacker may be taking in his name and reputational harm from the same.

### Plaintiff Metzler's Experience

85.    After hackers took over Plaintiff Metzler's non-commercial Meta accounts, including her personal Facebook account, Meta failed to restore her access to the Facebook account and she lost access to years of photos, posts, personal messages, personal connections, creative writing, and more.

86.    Plaintiff Metzler had previously used Facebook for approximately 16 years.

87.    On or around January 4, 2025 while Plaintiff Metzler was asleep, an unauthorized user compromised Plaintiff Metzler's Meta accounts by linking another Instagram account to her Meta profile. Upon information and belief, the actions taken by the unauthorized user resulted in Plaintiff Metzler's personal Facebook and Instagram accounts becoming suspended.

88.    When Plaintiff Metzler woke up that morning, she received a notification from Instagram that the offending Instagram account had been removed, and Plaintiff Metzler was able

1    to access her personal Instagram account.

2        89.    Plaintiff Metzler was unable to access her Facebook account despite Instagram

3    resolving her account access issue as to her Instagram account. When she attempted to access her

4    Facebook account, she was directed to file an appeal on Instagram.

5        90.    Plaintiff Metzler completed the web form on Meta Help Center's "Report a Problem"

6    link multiple times over the course of several days, but never received a response, or even an

7    acknowledgement from Meta.

8        91.    Plaintiff Metzler could not file an appeal on Instagram because her Instagram account

9    was not suspended, and she could not access the appeal process.

10        92.    On or around January 18, 2025, Plaintiff Metzler filed a complaint with the Federal

11    Trade Commission regarding her in ability to access her personal Facebook account.

12        93.    In researching ways to regain access to her account, Plaintiff Metzler saw firsthand

13    how other scammers attempt to prey on people in her vulnerable position by promising to help

14    victims regain access to their accounts through Meta's back channels in exchange for a fee,

15    exacerbating the harm that victims face.

16        94.    Meta's Terms further state that users who are suspended can download their content,

17    but when Meta provided Plaintiff Metzler a link, she was unable to download any of her own content

18    despite following the provided instructions to do so, and received an error message instead.

19        *Plaintiff Repp's Experience*

20        95.    After hackers took over Plaintiff Repp's personal Facebook account, Meta failed to

21    restore his access to that account and he lost access to years of photos, posts, personal messages and

22    connections, and more, while Meta and the unauthorized user or users who accessed his account

23    benefit unabated from his account.

24        96.    Prior to being locked out of his account, Plaintiff Repp used Facebook for many years.

25        97.    On September 19, 2024, while Plaintiff Repp was sleeping, an unknown user changed

26    Plaintiff Repp's personal Facebook account information by adding the email address

27    islenamangu@hotmail.com to his account. That account modification was made from Ho Chi Minh

28    City.

98.     The unknown user also added a new telephone number to Plaintiff Repp's personal Facebook account, 562-620-9164. That change was made from Iwaya, Nigeria.

99.     The unknown user also paid $13.07 to Facebook for Meta Verified (Payment ID 8302841273162844), using a card that belonged to Plaintiff Repp. While this charge was recognized as fraudulent, Meta still refused to assist Plaintiff Repp in recovering his compromised account.

100.    On September 22, 2024, Plaintiff Repp realized that he could not access his Facebook account, and that it was hidden from public view.

101.    Plaintiff Repp attempted to follow the automated account recovery options available to him from Facebook's log in page, but was unable to regain access to his account. Plaintiff Repp logged into his email account, and saw emails from Meta's security@facebookmail.com account stating that Plaintiff Repp's account information was changed as described above. Plaintiff Repp then attempted to use the account recovery options included in the emails from Meta.

102.    Plaintiff Repp used each of the automated support options that were available to him on Facebook's log in page and from the emails, including logging into his account on a device that he previously used to access his personal Facebook account with an old password.

103.    While Facebook recognized his device as familiar and recognized his password as one he previously used, his account could not be restored because Facebook requires users to receive an email or text message but the contact information associated with his account had been changed to that of the hacker's. Upon information and belief, sometime between September 19 and September 22, 2024, the hacker changed the email address associated with Plaintiff Repp's account to d*****k@gmail.com.

104.    Plaintiff Repp also attempted to recover his account through submission of identification documents. Plaintiff Repp received an error code from Facebook in response to his attempt to upload identification documents that stated "Sorry, something went wrong…. We're sorry, there's a technical problem with this feature. We're working on getting it fixed."

105.    Plaintiff Repp further attempted to use the account recovery links provided to him, but by the time he had accessed them, the links were either invalid or expired or otherwise nonfunctional. Plaintiff Repp emailed Meta's security@facebookmail.com account seeking assistance

1    but never received a response.

2        106.    Plaintiff Repp subsequently attempted to complete these steps several times, and after

3    some time, the account recovery process was no longer available to him.

4        107.    Plaintiff Repp was and is distraught of the prospect of losing access to nearly 20 years

5    of family memories, including his own wedding photographs. Plaintiff Repp engaged an identity

6    recovery service and two different IT support firms after failing to receive any support or response

7    from Meta, but was unable to regain access to his account.

8        108.    All Plaintiffs spent countless hours trying to navigate Defendant's support

9    mechanisms with no success whatsoever. Plaintiffs eventually learned that Facebook had functionally

10    eliminated its customer support team. Defendant continues to deny Plaintiffs access to their Meta

11    accounts causing them harm while Meta continues to profit from the information collected from

12    Plaintiffs' use of their Facebook accounts—including through using her information for targeted

13    ads—as well Meta's decision to eliminate its customer support team.

14        109.    Likewise, Meta retains its "non-exclusive, transferable, sub-licensable, royalty-free,

15    and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display,

16    translate, and create derivative works of [Plaintiffs'] content (consistent with [Plaintiff's] privacy and

17    application settings)" that Plaintiffs cannot end because Plaintiffs cannot delete any content from

18    Meta's systems without access to their accounts.

19        **E.**    **Plaintiffs and Class members are owed damages for Meta's breach of its Contract.**

20        110.    The Terms contain a Limitation of Liability provision that limits Meta's aggregate

21    liability to $100 for breaches arising out of or relating to its Terms or the Meta Products, while

22    disclaiming liability for consequential, punitive, or other damages beyond that $100 amount.[21]

23        111.    Meta breached its Terms by denying the service it promised in exchange for Plaintiffs'

24

---

25    [21] *See* Ex. A at 9 ("**3. Limits on liability**…. We cannot predict when issues might arise with our

26    Products. Accordingly, our liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will be liable to you for any lost profits, revenues, information, or data,

27    or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Meta Products (however caused and on any theory of liability, including negligence), even if we have been advised of the possibility of such damages. Our aggregate liability

28    arising out of or relating to these Terms or the Meta Products will not exceed the greater of $100 or the amount you have paid us in the past twelve months.").

1    and Class members' provision of their personal information. For this breach of Contract, pursuant

2    to Meta's Limitation of Liability and the aggregate liquidated amount included therein, Plaintiffs and

3    Class members are entitled to $100. In the alternative, for this breach of Contract, Plaintiffs seek

4    nominal damages available under California law.

5        112.    In addition, Meta breached its Terms and the Privacy Policy incorporated by

6    reference by failing to secure its platform and combat harmful criminal behavior when it failed to

7    restore access Plaintiffs' and Class members' access to their individual accounts on Facebook. This

8    breach of Contract provides a second independent basis for the $100 aggregate liquidated damages

9    amount, or, in the alternative provides a second independent basis for nominal damages.

10        113.    Meta's continued failure to restore Plaintiffs and Class members access to their

11    account while it earns a profit by using their personal information also violates the UCL. Accordingly,

12    Plaintiffs seek injunctive relief on their own behalf and on behalf of similarly situated Class members

13    pursuant to the UCL to obtain restored access their individual accounts. In addition, in the alternative

14    to contract damages described in paragraphs 59 and 60 directly above, Plaintiffs also seek restitutionary

15    relief on behalf of herself and the Class members. For example, in 2023, the average revenue that Meta

16    generated per Facebook user based in the United States and Canada by using personal data to target

17    sponsored advertising was $68.44.[22]

18        **F.    Facebook personal user accounts are valuable to Meta and its users.**

19        114.    Personal user accounts are of immense value to Meta even if users do not pay Meta a

20    dollar amount for account access.

21        115.    To Plaintiffs and similarly situated Class members, the data on Meta's platforms is

22    priceless as users place a high value on their user-generated content.[23]

23        116.    Plaintiffs and Class members have all lost access to their accounts, including photos,

24    posts, personal messages, business and personal connections, and more, while hackers benefit

25    unabated from the unauthorized use of their accounts. For example, Plaintiff Isgur has lost access to

26

27    _____

[22]    Gennaro Cuofano, *The Facebook ARPU Explained*, FourWeekMBA (Feb. 6, 2024),
https://fourweekmba.com/facebook-arpu/.

28    [23] *See id.*

the online repository of her memories, including her friends list, photos and records of her communications with friends and family, including a deceased loved one, has missed a memorial service for that loved one, as well as lost a means of communicating with friends and family members who rely on Facebook to keep in touch. For other people, loss of access to their Facebook accounts has resulted in consequences including loss of evidence contained in messages for a custody dispute,[24] losing access to photos of deceased loved ones. [25]

117.    Plaintiffs and Class members are also harmed because they are left vulnerable to nefarious uses of their identity and information as hackers operate their account. For example, hackers often use stolen accounts to publicize scams and to prey on users' contacts by impersonating the user.

118.    While Plaintiffs and the Class are unable to access the Facebook platform, Meta retains a broad license to use content published or uploaded to Facebook by Plaintiffs and the Class, including to further its own products and services, such as its new AI tools, conferring a benefit on Meta. Plaintiffs and the Class are unable to limit that license by deleting information they posted to Facebook, as contemplated in the Terms, because Meta will not restore Plaintiffs' and the Class's access to the platform.

119.    Thus, while Plaintiffs and the Class are unable to access the Facebook platform, Meta profits from Plaintiffs' and the Class members' personal data including activity history and interests by using it to permit outside entities to effectively place targeted ads to their accounts.

120.    In 2023, Meta's average revenue per user worldwide was $40.60,[26] while the total revenue per Facebook user was $68.44 for users based in the United States and Canada.[27]

---

[24] Florian, *supra* note 4.
[25] *Id.*
[26] Stacy Jo Dixon, *Average revenue per user (ARPU) of Meta Platforms from 2011 to 2023*, STATISTA (Feb. 12, 2024), https://www.statista.com/statistics/234056/facebooks-average-advertising-revenue-per-user/#:~:text=In%202023%2C%20Meta's%20average%20revenue, from%2039.63%20USD%20in%202022.
[27] Cuofano, *supra* note 22.

1    121.    In fact, Meta's advertisement revenue of approximately $131.95 billion in 2023

2    accounted for approximately 98% of its profits.[28]

3    122.    Moreover, it is by now incontrovertible that there is a robust market for this data. The

4    robust market for user data has been analogized to the "oil" of the tech industry. A 2015 article from

5    TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire

6    or maintain a competitive edge." That article noted that the value of a single Internet user—or really,

7    a single user's data—varied from about $15 to more than $40.

8    123.    One study by content marketing agency Fractl has found that an individual's online

9    identity, including hacked financial accounts, can be sold for $1,200 on the dark web. Other reports

10   show that the value of a hacked Facebook account to be $45.[29]

11   124.    In short, Plaintiffs and Class members have suffered an economic injury by the loss

12   of their valuable Meta accounts while Meta still unfairly gets the benefit of the profit generated from

13   leveraging Plaintiffs' and Class members' user-generated information with advertisers. Further,

14   Plaintiffs and Class members were denied the benefit of knowledge that Meta would not provide

15   adequate assistance for users in regaining access to their accounts. Therefore, they were unable to

16   mitigate harms they incurred because of Defendant's actions. That is, Meta's lack of transparency

17   prevented and still prevents Plaintiffs' and Class members' ability to mitigate harm. They have also

18   suffered a loss of a personal property interest, as the accounts have personal value to the users who

19   spent hours of their time building the sites for their personal use.

20       **G.    Forty State Attorney Generals Demand a Conversation with Meta**

21   125.    On March 5, 2024, the issues described herein were recognized by a group of 40 state

22   attorneys general and the attorney general for the District of Columbia in a letter to Meta detailing

23   their concern with the sharp increase in complaints regarding Facebook account takeovers and

24

25   [28] Stacy Jo Dixon, *Annual revenue generated by Meta Platforms from 2009 to 2023, by segment*, STATISTA (Feb.
     12, 2024), https://www.statista.com/statistics/267031/facebooks-annual-revenue-by-segment/;
26   Stacy Jo Dixon, *Annual revenue and net income generated by Meta Platforms from 2007 to 2023, by segment*,
     STATISTA (Mar. 4, 2024), https://www.statista.com/statistics/277229/facebooks-annual-revenue-
27   and-net-income/(Meta's revenue in 2023 was over $134 billion).
     [29] Patricia Ruffio, *Dark Web Price Index 2022*, PRIVACYAFFAIRS.COM (June 10, 2023),
28   https://www.privacyaffairs.com/dark-web-price-index-2022/.

1    lockouts (the "State AG Letter").

2    126.    The State AG Letter emphasized the utter panic of consumers in their states, noting

3    that "[u]sers spend years building their personal and professional lives on [Meta's] platforms, posting

4    intimate thoughts, and sharing persona details, locations, and photos of family and friends. To have

5    it taken away from them through no fault of their own can be traumatizing. Connections they made

6    and friendships that they forged become threatened."[30]

7    127.    The State AG Letter also focused on the increased risk of financial harm to those

8    users whose accounts were taken over and to their contacts.[31]

9    128.    The State AG Letter acknowledged that the sharp uptick in consumer complaints to

10   their offices happened around the time Defendant laid off 11,000 employees concentrated in the

11   security and privacy and integrity sector in 2022.[32]

12   129.    These attorneys general requested that Defendant "take immediate action and

13   substantially increase its investment in account mitigation tactics, as well as responding to users

14   whose accounts were taken over . . . [p]roper investment in response and mitigation is mandatory."[33]

15   130.    The attorneys general further noted the substantial resource burdens that is being

16   placed on their offices in having to respond to the large (and increasingly so) volume of user

17   complaints and underscored their "refus[al] to operate as the customer service representatives of

18   [Meta]."[34]

19   ## NO ADEQUATE REMEDY AT LAW

20   131.    Plaintiffs and Class members have suffered an injury in fact resulting in the loss of

21   property as a proximate cause of the violations of law and wrongful conduct by Meta alleged herein.

22   No remedy at law is available that will remedy Plaintiffs' and Class members' ongoing harm from

23   Meta's continued failure to provide them restored access to their personal information and their

24

25   [30] State AG Ltr. at 1.

26   [31] *Id.* at 1-2.
     [32] Catherine Thorbecke, *Facebook parent company Meta will lay off 11,000 employees*, CNN BUS.,

27   https://www.cnn.com/2022/11/09/tech/meta-facebook-layoffs/index.html (last updated November 9, 2022).

28   [33] State AG Ltr. at 3.
     [34] *Id.* at 3.

1    account, or to even allow them to delete their account and end Meta's ability to profit from their

2    information. If an injunction is not issued requiring Meta to comply with the UCL, Plaintiffs and Class

3    members will suffer irreparable injury.

4         132.    Legal remedies available to Plaintiffs and Class members are inadequate because they

5    are not equally prompt and certain and in other ways efficient as equitable relief. Damages are not

6    equally certain as restitution because the standard that governs restitution is different than the standard

7    that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs and

8    Class members fail to sufficiently adduce evidence to support an award of damages. Damages and

9    restitution are not the same amount. Equitable relief, including restitution, entitles a plaintiff to recover

10   all profits from the wrongdoing. Legal claims for damages are not equally certain as restitution which

11   depend on interpretation of Meta's Contract. In short, significant differences in proof and certainty

12   establish that any potential legal claim cannot serve as an adequate remedy at law.

13        133.    Equitable relief in the form of an injunction is appropriate because legal remedies

14   cannot address future harm.

15        134.    Equitable relief in the form of restitution may be appropriate because Plaintiffs may

16   lack an adequate remedy at law for breach of contract. Thus, even if legal remedies may be available,

17   Plaintiffs seek restitution as equitable remedy in the alternative to legal remedies which are as of yet

18   uncertain.

19                                     **CLASS ALLEGATIONS**

20        135.    Plaintiffs seek certification of the following class:

21   **Nationwide Class:** All persons subject to Meta's Facebook Terms of Service who lost access to

22   their personal Facebook account used for personal or non-commercial purposes through an account

23   takeover, and have not regained access to their account(s) after March 2023 through the date of class

24   certification.

25        136.    Excluded from the Class is the Defendant, any entities in which Defendant has a

26   controlling interest, the Defendant's employees, any Judge to whom this action is assigned, and any

27   member of such Judge's staff and immediate family.

28        137.    Plaintiffs reserve the right to amend or modify the Class definition after having an

1    opportunity to conduct discovery.

2        138.    California law applies to a nationwide Class because Meta's Terms contain a choice

3    of law clause designating California law.[35]

4        139.    The Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4).

5    Plaintiffs and all members of the Class have been harmed by the acts of the Defendant. Class-wide

6    adjudication of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their

7    claims on a class-wide basis using the same evidence as would be used to prove those elements in

8    individual actions asserting the same claims.

9        140.    **Numerosity (Fed. R. Civ. P 23(a)(1)).** The members of the Class are so numerous

10   that individual joinder of all Class members is impracticable. Hundreds of thousands, if not millions,

11   of Class members' accounts have been taken over by hackers while Meta systematically fails to

12   provide any recourse for re-gaining access such that the Class is so numerous that joinder of all

13   members of the Class is impracticable.

14       141.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and (b)(3)).**

15   Common questions of law and fact exist as to all members of the putative Class that will drive the

16   litigation and predominate over any questions affecting only individual Class members. Common

17   questions include, but are not limited to:

18           a.   Whether Meta promised to maintain the security and availability of its platforms in

19                its Contract;

20           b.   Whether Meta breached its Contract when it failed to re-authorize Plaintiffs' and

21                Class members' access to their accounts after hackers effected account takeovers;

22           c.   Whether Plaintiffs and Class members suffered harm as a result of Meta's breach of

23                its Contract;

24           d.   Whether Meta breached the covenant of good faith and fair dealing;

25           e.   Whether Plaintiffs and Class members suffered harm as a result of Meta's breach of

26                the covenant of good faith and fair dealing;

27

28   _____

[35] Ex. A at 10 ("You also agree . . . that the laws of the State of California will govern these terms and any claim, cause of action, or dispute without regard to conflict of law provisions.")

f.   Whether Meta owes damages for its breach of Contract in the aggregate amount set forth in its Terms of Service;

g.   Whether Meta's conduct violates the Unfair Competition Law;

h.   Whether Plaintiffs and Class members are entitled to an injunction;

i.   Whether Plaintiffs and Class members are entitled to restitution; and

j.   Whether Plaintiffs and Class members are entitled to other appropriate remedies.

142.   **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of the claims of each putative Class member and are based on the same facts and legal theories as each of the Class members. Plaintiffs, like all members of the Class, had their Facebook account hacked and taken over. Plaintiffs, like all Class members, were unable to regain access to their Facebook accounts because Meta does not facilitate their users' ability to regain control of their accounts. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative Class.

143.   **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Plaintiffs are adequate representatives of the putative Class because their interests coincide with, and are not antagonistic to, the interests of the members of the Class that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex consumer class action litigation, who intend to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class.

144.   **Superiority (Fed. R. Civ. P. 23(b)(3))**. A class action is superior to other available methods for fair and efficient adjudication of the controversy. The amounts sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof. Plaintiffs are not aware

of any other current pending litigation against Defendant to which any Class member is a party involving the subject matter of this suit, and the Action presents no difficulties that will impede its management by the Court as a class action.

145.    **Injunctive Relief Appropriate for the Class (Fed. R. Civ. P. 23(b)(2))**. Class certification is appropriate because Defendant acted on grounds generally applicable to the Class, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to Plaintiffs and putative Class members. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that could establish incompatible standards of conduct for Defendant. Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendant.

**<u>COUNT I</u>**
**Breach of Contract**
**By all Plaintiffs on behalf of a nationwide Class of Meta account users.**

146.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

147.    Defendant's Terms of Service provide that the laws of California will apply to any disputes between users, including Plaintiffs and Class members, and Defendant.

148.    Defendant Meta, in its agreements with users, provides users with access to its Facebook platform. Users agree to the conditions of Defendant Facebook Contract (*i.e.* Meta's Terms of Service and Privacy Policy) to use or continue to use Defendant's Facebook platforms.

149.    Defendant Meta and users mutually assented to, and therefore were bound by, Meta's Privacy Policy.

150.    Meta represents in its Terms of Service that instead of collecting monetary payment for its services from users, Meta collects their personal data worth millions to it in ad dollars in exchange for providing its services. *See* Exhibit A at 5 ("Instead of paying to use Facebook …, by using the Meta Products covered by these Terms, you agree that we can show you personalized ads and other commercial and sponsored content that businesses and organizations pay us to promote on and off Meta Company Products. . . . We collect and use your personal data in order to provide the services described above to you").

33

151.    Meta represents in its Terms of Service that it will "Promote the safety, security, and integrity of [its] services, combat harmful conduct, and keep [Meta's] community of users safe: . . . [Meta] work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and services[.]"[36]

152.    The Terms continue to tout Meta's "dedicated teams around the world, with external service providers, partners, and other relevant entities" that "develop advanced technical systems to detect potential misuse of [Meta's] Products, harmful conduct towards others, and situations where [Meta] may be able to help support or protect [its] community, including to respond to user reports of potentially violating content."[37]

153.    Defendant Meta profits from using this data.

154.    Meta's Terms also award it a broad transferrable, worldwide and royalty-free license to use content its users create and share on the platform. This license can only be terminated if the content is deleted.

155.    Meta represents in its Privacy Policy that it will "investigate suspicious activity, detect, prevent and combat harmful or unlawful behavior . . . , [and] detect and prevent spam and other bad experiences[.]"[38]

156.    By denying access to user's accounts and failing to remedy—or even investigate or otherwise acknowledge—account lockouts or takeovers, Meta fails to abide by its Contract. Meta failed to prevent account lockouts and takeovers, failed to mitigate existing account lockouts and takeovers, and failed to provide customer support services to users experiencing such account lockouts and takeovers.

157.    Even though Plaintiffs and the Class are unable to access their accounts and therefore, the Facebook platform, Meta retains access to the personal data posted on Facebook. Meta maintains a license over the content posted or published to Facebook that Plaintiffs and the Class cannot revoke without access to their accounts.

---

[36] Ex. A at 2.
[37] *Id.*
[38] Ex. B at 15.

SECOND AMENDED CLASS ACTION COMPLAINT

158.    Meta's violations continue to this day. As a direct and proximate result of Meta's breach of contract, Plaintiffs have suffered actual harm as detailed herein. Meta's Facebook Terms of Service contain a damages limitation provision setting a presumptive damage amount of $100 as the upper limit of liability for its consumer accounts. Meta's provision setting and limiting its aggregate liability to $100 is a liquidated damages provision because it predetermines the amount of damages in the event that Meta breaches its contract. Plaintiffs thus seek $100 for Meta's breach of its Contract for herself and similarly situated Class members.

159.    The $100 amount that Meta unilaterally predetermined as liquidated damages is a reasonable estimate of damages related to the failure to protect personal information, as nominal damages are available for such breach of contract claims.

160.    In the alternative, Plaintiffs seek nominal damages in an amount to be determined if fixing the amount of actual damages is impracticable or extremely difficult. The presumptive amount of any such nominal damages is $100 based on the liquidated damages provision in the Terms of Service.

**COUNT II**
**Breach of the Covenant of Good Faith and Fair Dealing**
**By All Plaintiffs on behalf of a nationwide Class of Meta account users.**

161.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

162.    Under the laws of California, within every contract is a duty of good faith and fair dealing that applies to each party. Good faith and fair dealing, in connection with executing contracts and discharge performance and other duties according to their terms, requires preserving the spirit— not merely the letter—of the bargain. In other words, the parties to a contract are mutually obligated to comply with the substance of the contract in addition to the form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts. Bad faith encompasses both overt acts and inaction, and fair dealing is not satisfied by mere honesty.

163.    The obligation of good faith and fair dealing is violated as relates to contract performance where a party exercises discretion reserved to it solely in its favor and contrary to the

benefit of the other party, exercises discretion with a bad motive, dishonestly, or otherwise exercises in bad faith. Doing so exploits discretion to a party's benefit, particularly when, as here, the party exercising discretion drafted the contract—thus reserving the discretion to itself—and consistently exercises that discretion against the benefit of the less sophisticated party, in this case Plaintiffs and the Class.

164.    Per the express terms of the Contract that Meta unilaterally drafted, Meta is the sole party that can restore access to users who are locked out of their Facebook accounts.

165.    Meta's Terms, Privacy Policy, and Help Center give it the discretion to investigate and address account misuse, and implement steps to help locked out user regain access to their accounts. Meta's Terms explain that it "employ[s] dedicated teams around the world . . . to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of conduct like this we may take appropriate action based on our assessment that may include – notifying you, offering help . . . ". *See* Ex. A at 2.

166.    Meta likewise violated the covenant of good faith and fair dealing by retaining a license over content that belongs to Plaintiffs and the Class, per express terms of the Contract, while Plaintiffs and the Class lost the ability to modify or end such license.

167.    Per the express terms of the adhesive Terms of Service that Meta drafted, Meta is awarded a "non-exclusive, transferrable, sub-licensable, royalty-free, and worldwide license to host, use distribute, modify, publicly perform or display, translate, and create derivative works of [a user's] content." This license only ends when the user's content is deleted. Users locked out of their accounts cannot end the license.

168.    Meta, on the other hand, reserves itself discretion to terminate accounts that are being misused if it wants to as the Contract also states that Meta "may disable or delete your account if after registration your account is not confirmed, your account is unused and remains inactive for an extended period of time, or if we detect someone may have used it without your permission and we are unable to confirm your ownership of the account."

169.    As users require access to delete their accounts and eliminate Meta's use of their

36

1  personal information, Meta is also the sole party that can delete the account or terminate Meta's
2  license provided by the Terms to use the personal information with respect to locked out users like
3  Plaintiffs and the Class. By affording itself a license to use personal information in the Terms that
4  can only be ended with deletion of the account, Meta reserves itself discretion to terminate the
5  account or to keep using personal information.

6      170.    Meta has a duty of good faith and fair dealing to perform the foregoing obligations
7  because it is within Meta's sole discretion to do so.

8      171.    By laying off droves of its existing customer service team members, Meta decimated
9  its own ability to restore account access to locked out users like Plaintiffs and the Class as
10  contemplated in multiple parts of the Contract.

11      172.    Upon information and belief, Meta is, and was at all applicable times, aware that its
12  users' abilities to regain access to their accounts would be significantly impaired, if not totally
13  destroyed by the stark reduction in its customer service staffing and adoption of a largely, if not
14  totally, ineffective account recovery process.

15      173.    Meta nonetheless has not, and did not, adopt steps or procedures for users who are
16  locked out of their accounts to take to regain access, despite this being in its sole discretion. This is
17  supported by data compiled by the state attorneys general of 40 states and the District of Columbia
18  set forth in the State AG Letter, explaining that account takeover complaints rose from 270% to
19  740% following the gutting of Facebook's customer service team.

20      174.    Meta has further failed to, at the very least, terminate or disable accounts taken over
21  by hackers, despite this being in its sole discretion. By exercising its discretion in this manner, Meta
22  retains its license to users' profitable personal content.

23      175.    Meta's exercise of its discretion unquestionably frustrated the purpose of the
24  Contract between Meta and Plaintiffs, and Meta and the Class, namely, the "access and use" of the
25  Facebook platform. Such purpose is frustrated where Plaintiffs and the Class cannot access and use
26  their Facebook accounts—or even access them to delete them to terminate Meta's license to use
27  their information. Meta is and was, at all applicable times, aware of this, and nonetheless acted in
28  disregard to the rights and expectations of Plaintiffs and the Class.

SECOND AMENDED CLASS ACTION COMPLAINT

176. Rather than use the Contract's discretion to provide relief to Facebook users like Plaintiffs and the Class, Meta instead exercises its discretion in its own favor for the benefit of its bottom line. In doing so, Meta unfairly interfered with Plaintiffs' and the Class's right to receive the benefits of the Contract.

177. Meta's failure to exercise its discretion to restore Plaintiffs' and the Class's access to the Facebook platform, or to at least disable the hacked accounts, while receiving the benefits of Plaintiffs' and the Class's performance is in bad faith.

178. Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

179. Based on representations in the Contract, Plaintiffs and the Class legitimately expected that Meta would restore access to their accounts or, at least, disable them if stolen by hackers. Plaintiffs and the Class legitimately believed that Meta would provide steps to regain account access that actually work for locked out users, as contemplated in the Contract.

180. Defendant's violations continue to this day. As a direct and proximate result of Meta's breach of the covenant of good faith and fair dealing, Plaintiffs have suffered actual harm as detailed herein. Meta's Facebook Terms contain a damages limitation provision setting a presumptive damage amount of $100 as the upper limit of liability for its consumer accounts. Meta's provision setting and limiting its aggregate liability to $100 is a liquidated damages provision because it predetermines the amount of damages in the event that Meta breaches its contract. Plaintiffs thus seek $100 for Meta's breach of its Contract's covenant of good faith and fair dealing for herself and similarly situated Class members.

181. The $100 amount that Meta unilaterally predetermined as liquidated damages is a reasonable estimate of damages related to the breach of the covenant of good faith and fair dealing, as nominal damages are available for such breach of contract claims and the covenant is implied in every contract.

182. In the alternative, Plaintiffs seek nominal damages in an amount to be determined if fixing the amount of actual damages is impracticable or extremely difficult. The presumptive amount of any such nominal damages is $100 based on the liquidated damages provision in the Terms.

## COUNT III
### Violation of California's Unfair Competition Law ("UCL") -
### (Cal. Bus. & Prof. Code §17200, et seq.)
### By All Plaintiffs on behalf of a nationwide Class of Meta account users.

183.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

184.    Defendant's Facebook Terms of Service provide that the laws of California will apply to any disputes between users, including Plaintiff and Class members, and Defendant.

185.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 1720.

186.    By reason of the conduct alleged herein, Defendant engaged in unlawful, unfair, and/or fraudulent practices within the meaning of the UCL. The conduct alleged herein is a "business practice" within the meaning of the UCL.

187.    Defendant violated the "fraudulent" prong of the UCL by misrepresenting, both by affirmative conduct and by omission, that Plaintiffs and Class members can maintain access or regain access to their social media accounts.

188.    Meta represents that in exchange for providing its Facebook platform, Meta will collect personal data that generates ad revenue from advertising for Meta. Meta thus profits from using this data. Meta's Terms also award it a broad transferrable, worldwide and royalty-free license to use content its users create and share on the platform. This license can only be terminated if the content is deleted.

189.    Meta further represents in its Terms of Service that it will "Promote the safety, security, and integrity of [its] services, combat harmful conduct, and keep [Meta's] community of users safe: . . . [Meta] work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and services[.]"[39]

190.    The Terms also tout Meta's "dedicated teams around the world, with external service providers, partners, and other relevant entities" that "develop advanced technical systems to detect potential misuse of [Meta's] Products, harmful conduct towards others, and situations where [Meta] may be able to help support or protect [its] community, including to respond to user reports of

---

[39] Ex. A at 2.

SECOND AMENDED CLASS ACTION COMPLAINT

1    potentially violating content."[40]

2        191.    Meta further represents in its Privacy Policy that it will "investigate suspicious activity,

3    detect, prevent and combat harmful or unlawful behavior . . . , [and] detect and prevent spam and

4    other bad experiences[.]"[41]

5        192.    Based on Meta's representations about the security of its platforms and Meta's

6    omissions, as it never informed Plaintiffs and Class members that their accounts could be stolen with

7    no recourse, or that the online account recovery steps were nonfunctional or nonexistent, Plaintiffs

8    and Class members believed that they would continue to have access to their private social media

9    accounts and that Meta would not allow hackers to continue to use their accounts with impunity.

10    Defendant's misrepresentations and omission that hackers could steal user accounts with impunity

11    were material because they were likely to deceive reasonable consumers about the adequacy of

12    Defendant's data security and ability to protect the confidentiality of Plaintiffs' and Class members'

13    personal information. Indeed, Plaintiffs' and Class members' belief that Meta would maintain the

14    security of their accounts, and would allow them to have access to their own accounts and personal

15    information, were substantial factors in Plaintiffs' and Class members' decisions to open and use

16    their accounts and to provide their valuable personal information.

17        193.    Defendant misrepresented that Plaintiffs and Class members could access the

18    Facebook platform in exchange for permitting Meta to use their personal data for its own profit.

19    Plaintiffs and Class members' belief that permitting Meta to access this data in exchange for the

20    ability to use the Facebook platform was a substantial factor in Plaintiffs' and Class members'

21    decisions to open and use their accounts and to provide their valuable personal information.

22        194.    Defendant further misrepresented that Plaintiffs and Class members could revoke

23    the broad license that Meta enjoys over content created or posted by Plaintiffs and Class members

24    on the Facebook platform by deleting that content, but Plaintiffs and Class members cannot do so

25    when Meta does not permit them to regain access to their accounts. Plaintiffs' and Class members'

26    belief that they could revoke any license given to Meta for content they posted was revocable was a

27

---

28    [40] *Id.*
      [41] Ex. B at 15.

SECOND AMENDED CLASS ACTION COMPLAINT

1   substantial factor in their decision to open and use their account sand post or create content.

2        195.    Defendant continues to fail to live up to its representations and omissions on an

3   ongoing basis. Defendant Meta continues to fail to allow Plaintiffs and Class members to maintain

4   access to their social media accounts as Defendant Meta continues to fail to mitigate account

5   takeovers and lockouts because it has process or measures to allow Plaintiffs and Class members to

6   regain access to their accounts.

7        196.    Defendant also violates the "unfair" prong of the UCL on an ongoing basis by

8   engaging in unfair business practices under the "balancing test" because the harm caused by their

9   actions and omissions, as described in detail *supra*, greatly outweigh any perceived utility. Indeed,

10  Defendant' withholding of account access for Class members cannot be said to have had any utility

11  at all, beyond that of an unfair and deceptive financial savings to Defendant at the expense of Class

12  members.

13       197.    Defendant engages in unfair business practices under the "tethering test" because

14  their actions and omissions, as described in detail *supra*, violated fundamental public policies

15  expressed by the California Legislature and the Federal Trade Commission.

16       198.    Further, Defendant engages in "unlawful" business practices on an ongoing basis

17  with respect to the Class as a whole by failing to implement reasonable data security measures as

18  required under legislatively-declared public policy that seeks to protect consumers' data and ensure

19  that entities that are trusted with it use appropriate security measures. These policies are reflected in

20  laws, including the FTC Act, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code §

21  1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100.

22       199.    Defendant' violations of the UCL continue to this day. As a direct and proximate

23  result of Defendant' violations of the UCL, Plaintiffs and Class members have suffered harm, inter

24  alia, as detailed herein, including the loss of their valuable personal information stored in their Meta

25  accounts and the risk that their accounts and the identities associated with those accounts will be

26  used for nefarious purposes.

27       200.    Plaintiffs and Class members have an ongoing property interest in the personal

28  information lost as a result of Defendant's conduct. Meta's failure to implement reasonable security

41

1    measures to allow Plaintiffs and Class members to regain access to their accounts allows hackers to

2    continue to access and seize their property. Plaintiffs and Class members lack an adequate remedy at

3    law to address the future and ongoing harm described herein and are thus entitled to seek injunctive

4    relief. Unless restrained and enjoined, Defendant will continue to misrepresent that it will provide

5    adequate measures to allow users to regain access to their accounts, will continue to omit the truth

6    that it allows hackers to abscond with accounts with no recourse for the real user, and will continue

7    to deny Plaintiffs and Class members access to their accounts, all while retaining access to Plaintiffs'

8    and Class members' valuable information and retaining licenses over any content they posted that

9    cannot be revoked without account access. Due to the ongoing nature of the harm, damages will be

10   insufficient to address it.

11        201.    Plaintiffs and the Class members are entitled to injunctive relief. No remedy at law

12   can remedy the future harm. The continued risk to Plaintiffs and the Class members from the theft

13   of their accounts and the personal information therein can only be addressed by injunctive relief.

14   Accordingly, pursuant to § 17203 of the UCL, Plaintiffs and the other Class members seek an order

15   that requires Defendant to:

16            a.    modify Defendant's practices in a manner that allows users to regain access to their

17                  social media accounts and/or act on reports from users of lost access as a result of

18                  hacking and restore access to account;

19            b.    modify Defendant's practices in a manner that providers customer support in the

20                  event of account access difficulties or loss;

21            c.    in the alternative, disable or terminate stolen accounts and end license to personal

22                  data;

23            d.    pay restitution in amounts to be determined; and

24            e.    pay attorney fees and costs incurred by counsel for Plaintiffs and the proposed Class

25                  in accordance with the California Code of Civil Procedure § 1021.5.

26        202.    Plaintiffs also seek restitution in the form of the commercial value of the data Meta

27   improperly used. To the extent this remedy is available, Plaintiffs seek it in the alternative to any

28   adequate remedy at law she and the Class members may have.

**COUNT IV**
*In the Alternative*, **Unjust Enrichment**
**By all Plaintiffs on behalf of a nationwide Class of Facebook account users.**

203.    Plaintiffs hereby repeat, reallege, and incorporate by reference each and every allegation contained above as though the same were fully set forth herein.

204.    Plaintiffs and Class members conferred a benefit on Meta by permitting Meta to use their personal data in exchange for accessing the Facebook platform.

205.    Plaintiffs and the Class members no longer have access to the Facebook platform, but Meta still retains access to the personal data Plaintiffs and the Class members provided to use Facebook, and Meta still generates revenue from its use of the same.

206.    Meta uses and profits from that personal data through the placement of sponsored posts and targeted advertisements: in 2023 the total revenue per Facebook user based in the United States and Canada was $68.44.

207.    Plaintiffs and the Class members conferred a benefit on Meta by giving Meta a broad, transferrable and worldwide license to use content that Plaintiffs and the Class created and shared on Facebook.

208.    Per Meta's Terms, this license can only be revoked when a user deletes the content that was created and shared on Facebook. Plaintiffs and the Class cannot revoke that license because they do not have access to their Facebook accounts. Thus, Meta continues to profit from Plaintiffs and Class members personal information while unfairly denying them access to stop Meta from its use.

209.    Meta has the ability to restore Plaintiffs' and the Class members' access to their accounts, and represents that it has teams dedicated to doing so, and steps that a user can take to restore access to their accounts. Yet, Meta chooses not to do so because it is not financially expedient.

210.    Meta is unjustly enriched by retaining access to Plaintiffs' and the Class members' personal data, while depriving them of access to its platform to use it to or even to stop Meta from generating revenue from the use of their personal information.

211.    Meta is also unjustly enriched by maintaining a license over content created and posted by Plaintiffs and the Class members because it is preventing Plaintiffs and the Class members

43

1 | from revoking that license.

2 |     212.     Plaintiffs and the Class retain a stake in the profits garnered from their personal

3 | information that Meta has retained since they have lost access to the Facebook platform. It would

4 | be inequitable and unconscionable for Meta to retain the profit, benefit, or other compensation it

5 | obtained from using Plaintiffs' and the Class's personal data while refusing to restore Plaintiffs and

6 | the Class access to their Facebook accounts.

7 |     213.     Plaintiffs and the Class also retain a stake in the profits garnered from Meta's license

8 | on their posts or content they uploaded to the Facebook platform without the ability to revoke such

9 | license.

10 |     214.     Plaintiffs and the Class members seek an order from this Court requiring Meta to

11 | disgorge all proceeds, profits, benefits, and other compensation obtained by Meta from its improper

12 | use of their personal data where they are not provided access to the Facebook platform, and from

13 | Meta's improper maintenance of its license over their posts and content where Meta prevents

14 | Plaintiffs and the Class from accessing the same.

15 |     215.     In the alternative, Plaintiffs seek restitution in the form of the commercial value of

16 | the data Meta improperly used.

17 | **<u>PRAYER FOR RELIEF</u>**

18 | Wherefore, Plaintiffs pray for a judgment:

19 | A.     Certifying the Class as requested herein;

20 | B.     Awarding damages to Plaintiffs and Class members in the amount set in Meta's

21 |        Terms of Service;

22 | C.     Entering an injunction that requires Meta to comply with the UCL;

23 | D.     Providing restitution (in the alternative to damages)

24 | E.     Awarding attorneys' fees and costs; and

25 | F.     Providing such further relief as may be just and proper.

26 |

27 |

28 |

Date: June 4, 2025                    /s/ Annick M. Persinger
                                      Annick M. Persinger (State Bar No. 272996)
                                      **TYCKO & ZAVAREEI LLP**
                                      1970 Broadway, Suite 1070
                                      Oakland, California 94612
                                      Telephone: (510) 254-6808
                                      Facsimile: (202) 973-0950
                                      apersinger@tzlegal.com

                                      Hassan A. Zavareei (State Bar No. 181547)
                                      Gemma Seidita (State Bar No. 322201)
                                      **TYCKO & ZAVAREEI LLP**
                                      2000 Pennsylvania Avenue, Northwest, Suite 1010
                                      Washington, District of Columbia 20006
                                      Telephone: (202) 973-0900
                                      Facsimile: (202) 973-0950
                                      hzavareei@tzlegal.com
                                      gseidita@tzlegal.com

                                      *Attorneys for Plaintiffs and the Putative Class*

45