UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA ISGUR, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>    Defendant. | Case No. 24-cv-06559-WHO<br><br>**ORDER ON THE MOTION TO DISMISS**<br><br>Re: Dkt. No. 40 |

Plaintiffs are individuals from four states bringing class claims against defendant Meta Platforms, Inc. ("Meta"), a global social media and social networking company that operates websites including Facebook and Instagram. They allege various state law violations related to Meta's failure to support its users in the wake of hacking activity that prevents users from accessing their accounts. Meta argues both that the Terms of Service preclude all but one of plaintiffs' claims and that plaintiffs have failed to adequately plead each of their asserted claims in any event. I disagree that the Terms of Service definitively preclude any of plaintiffs' causes of action but agree that plaintiffs need to add more specificity to adequately plead them. I also conclude that plaintiffs likely have standing to bring a license revocation theory in any amended complaint. However, there are deficiencies in each of plaintiffs' causes of action. For the reasons explained below, Meta's Motion to Dismiss is GRANTED IN PART and plaintiffs have leave to amend within 30 days of this Order.

## BACKGROUND

Sara Isgur, Erik Brand, Eddie Edwards, Linda Metzler, and Richard Repp (together, "plaintiffs") are five Facebook account holders who have been hacked by third parties and no

longer have access to their Facebook accounts, including years of personal photos, messages and connections. Second Amended Class Action Complaint ("SAC") [Dkt. No. 37] ¶¶ 16–20. They allege that although they have lost access to their accounts, Meta continues to make use of their personal information posted prior to being hacked in order to profit from personalized advertisement generation in violation of state laws and in contravention of Meta's Terms and Services ("TOS"). SAC ¶¶ 146–215.

Plaintiffs contend that because of Meta's reliance on individuals' personal data and information, Facebook is something of a hotspot for hacking activity. Namely, "hackers routinely target and successfully access the valuable information Meta stores related to users' accounts." SAC ¶ 27. These hackers can operate by (1) accessing a user account, (2) changing login information to prevent a user from accessing the account, (3) accessing private user information (e.g., name, birthday, credit card information, etc.), (4) making posts on the users account to scam the user's friends and connections, (5) harvesting personally identifiable information of the user located on the account, and even (6) selling the account for $50–$75 on the dark web. SAC ¶¶ 28–30. Despite the frequency with which Facebook users get hacked, however, Meta consistently fails to block hacking activity or reinstate users to their profiles despite repeated requests. SAC ¶ 31.

When a user decides to open a Facebook account, that user must agree to Meta's TOS. Relevant provisions of the TOS include:

> Instead of paying to use Facebook and the other products and services we offer, by using the Meta Products, covered by these Terms, you agree that we can show you personalized ads and other commercial and sponsored content that businesses and organizations pay us to promote on and off Meta Company Products. We use your personal data such as information about your activity and interests, to show you personalized ads and sponsored content that may be more relevant to you.
> . . .
> When you share, post, or upload content . . . you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content . . . . This license will end when your content is deleted from our system . . . . You can

2

> delete individual content you share, post, and upload at any time . . . this license will continue until the content has been fully deleted.

SAC ¶ 32.

The TOS also states that Meta "work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of [Meta's] Products and services" and provides steps a user can take that will enable Meta to unlock or reinstate a hacked account. SAC, ¶ 34, p.12 ¶ 36.[1] One method that Meta uses to "maintain [account] security" is by deleting or disabling any account if it has detected that the account "appears to have been hacked or compromised and [Meta] is unable to confirm ownership of the account after a year, or if the account is unused and remains inactive for an extended period of time." SAC, p.12 ¶ 36. The TOS additionally includes a Privacy Policy in which Meta states that it "promote[s] safety, security and integrity." SAC ¶¶ 37–38. The privacy policy reads in part that to promote safety, security, and integrity, Meta

> work[s] to:
>
> Verify accounts and activity,
> Investigate suspicious activity,
> Detect, prevent and combat harmful or unlawful behavior
> Detect and prevent spam and other bad experiences
> Detect and stop threats to our personnel and property,
> Maintain the integrity of Meta's Products

SAC, p.13 ¶ 38 (cleaned up).

Plaintiffs allege that by purposefully ignoring user account-takeovers by hackers, Meta violates its own TOS and Privacy Policy. SAC, p. 13 ¶ 35–36. They assert that Meta took intentional steps that knowingly resulted in a sharp increase in account takeovers. Between 2022 and 2023, it laid off more than 20,000 people working in the customer service and support fields.

---

[1] The SAC begins renumbering on page 13 after the first paragraph 38, starting with another paragraph 35.

3

SAC, p.13 ¶ 36. At the same time, it "tallied its most profitable quarter—and year—ever." SAC, p.14 ¶ 38. Plaintiffs contend that these layoffs had a direct and negative impact on users whose accounts have been hacked. SAC ¶ 11 ("By essentially gutting Facebook's customer support team, which it cut to increase its bottom line, Meta only provides a circular process whereby Meta does not meaningfully investigate users' claims of being locked out of their accounts, effectively giving hackers the green light to maintain control of . . . [the] accounts."), pp. 13–15 ¶¶ 36–39. While Meta was able to pay fewer employees and benefit from hacked users' accounts to generate personalized ads, the hacked users themselves were unable to access, modify, save the contents of, or otherwise control their accounts. SAC ¶¶ 40–45. In short, hacked users are unable to share in the "benefit of the bargain." SAC ¶ 40.

Each of the named plaintiffs' accounts were hacked in the manner described above, after having had Facebook accounts for many years. SAC ¶¶ 46–109. They repeatedly reached out to Meta after learning their account was hacked using the automated support as detailed in the "account recovery steps" provided in the TOS, as well as other methods, but Meta never responded. *Id.* One plaintiff went to his local police department to report an instance of identity theft, and multiple plaintiffs filed reports with the Federal Bureau of Investigations. SAC ¶¶ 55, 66–67. Another plaintiff's Facebook connections reached out to alert her of unusual account activity—presumably carried out by the hackers. SAC ¶¶ 52–53. While plaintiffs are locked out of their accounts, however, Meta maintains the benefit of the user license agreement—continuing to profit from the information published on the now-hacked user accounts. SAC ¶ 109.

Plaintiffs contend that Meta breached the TOS "by denying the service it promised in exchange for [users'] provision of their personal information" and by "fail[ing] to restore access . . . to [users] individual accounts on Facebook." SAC ¶ 111. It additionally contends that Meta's "continued failure to restore" user access to the accounts "while it earns a profit by using their personal information" violates California's Unfair Competition Law ("UCL"). SAC ¶ 113. In

4

other words, "Meta retains a broad license to use content published or uploaded to Facebook by Plaintiffs and the Class . . . [but] Plaintiffs and the Class are unable to limit that license by deleting information they posted to Facebook . . . ." SAC ¶ 118. These issues have made their way to the forefront of concern for at least forty State Attorneys General that resulted in a letter to Meta in which the Attorneys General requested that Meta take "immediate action" to combat the onslaught and fallout of the increased hacking activity. SAC ¶ 129.

Plaintiffs filed their Second Amended Class Action Complaint on behalf of the individually named plaintiffs and a Nationwide Class on June 4, 2025. Dkt. No. 37. The SAC alleges four causes of action for: (1) Breach of Contract, SAC ¶¶ 146–160; (2) Breach of the Covenant of Good Faith and Fair Dealing, SAC ¶¶ 161–182, (3) Violation of California's Unfair Competition Law, SAC ¶¶ 183–202; and, in the alternative, (4) Unjust Enrichment, SAC ¶¶ 203–215. They seek damages ($100 per user of liquidated damages pursuant to the TOS or nominal damages) or restitution, and injunctive relief so they may regain access to their accounts. SAC ¶¶ 13–15, 110. Meta filed its Motion to Dismiss ("MTD") on July 17, 2025.[2] Dkt. No. 40. Plaintiffs opposed the motion and Meta replied. Opposition to the MTD ("Oppo.") [Dkt. No. 42]; Reply ISO MTD ("Reply") [Dkt. No. 43].

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to

---

[2] Meta requests judicial notice of 5 exhibits appended to its Motion to Dismiss. *See* Request for Judicial Notice ("Meta RJN") [Dkt. No. 40-7]. These documents include Meta's TOS in 2022 and 2025, and Meta's June 2023, June 2024, and November 2024 Privacy Policies. *See* Dkt. Nos. 40-2, 40-3, 40-4, 40-5, and 40-6. The motion is unopposed, and indeed plaintiffs rely on identical exhibits appended to their complaint. The request for judicial notice is GRANTED. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.").

5

dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

**I.     Whether Plaintiffs Have Adequately Pleaded Standing to Raise a License Revocation Breach of Contract Theory**

Meta contends that plaintiffs lack standing because they do not allege "an injury in fact that is concrete, particularized, and actual or imminent." Reply 2–3 (citing to *TransUnion LLC v.*

6

*Ramirez*, 594 U.S. 413, 423 (2021)). In Meta's view, although plaintiffs argue in their opposition to the motion that "Meta precluded them from terminating [the license to content individuals post on Facebook] while their accounts were taken over [by hackers] and that Meta continued to profit from this license," nowhere in the SAC do plaintiffs argue that they wished to *revoke* the aforementioned license or delete the licensed content. Reply 2.

Meta is correct that plaintiffs' SAC principally contends that Meta is liable for the lack of access to their accounts and for Meta's purposeful inaction facing the activity of hackers, and that plaintiffs only significantly raise the issue that Meta does not allow them to delete their hacked accounts at any point in their opposition. *See* Oppo. 7–8. But the issue is generally broached in the SAC, if not thoroughly pleaded regarding any specific plaintiff or exclusively relied upon in any cause of action. *See, e.g.*, SAC ¶ 4 ("Thus, while Meta retains the benefit of the bargain, Plaintiffs and the Class have no access to their accounts nor the ability to restrict that license by altering or deleting such content"), ¶ 10 ("Plaintiffs and the Class also cannot access their accounts to delete them to prevent Meta from continuing to profit from their personal information . . . ."), ¶ 20 ("Meta profits from the content [plaintiff] posted through a license that [plaintiff] cannot revoke."), ¶ 32 ("Meta continues to benefit from this arrangement, which provides it a broad license over all content that users 'post or upload,' until the user deletes the content."), ¶ 44 ("Plaintiffs and Class members have been harmed by the loss of their accounts, the ability to use the Facebook platform, and the loss of control over the license that Meta is granted, which constitute further breaches to the Contract."), ¶ 131 ("No remedy at law is available that will remedy Plaintiffs and Class members' ongoing harm from Meta's continued failure to provide them restored access to their personal information and their account, or to even allow them to delete their account and end Meta's ability to profit from their information.").

It is not unreasonable to draw the inference that if plaintiffs are locked out of their accounts and unable to access the contents of their various posts, as plaintiffs allege throughout the SAC,

they are therefore precluded from deleting content or accounts. *Usher*, 828 F.2d at 561. This ultimately results in an inability to revoke Meta's license to plaintiffs' Facebook content. And, although Meta is again correct that any profit earned by Meta as a result of those licenses does not amount to an "injury in fact" to the plaintiffs, that plaintiffs no longer have control over whether their content is licensed and distributed to third parties by Meta could result in an injury in fact. *See* Reply 3; *see TransUnion LLC*, 594 U.S. at 423–430 (defining Article III standing requiring a concrete injury in fact).

As currently pleaded, Meta is correct that "nowhere in the SAC do Plaintiffs allege that they attempted, or even desired, to access Facebook to revoke any license that they granted Meta or delete the 'licensed' content." Reply 2. They must so allege if they wish to pursue a license revocation breach of contract theory in this case. *See TransUnion LLC*, 594 U.S. at 423–430.

## II.    Whether the TOS Bars any of Plaintiffs' Claims

Meta next argues that the TOS's limitation of liability provision precludes plaintiffs' causes of action for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; and (3) unjust enrichment. MTD 4–5; Reply 3. That provision states:

> To the extent permitted by law, [Meta] DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT.
>
> . . . [Meta] does not control or direct what people and others do or say [and is not] responsible for their actions or conduct (whether online or offline).
>
> [Meta's services are provided] as is [and Meta] makes no guarantees that [those services] always will be safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections.
>
> . . . under no circumstance will [Meta] be liable . . . for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Meta Products (however caused and on any theory of liability, including negligence), even if we have been advised of the possibility of such damages.

Meta RJN Exh. 1 [Dkt. No. 40-2] at 15, Exh. 5 [Dkt. 40-6] at 10. Meta argues that, far from what

8

plaintiffs allege in this case, these limitation of liability provisions require a conclusion that Meta cannot be held liable for "failing to provide 'error-free' access to Facebook." MTD 5.

In support of its argument, Meta cites a number of recent decisions in this court in which it says that my colleagues and I "have consistently held that Meta's TOS foreclose Meta's liability for claims related to user account access and lockouts . . . ." MTD 5 (citing *Kennedy v. Meta Platforms, Inc.*, No. 23-CV-06615-HSG, 2025 WL 1935433 (N.D. Cal. June 5, 2025) (Gilliam, J.), *Kennedy v. Meta Platforms, Inc.*, No. 23-CV-06615-HSG, 2024 WL 4565091 (N.D. Cal. Oct. 23, 2024) (Gilliam, J.), *Damner v. Facebook, Inc.*, No. 20-CV-05177-JCS, 2020 WL 7862706 (N.D. Cal. Dec. 31, 2020) (Spero, M.J.), *Long v. Dorset*, 369 F. Supp. 3d 939 (N.D. Cal. 2019) (Hamilton, J.), *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019) (Alsup, J.), *King v. Facebook*, No. 19-CV-01987-WHO, 2019 WL 6493968 (N.D. Cal. Dec. 3, 2019) (Orrick, J.)). I previously noted in *King*, for example, that "[a]s courts in this District have explained, while Facebook's Terms 'place restrictions on users' behavior,' they 'do not create affirmative obligations' on Facebook." *King*, 2019 WL 6493968, at *2 (collecting cases). Because this case involves third party hackers' interference with Facebook's platform, argues Meta, the TOS precludes Meta from any related liability.

I do not quite read these cases so broadly. Just because a case *involves* third party actors does not mean that Meta itself is not responsible for its own alleged conduct. Instead, this case is more like *Doe v. Meta Platforms*. 690 F. Supp. 3d 1064. *Doe* is an ongoing case where plaintiffs allege that Meta intercepted their sensitive health data, acquired through the Meta Pixel installed on different healthcare providers' websites, to direct targeted health-based advertisements towards plaintiffs for its own monetary gain in contravention of Meta's stated policies in its TOS. *Id.* at 1074. In *Doe*, I held that Meta's TOS did not bar plaintiffs' breach of contract claims or unjust enrichment claim because the type of damages sought there, restitution and nominal damages, along with Meta's alleged intentional conduct, was enough to at least survive a motion to dismiss

9

based on the limitation of liability clause. *Id.* at 1084–85. In *Doe*, I discussed California Civil Code section 1668, which reads: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

California Civil Code section 1668 equally applies here. Plaintiffs allege that Meta's conduct—specifically its decision to terminate upwards of 20,000 customer service employees—was an intentional step towards increasing Meta's profit margins that would knowingly result in an increase in unresolved hacked accounts from which Meta would continue to be able to profit. SAC, pp. 13–15 ¶¶ 36–39. They likewise allege entitlement to restitution and nominal damages. SAC ¶¶ 13–15, 110. And plaintiffs' license revocation breach of contract theory may add more color to the intentionally-alleged conduct. Even as currently alleged, however, the claims by-and-large would survive Meta's limitation of liability provisions.

There is an important qualification. As Meta argues, I and other judges throughout this district have consistently held that Meta's TOS do not create an "affirmative obligation" on Meta to act. MTD 5; *King*, 2019 WL 6493968, at *2. Insofar as the SAC and any TAC attempts to allege that Meta is liable under its TOS for (1) any third-party hacker behavior or (2) responsible for immediately remedying third party behavior, such claims are not actionable. *See Kennedy*, 2024 WL 4565091, at *4 (granting "the motion to dismiss Plaintiff's causes of action to the extent they are based on the alleged failure to keep Plaintiff's account secure and free from disruptions due to . . . third-party conduct"); *Damner*, 2020 WL 7862706, at *1–9 (same).

**III.  Whether Plaintiffs Have Stated a Claim for Relief for Each of Their Causes of Action**

Meta next argues that even if the limitation of liability provision of the TOS did not bar any of plaintiffs' causes of action, plaintiffs have failed to state a claim upon which relief could be granted for each claim in any event. MTD 6–25. Its arguments have merit.

### A. Breach of Contract

To adequately plead a breach of contract claim, a plaintiff must allege: "(1) [the existence of] the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom." *Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 999 (2010). Meta contends that plaintiffs fail to (1) identify any agreement that Meta breached and (2) allege adequate damages. MTD 6–15.

In opposition to the motion, plaintiffs state: "Plaintiffs allege that Meta breached its adhesive TOS by maintaining its license to use Plaintiffs' personal information after Plaintiffs lost the use of their accounts, which also deprived them of the ability to revoke Meta's license to use their information as well." Oppo. 7. Plaintiffs agree with Meta that "it might be in Meta's discretion to decide whether to restore access to users or to delete or disable stolen accounts," but emphasize that Meta "must do one of those two things or it breaches the contract by maintaining a license and continuing to use personal information while it does not provide use of the Facebook account containing personal information in return." Oppo. 7–8. They point to Meta's TOS stating: "You can delete individual content you share, post, and upload at any time" as a sufficient promise by Meta to a user signing up to use either of Meta's online platforms.[3] Oppo. 8. This provision, at least, could suffice as a "promise" or "contract" required for plaintiffs to state a claim for breach of contract. But plaintiffs' complaint, as currently pleaded, does not rely on this specific language and instead significantly depends on other provisions in Meta's TOS that make no such promise.

"To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis

---

[3] As Meta indicates, this deletion is distinct from full "deletion of content from Meta's systems"— a distinction that plaintiffs will need to address in any amended complaint. Reply 4.

11

for the assessment of damages." *Ladas v. Cal. State Auto. Assn.*, 19 Cal. App. 4th 761, 770 (1993). "An amorphous promise . . . cannot rise to the level of a contractual duty." *Id.* at 771. As currently pleaded, plaintiffs rely on portions of the TOS and privacy policy that constitute "amorphous promise[s]." *Id.* For example, the SAC cites Meta's policy that it "may disable or delete [a user's] account if it appears to have been hacked or compromised and we are unable to confirm ownership of the account after a year, or if the account is unused and remains inactive for an extended period of time." SAC, p.12 ¶ 36. Likewise, plaintiffs assert that Meta states an intention that it "promote[s] safety, security and integrity" or that it "work[s] to . . . verify accounts and . . . investigate suspicious activity," among other things. SAC, p.13 ¶ 38. But these are nothing more than Meta's stated goals—they do not amount to a contractual *guarantee* that Meta will respond to any particular problem in any particular manner and therefore "cannot rise to the level of a contractual duty." *Ladas*, 19 Cal. App. 4th at 771; *accord Kennedy*, 2025 WL 1935433, at *3. In their amended complaint, plaintiffs may not rely on these or similar provisions of the TOS as requiring Meta to take specific action—Meta does not promise that it will – and instead identify each provision in the TOS or privacy policy that they believe creates an enforceable contractual promise.[4]

Meta also contests the fourth prong of plaintiffs' breach of contract claim, damages. MTD 12–15. Principally, Meta argues that (1) plaintiffs have failed to allege any actual economic damages, (2) their stated claim for liquidated damages is flawed, and (3) any reliance on mere nominal damages at this stage in the litigation fails pursuant to California law. *Id.* Plaintiffs admit they do not seek actual damages, but argue they have adequately alleged and can seek liquidated and nominal damages.

---

[4] Akin to my conclusion in *Doe*, however, plaintiffs may use any "sufficiently definite" contractual provisions to support their claim for breach of contract. *Doe*, 690 F. Supp. 3d at 1085.

"California courts have defined liquidated damages as an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by agreement." *Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252, 1256 (N.D. Cal. 2015) (quoting *Chodos v. West Publ'g Co.*, 292 F.3d 992, 1002 (9th Cir. 2002)). "To be sufficiently fixed and certain to qualify as 'liquidated damages,' a provision must either set the exact amount (i.e., a single number), or provide some formula by which the amount is 'certain or readily ascertainable.'" *Id.* (citation omitted).

The provision at issue in this case reads: "Our aggregate liability . . . will not exceed the greater of $100 or the amount you have paid us in the past twelve months." RJN Exh. 1 at 15. Plaintiffs agree that the second clause of the liability statement does not apply to them. Oppo. 11. They read the provision "will not exceed . . . $100" to require a definitive liability, upon the determination of a breach of contract, of $100 for each plaintiff. That is not what the plain language says. "[W]ill not exceed . . . $100" means exactly that—that Meta's total liability will not be more than $100. That does not preclude that it may be less. Because the value is not "sufficiently fixed and certain," this provision cannot be read to amount to liquidated damages in the sense contemplated by California law. *See Chodos*, 292 F.3d at 1002.

The issue of nominal damages swings the other way. Meta argues that nominal damages are insufficient to state a claim for breach of contract. MTD 15 (citing *Advanced Risk Managers, LLC v. Equinox Mgmt. Grp., Inc.*, No. 19-CV-03532-DMR, 2021 WL 4243400, at *7 (N.D. Cal. Sept. 17, 2021) (Ryu, M.J.) ("a breach of contract claim does not accrue until the plaintiff shows an actionable and appreciable harm beyond mere nominal damages.") (cleaned up)). As plaintiffs point out, there is a clear split in California caselaw whether that is so. *See* Oppo. 10 (citing *In re Facebook Priv. Litig.*, 192 F. Supp. 3d 1053, 1060–62 (N.D. Ca. 2016) (Whyte, J.) (collecting cases). Meta asks that I look to an unpublished, and therefore non-precedential, Ninth Circuit case on the issue but simultaneously recognizes that "the California Supreme Court" has not yet

13

answered the question. Reply 6 (citing to *Ruiz v. Gap, Inc.*, 380 F. App'x 689, 692 (9th Cir. 2010)). Indeed, I previously allowed a breach of contract claim to move forward on claims of entitlement to nominal damages and restitution. *See Doe*, 690 F. Supp. 3d at 1084–85; *see also* Cal. Civ. Code § 3660 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."). Unless and until the California Supreme Court definitively decides this issue, I will not foreclose nominal damages here.

Plaintiffs' breach of contract claim is DISMISSED with leave to amend. They are permitted to allege nominal damages in connection with their license revocation theory but may not seek liquidated damages.

### B. Breach of Covenant of Good Faith and Fair Dealing

"A claim for breach of the implied covenant of good faith and fair dealing requires the same elements [as a claim for breach of contract], except that instead of showing that defendant breached a contractual duty, the plaintiff must show, in essence, that defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting." *Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 949 (N.D. Cal. 2014) (Cousins, M.J.) (citation omitted). Although there can be significant overlap between a breach of contract and breach of covenant of good faith and fair dealing claim, courts typically allow both claims to proceed when, in addition to the required breach of contract elements, a plaintiff additionally alleges bad faith on the part of defendant(s). *See Doe*, 690 F. Supp. 3d at 1086, n.10. Additionally, courts "allow simultaneous breach of contract and implied covenant claims when the plaintiff alleges that the defendant exercised a right under the contract in bad faith to frustrate the contract's benefits." *JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, No. 20-CV-05381-HSG, 2022 WL 195648, at *3 (N.D. Cal. Jan. 21, 2022) (Gilliam, J.).

Here, plaintiffs again heavily reference their license revocation theory. Oppo. 14. For the same reasons that I explained above, they must expressly and adequately plead that theory to move

forward on this claim. It follows from plaintiffs' purported license theory that any alleged intentional act on Meta's behalf to maintain a license while plaintiffs themselves cannot revoke said license is an act in "bad faith to frustrate the contract's benefits." *JH Kelly, LLC*, 2022 WL 195648, at *3. It appears likely that, at least as explained in opposition, if plaintiffs are able to adequately plead this cause of action:

> the case for breach of implied covenant is stronger [than plaintiffs' breach of contract claim] because even if [Meta] were, at a later stage in the litigation, able to identify a technical argument for why it did not *quite* violate the literal terms of its contract with its users, it would be difficult to conclude (if the factual allegations in the complaint are true) that [Meta] did not frustrate the purposes of the contract, and intentionally so.

*In re Facebook Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 802 (N.D. Cal. 2019) (Chhabria, J.) (emphasis in original).

### C. Violation of California's Unfair Competition Law

California's UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. A UCL claim may only be brought by "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." *Id.* at § 17204. Plaintiffs must therefore "demonstrate some form of economic injury." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011). For example, a "plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.* This list is non-exhaustive. *Id.*

Here plaintiffs assert that they have standing to bring a UCL claim because they have "demonstrate[d] some form of economic injury" by alleging "the loss of their personal property—their valuable personal information" due to Meta's practices. *Id.*; Oppo. 18. Courts in this district are split on whether loss of plaintiffs' valuable personal information constitutes "economic injury," and there is no binding Ninth Circuit authority. *See A&B ex rel. Turner v. Google LLC*,

37 F. Supp. 3d 869, 881 (N.D. Cal. 2024) (Pitts, J.) (collecting cases).

For example, the panel in *In re Facebook Privacy Litigation*, cited by plaintiffs in support of their opposition, "affirm[ed] the district court's dismissal of plaintiffs' UCL claim because plaintiffs failed to allege that they 'lost money or property as a result of the unfair competition,'" despite their allegations that they were "harmed both by the dissemination of their personal information and by losing the sales value of that information." 572 F. App'x 494 (9th Cir. 2014). And, in *Hubbard v. Google LLC*, No. 19-CV-07016-SVK, 2025 WL 82211 (N.D. Cal. Jan. 13, 2025) (Van Keulen, M.J.), the court determined that assertions of privacy loss could not suffice to adequately plead economic injury. Cases like *Calhoun v. Google*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (Koh, J.) and *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1024 (N.D. Cal. 2024) (Pitts, J.) conclude otherwise. I agree with the latter line of cases. As the Hon. Casey Pitts held in *In re Meta Pixel Tax Filing Cases,* "Privacy harms involving personal data can constitute an injury to money or property sufficient to provide standing under the UCL." 724 F. Supp. 3d at 1024. The harms involving personal data can constitute economic injury under three distinct theories: (1) unfair benefit-of-the-bargain; (2) diminished value of personal information; and (3) reduced right to exclude others from accessing personal data. *Id.* However, plaintiffs in the instant case fail to adequately plead economic injury under any of these theories.

In opposition, plaintiffs attempted to clarify that their loss of access to personal information ("including pictures, private messages, and connections with personal and business partners") has resulted in a quantifiable net gain for *Meta*, and so they have pleaded a calculable monetary damage to themselves. Oppo. 19–20. That is not the same as pleading "diminished value of personal information." *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1024. As the Hon. William Alsup held in *Bass v. Facebook*, "[t]hat the information has external value, but no economic value to plaintiff, cannot serve to establish that plaintiff has personally" suffered an economic injury. 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019). And, as explained by Judge Pitts

16

in *In Re Meta Pixel Tax Filing Cases*, a UCL claim can be sustained on this theory only "if a plaintiff alleged that they either 'attempted or intended to participate' in the market for their data, or 'otherwise to derive economic value from their [personally identifiable information].'" 724 F. Supp. 3d at 1024 (quoting *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 538 (2022)). Plaintiffs have not alleged any attempt or intention to participate in the market in the SAC.

Further, plaintiffs' brief "benefit of the bargain" argument falls flat because even in the context of loss of personal data as economic loss, courts look to allegations that a "user originally paid for the business's service as part of the transaction," which has not been alleged here. Oppo. 20; *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1024; *see also In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *32 (N.D. Cal. May 27, 2016) (Koh, J.) (plaintiffs paid insurance premiums); *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1019 (N.D. Cal. 2019) (Seeborg, J.) (plaintiffs made purchases on walmart.com); *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1301 (S.D. Cal. 2020) (defendants sold medical devices to plaintiffs). Plaintiffs do not allege this type of financial transaction here.

Plaintiffs do not raise any argument aligned with the "reduced right to exclude" theory of economic injury in opposition. *See* Oppo. 18–20. Plaintiffs therefore lack standing to bring a UCL claim. The third cause of action is DISMISSED with leave to amend.[5]

### D. Unjust Enrichment

In the alternative to its contract claims, plaintiffs plead a fourth cause of action for unjust enrichment. SAC ¶¶ 203–215. Although there is no cause of action in California for unjust

---

[5] If plaintiffs are able to successfully plead economic injury in any amended complaint, they should specify intended legal hooks that adequately plead any one of the three UCL prohibited behaviors.

17

enrichment, "[v]arious causes of action may allege that a defendant has been unjustly enriched and that restitution is required." *World Surveillance Grp. Inc. v. La Jolla Cove Investors, Inc.*, No. 13-CV-03455-WHO, 2014 WL 1411249, at *2 (N.D. Cal. Apr. 11, 2014) (Orrick, J.). In cases where such a cause of action is pleaded, "the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment." *Id.* (citation omitted). Despite the allowance of a quasi-contract in such instances, plaintiffs' unjust enrichment claim in *this* case fails at this juncture.

As an initial matter, "courts routinely dismiss unjust enrichment claims where a plaintiff cannot assert any substantive claims against a defendant." *In re Actimmune Marketing Litig.*, No. C-08-02376-MHP, 2009 WL 3740648, at *16 (N.D. Cal. Nov. 6, 2009) (Patel, J.). Since I have already dismissed each of plaintiffs' previous causes of action in this case, it follows that this cause of action must be dismissed too. But, more important to the claims as currently pleaded, "[a]s a matter of law, an unjust enrichment claim does not lie where the parties have an enforceable express contract." *Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010).

Federal Rule of Civil Procedure 8 allows a plaintiff to assert "inconsistent theories of recovery at the pleading stage . . . and even inconsistent claims alleging both the existence and the absence of an enforceable contract." *Schulz v. Cisco Webex, LLC*, No. 13-CV-04987-BLF, 2014 WL 2115168, at *5 (N.D. Cal. 2014) (Freeman, J.). But "a plaintiff may not plead the existence of an enforceable contract and maintain a quasi-contract claim at the same time, unless the plaintiff has pled facts suggesting that the contract may be unenforceable or invalid." *Jacobs v. Sustainability Partners LLC*, No. 20-CV-01981-PJH, 2020 WL 5593200, at *17 (N.D. Cal. Sept. 18, 2020) (Hamilton, J.) (citation omitted). Plaintiffs allege the existence of a contract throughout the complaint via Meta's TOS. And, even in their unjust enrichment cause of action, plaintiffs directly refer to the "exchange" of personal data for Meta's "broad, transferrable and worldwide license to use [plaintiffs'] content. SAC ¶¶ 204–08. Plaintiffs cannot allege the existence of a

contract while simultaneously alleging a quasi-contract. If they wish to truly bring a cause of action for unjust enrichment in the alternative, they must do so by pleading facts suggesting the unenforceability or invalidity of the contract at issue. *See, e.g.*, *Doe v. Meta Platforms, Inc.* No. 22-CV-03580-WHO, Consolidated Class Action Complaint [Dkt. No. 185] at 115, ¶¶ 489–495. Once adequately pleaded, to the extent the court finds any alleged contract unenforceable or invalid, plaintiffs may sustain a claim for unjust enrichment.

## CONCLUSION

For the above reasons, Meta's motion to dismiss is GRANTED IN PART. Each of plaintiffs' causes of action are DISMISSED WITH LEAVE TO AMEND. Any amended complaint shall be filed within 30 days of this order.

**IT IS SO ORDERED.**

Dated: January 26, 2026

William H. Orrick
United States District Judge