WALTER F. BROWN (SBN: 130248)
wbrown@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON**
**& GARRISON LLP**
535 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

MELISSA FELDER ZAPPALA (*Pro Hac Vice*)
mzappala@dirllp.com
**DUNN ISAACSON RHEE LLP**
401 9th Street NW
Washington DC, 20004
Telephone: (202) 240-2900
Facsimile:  (202) 240-2050

MEREDITH R. DEARBORN (SBN: 268312)
mdearborn@dirllp.com
**DUNN ISAACSON RHEE LLP**
345 California Street, Suite 600
San Francisco, CA 94104
Telephone: (202) 240-2900

*Attorneys for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SARA ISGUR, EDDIE EDWARDS, and RICHARD REPP, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 3:24-cv-06559-WHO <br><br> **DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date: July 15, 2026 <br> Time: 2:00 p.m. PT <br> Courtroom: 2 (17th Floor) <br> Judge: Hon. William H. Orrick |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 15, 2026, at 2:00 p.m. PT, or as soon thereafter as this matter may be heard, in the United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom 2, 17th Floor, at 450 Golden Gate Avenue, San Francisco, CA 94102, before the Hon. William H. Orrick, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move the Court to dismiss Plaintiffs Sara Isgur, Eddie Edwards, and Richard Repp's Third Amended Class Action Complaint (*Isgur, et al.* v. *Meta Platforms, Inc.*, No. 3:24-cv-06559-WHO (Dkt. No. 48)) in its entirety. This Motion is supported by this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; all matters of which the Court may take judicial notice; the pleadings and papers on file herein; and any other argument or evidence that may be received by the Court.

## RELIEF SOUGHT

Meta seeks an order dismissing Plaintiffs' Third Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF ISSUE TO BE DECIDED

Should all claims against Meta be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6)?

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................II

INTRODUCTION .........................................................................................................................1

PROCEDURAL HISTORY............................................................................................................3

BACKGROUND ...........................................................................................................................3

      A.      Meta Promotes The Security Of Its Services. ...........................................................3

      B.      Meta Has A License To User Content That Ends When It Is
            Deleted From Meta's Systems. .................................................................................5

LEGAL STANDARD.....................................................................................................................6

ARGUMENT .................................................................................................................................7

I.      PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS BECAUSE
       THE TOS DO NOT CONTAIN THE ALLEGED PROMISES (COUNT
       I)..................................................................................................................................7

      A.      The TOS Do Not Promise That Locked-Out Users Can Delete
            Their Content. ...........................................................................................................7

      B.      The TOS Do Not Promise That Plaintiffs Can Revoke Meta's
            License To Use Their Information..............................................................................9

II.     PLAINTIFFS FAIL TO PLAUSIBLY PLEAD BREACH OF THE
       IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
       (COUNT II). ...........................................................................................................12

      A.      Plaintiffs' Implied Covenant Claim Seeks To Impose Obligations
            Beyond The Terms Of The Contract. ......................................................................12

      B.      Plaintiffs Fail To Plausibly Allege That Meta Acted In Bad Faith........................13

      C.      Plaintiffs Fail To Allege That Meta Deprived Them Of Any
            Benefit In Violation Of The Parties' Expectations. ...............................................16

III.    PLAINTIFFS FAIL TO PLEAD A VIOLATION OF CALIFORNIA'S
       UNFAIR COMPETITION LAW (COUNT III). ....................................................17

      A.      Plaintiffs Have No Standing To Bring A UCL Claim. ...........................................17

      B.      Plaintiffs Cannot Base An Unlawful Claim On A Breach Of
            Contract...................................................................................................................21

      C.      Plaintiffs' Allegations Do Not Establish That Meta's Conduct Is
            Unfair. .....................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amacker* v. *Bank of Am.*,
2014 WL 4771668 (N.D. Cal. 2014) ...................................................................22

*Anderson* v. *Apple Inc.*,
500 F. Supp. 3d 993 (N.D. Cal. 2020) (Orrick, J.) ..........................................13, 14

*In re Anthem, Inc. Data Breach Litig.*,
2016 WL 3029783 (N.D. Cal. May 27, 2016) .........................................................18

*Appling* v. *State Farm Mut. Auto. Ins. Co.*,
340 F.3d 769 (9th Cir. 2003) ...........................................................................12, 15

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) .................................................................................................7

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)..................................................................................................7

*Bodenburg* v. *Apple Inc.*,
146 F.4th 761 (9th Cir. 2025) .................................................................................10

*Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*,
971 F.2d 272 (9th Cir. 1992) ..................................................................................10

*Capp* v. *Cnty. of San Diego*,
940 F.3d 1046 (9th Cir. 2019) ..................................................................................7

*Careau & Co.* v. *Sec. Pac. Bus. Credit, Inc.*,
222 Cal. App. 3d 1371 (1990) .................................................................................13

*Dameron Hosp. Ass'n.* v. *Geico Gen. Ins. Co.*,
2024 WL 4581685 (E.D. Cal. Oct. 25, 2024) ........................................................21

*Davis* v. *HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) ................................................................................22

*Donohue* v. *Apple, Inc.*,
871 F. Supp. 2d 913 (N.D. Cal. 2012) ....................................................................14

*Drum* v. *San Fernando Valley Bar Ass'n*,
182 Cal. App. 4th 247 (2010) ............................................................................22, 23

*Ebeid* v. *Facebook, Inc.*,
2019 WL 2059662 (N.D. Cal. May 9, 2019).............................................................14

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...............................................................................................7

*In re Google RTB Privacy Litig.*,
    606 F. Supp. 3d 935 (N.D. Cal. 2022) ..................................................................................16

*Great Minds* v. *Office Depot, Inc.*,
    945 F.3d 1106 (9th Cir. 2019) ...............................................................................................8

*Hadley* v. *Kellogg Sales Co.*,
    243 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................................21, 22

*Hammerling* v. *Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) ................................................................................22

*Hazel* v. *Prudential Fin., Inc.*,
    2023 WL 3933073 (N.D. Cal. June 9, 2023) .........................................................................19

*Hodges* v. *Apple Inc.*,
    2013 WL 6698762 (N.D. Cal. Dec. 19, 2013) (Orrick, J.) *aff'd*, 640 F. App'x
    687 (9th Cir. 2016)................................................................................................................23

*Hodsdon* v. *Mars., Inc.*,
    162 F. Supp. 3d 1016 (N.D. Cal. 2016), *aff'd*, 891 F.3d 857 (9th Cir. 2018) .......................23

*Huynh* v. *Quora, Inc.*,
    2019 WL 11502875 (N.D. Cal. Dec. 19, 2019).....................................................................19

*Isgur, et al.* v. *Meta Platforms, Inc.*,
    2026 WL 194640 (N.D. Cal. Jan. 26, 2026) .................................................................. *passim*

*Jackson* v. *Fischer*,
    2015 WL 5569133 (N.D. Cal. Sept. 21, 2015) ......................................................................24

*Joude* v. *WordPress Found.*,
    2014 WL 3107441 (N.D. Cal. July 3, 2014)..........................................................................10

*Karam* v. *Meta Platforms, Inc.*,
    2025 WL 3079048 (N.D. Cal. Nov. 4, 2025) ..........................................................................8

*Kennedy* v. *Meta Platforms Inc.*,
    2024 WL 4565091 (N.D. Cal. Oct. 23, 2024)..........................................................................9

*King* v. *Facebook, Inc.*,
    2019 WL 6493968 (N.D. Cal. Dec. 3, 2019) (Orrick, J.), aff'd, 845 F. App'x
    691 (9th Cir. 2021)..................................................................................................................9

*Lagrisola* v. *N. Am. Fin. Corp.*,
    96 Cal. App. 5th 1178 (2023) ................................................................................................18

*Libman* v. *Apple, Inc.*,
2024 WL 4314791 (N.D. Cal. Sept. 26, 2024) ........................................................................20

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal 2024) .............................................................................18, 20

*Ndulue* v. *Fremont-Rideout Health Grp.*,
770 F. App'x 335 (9th Cir. 2019) ..........................................................................................21

*NorthBay Healthcare Grp.-Hosp. Div.* v. *Blue Shield of Cal. Life & Health Ins.*,
342 F. Supp. 3d 980 (N.D. Cal. 2018) (Orrick, J.) .................................................................22

*Puentes* v. *Wells Fargo Home Mortg., Inc.*,
160 Cal. App. 4th 638 (2008) .................................................................................................21

*Richards* v. *Centripetal Networks, Inc.*,
709 F. Supp. 3d 914 (N.D. Cal. 2024) ...................................................................................13

*S. Bay Chevrolet* v. *Gen. Motors Acceptance Corp.*,
72 Cal. App. 4th 861 (1999) ...................................................................................................22

*Schertzer* v. *Bank of Am., NA*,
109 F.4th 1200 (9th Cir. 2024) .................................................................................................8

*Shroyer* v. *New Cingular Wireless Servs.*,
622 F.3d 1035 (9th Cir. 2010) ...............................................................................................21

*Somers* v. *Apple*,
729 F.3d 953 (9th Cir. 2013) ..................................................................................................16

*Textron Fin. Corp.* v. *Nat'l Union Fire Ins. Co.*,
118 Cal. App. 4th 1061 (2004) ..............................................................................................22

*In re Tiktok Inc., Minor Priv. Litig.*,
2025 WL 3628598 (C.D. Cal. Nov. 5, 2025) .........................................................................20

*TopDevz, LLC* v. *LinkedIn Corp.*,
2021 WL 6113003 (N.D. Cal. Dec. 27, 2021) .......................................................................14

*Traumann* v. *Southland Corp.*,
858 F. Supp. 979 (N.D. Cal. 1994) ........................................................................................10

*Weisbuch* v. *Cnty. of Los Angeles*,
119 F.3d 778 (9th Cir. 1997) ....................................................................................................7

*Wright* v. *Charles Schwab & Co., Inc.*,
2021 WL 1056838 (N.D. Cal. Mar. 18, 2021) .......................................................................21

*Young* v. *Meta Platforms, Inc.*,
2025 WL 2930979 (N.D. Cal. Oct. 15, 2025) ..........................................................................8

*Zhang* v. *Superior Court*,
    57 Cal. 4th 364 (2013) ..................................................................................................22

**Statutes**

Cal. Civ. Code § 1641 ....................................................................................................8, 11

California's Unfair Competition Law, Cal. Bus. & Prof. § 17200 *et seq.* .................................2, 18

**Other Authorities**

Federal Rules of Civil Procedure 8 .................................................................................... i

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... i, 6

**INTRODUCTION**

Now on the fourth complaint in this matter, Plaintiffs Sarah Isgur, Eddie Edwards, and Richard Repp seek yet again to hold Defendant Meta Platforms, Inc. ("Meta") liable for the takeover of their Facebook accounts by malicious third parties. This Court previously dismissed Plaintiffs' Second Amended Complaint ("SAC"; Dkt. No. 37) for failure to state claims, and Plaintiffs' attempt to replead their claims in their Third Amended Complaint (the "TAC"; Dkt. No. 48) fares no better. The TAC repeats many of the allegations that this Court found deficient when dismissing the SAC. The Plaintiffs also pivot to a "license revocation" theory, which this Court dismissed as insufficiently pled in the SAC. *Isgur, et al.* v. *Meta Platforms, Inc.*, 2026 WL 194640, at *4-5 (N.D. Cal. Jan. 26, 2026). Despite getting another bite at the apple, Plaintiffs' license revocation theory still fails. Accordingly, the Court should dismiss Plaintiffs' claims with prejudice.

Just like the SAC, the heart of Plaintiffs' TAC is the notion that, after third-party bad actors took over Plaintiffs' accounts, Meta did not promptly restore Plaintiffs' access to their accounts. *See, e.g.*, TAC ¶¶ 2-3, 13-14, 40-41. And, just as in the SAC, Plaintiffs attempt to hold Meta liable for the misconduct of these third-party bad actors. But this Court already ruled that "[i]nsofar as the SAC and any TAC attempts to allege that Meta is liable under its TOS for (1) any third-party hacker behavior or (2) responsible for immediately remedying third party behavior, such claims are not actionable." *Isgur*, 2026 WL 194640, at *6.

Plaintiffs endeavor to circumvent this admonition by focusing on their previously (and still) inadequately pled "license revocation" theory. The TOS state that when users share, post, or upload content they grant Meta a "non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license" and that the "license will end when your content is deleted from our systems." Ex. A at 8 §3.3.1; Ex. B at 9 §3.3.2.[1] Plaintiffs argue that this language means users can revoke—at any time—Meta's license to their content by deleting the content. TAC ¶¶ 7, 12, 35-37, 146-48. They further contend that because locked-out users cannot revoke Meta's license,

---

[1]   References to "Exhibit A" are references to Meta's Terms of Services filed at ECF No. 48-1, and references to "Exhibit B" are references to Meta's Terms of Services filed at ECF No. 48-2. The associated page citations are based on the ECF pagination.

Meta has violated the TOS and is liable for breach of contract (Count I). TAC ¶¶ 146-53. But, contrary to what Plaintiffs claim, the TOS do not promise that locked-out users can delete their content. Nor do the TOS establish that user-deletion of content, on its own, terminates Meta's license. Such a reading contradicts the plain language of the TOS, which (1) do not impose any obligation on Meta to facilitate deletion of content by locked-out users, and (2) provide that Meta retains a license to content for as long as it resides on Meta's systems, and that there are circumstances in which Meta may continue to store content after it has been deleted by users.

Plaintiffs attempt to evade the plain language of the TOS by claiming that Plaintiffs' inability to terminate Meta's license is a breach of the implied covenant of good faith and fair dealing (Count II). This claim fails for three independent reasons. First, an implied covenant claim cannot be used to impose obligations not contained in the contractual language, and because the TOS contain no promise of license revocation, the implied covenant claim cannot manufacture one. Second, Plaintiffs cannot plausibly allege the bad faith required to maintain an implied covenant claim—none of their bad faith allegations reflect the required conscious and deliberate intent to frustrate the contract. Third, Plaintiffs' assertion that Meta violated their contractual expectations by retaining the license while Plaintiffs lacked account access, TAC ¶ 155, cannot be squared with the TOS, which make clear that Meta's license exists for the broad purpose of "providing and improving [its] Products and services," Ex. A at 7 §3.3.1, Ex. B at 8 §3.3.1, not solely to facilitate Plaintiffs' own use of the platform.

Finally, Plaintiffs' claim for violation of California's Unfair Competition Law, Cal. Bus. & Prof. § 17200 *et seq.* ("UCL") (Count III) fails as well. Plaintiffs have not adequately alleged any economic injury sufficient to grant them standing to bring any of their UCL claims. Moreover, Plaintiffs' attempt to argue a breach of the "unlawful" prong of the UCL fails because Plaintiffs base this claim on Meta's alleged breach of contract. It is well-established that Plaintiffs cannot base a claim under the unlawful prong of the UCL on an alleged breach of contract. Nor can Plaintiffs' claim under the "unfairness" prong of the UCL survive—among other reasons, the unfair business practices alleged overlap entirely with the business practices alleged under the unlawful prong of the UCL, and in such a situation, a claim under the unfair

prong of the UCL cannot survive if the unlawful claim fails.

Because Plaintiffs' fourth iteration of their claims fails again, the TAC should be dismissed with prejudice.

## PROCEDURAL HISTORY

Plaintiff Isgur filed her original Complaint on September 18, 2024. Dkt. No. 1. Meta timely filed a motion to dismiss on November 19, 2024. Dkt. No. 22. In lieu of opposing the motion, Plaintiff Isgur filed an Amended Complaint on January 21, 2025. Dkt. No. 27. Just four days before Meta's March 24, 2025 deadline to respond, Plaintiff Isgur notified Meta that she may seek to amend her Complaint a second time to bring in additional clients she had recruited. Dkt. No. 31. Plaintiff Isgur then sought leave to file Plaintiffs' SAC, Dkt. No. 35, which was granted on June 2, 2025, Dkt. No. 36. Plaintiffs filed the SAC on June 4, 2025. Dkt. 37. Meta filed its motion to dismiss the SAC on July 17, 2025, Dkt. 40. On January 26, 2026, the Court granted Meta's motion to dismiss in part, dismissing each of Plaintiffs' causes of action with leave to amend. *Isgur*, 2026 WL 194640, at *11. On February 25, 2026, a subset of Plaintiffs identified in the SAC filed their TAC. Dkt. No. 48.

## BACKGROUND

### A.    Meta Promotes The Security Of Its Services.

Meta operates Facebook, an online service that helps users build community, discover, connect, and share messages, photos, videos, and links to other content. Ex. A at 2; Ex. B at 2, Overview. As stated in the TOS, "[p]eople will only build community on Meta Products if they feel safe and secure," and Meta "work[s] hard to maintain the security. . . of [its] Products and services." Ex. A at 3 § 1; Ex. B at 4 § 1.5. When users lose control over their accounts, the locked-out users may miss out on Facebook's content, and other users who interact with the accounts that have been taken over may have bad experiences. *See e.g.*, TAC ¶¶ 16, 56-58, 99-100.

Meta "[p]romote[s] the safety, security, and integrity of [its] services." For instance, Meta's TOS describe that Meta:

work[s] hard to maintain the security (including the availability, authenticity, integrity, and confidentiality) of our Products and services. We employ dedicated teams around the world, work with external service providers, partners and other relevant entities and develop advanced technical systems to detect potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community, including to respond to user reports of potentially violating content. If we learn of content or conduct like this, we may take appropriate action based on our assessment that may include - notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement.

Ex. A at 3-4 § 1; Ex. B at 4 § 1.5.

As Plaintiffs themselves acknowledge, Meta's "dedicated teams" can, and do, work to protect Facebook users. For instance, Meta has an automated system that alerts users of unusual activity on their accounts, which can alert a user of a potential account take-over. TAC ¶¶ 53, 67-70, 87. And when Facebook users lose access to their accounts, Meta offers tools to recover them. *Id.* ¶¶ 38 n.6, 54, 70, 72, 78, 87. For example, Meta alerts users of unusual account activities, and Facebook's log-in page provides information on "account recovery options" for users who are locked out. *Id.* ¶¶ 87-88. These account recovery options are varied, with options that go so far as to let users submit "identification" documents to recover their accounts. *Id.* ¶¶ 54, 72, 90.

Plaintiffs allege they lost access to their Facebook accounts due to the conduct of third-party bad actors, not Meta. Plaintiff Isgur alleges that her Facebook account was "hacked by an unknown user" on June 21, 2023. TAC ¶ 52. This unknown user "immediately changed the password, mobile phone number, and email address associated with her accounts." *Id*. Likewise, Plaintiff Repp alleges that between September 19-22, 2024, an "unknown user" took over his account. TAC ¶¶ 83-86. Similarly, Plaintiff Edwards alleges that his "account was hacked by an unknown user" on March 5, 2025. TAC ¶ 64. Plaintiff Edwards has since regained access to his account. TAC ¶¶ 78-79.

Each Plaintiff's allegations confirm that their primary objective is regaining access to Facebook. Plaintiffs allege they contacted Meta through various channels seeking to recover their accounts. TAC ¶¶ 53-59, 72-79, 87-94. Every communication Plaintiffs allege was directed at restoring account access. *Id.* Nevertheless, Plaintiffs now assert that, if they could not regain account access, they would "prefer[] for Meta to return [their] personal content and provide

[them] with the ability to delete it from Meta's systems." TAC ¶¶ 61, 80, 94. No Plaintiff alleges that they ever communicated any such request to Meta.

### B.   Meta Has A License To User Content That Ends When It Is Deleted From Meta's Systems.

Plaintiffs seek to hold Meta liable for their lockouts under a "license revocation" theory of liability, which focuses on the license that Facebook users, such as Plaintiffs, grant Meta. As stated in the TOS, when users "share, post, or upload" content to their accounts, they grant Meta a "non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license." Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.2; TAC ¶¶ 6-7, 35-36, 146-47. The license gives Meta authority to "host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of [the] content." Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.2. Meta's license exists "for the purposes of providing and improving [Meta's] Products and services," including Facebook. Ex. A at 7 § 3.3.1; Ex. B at 8 § 3.3.1. The TOS state that Meta's license ends when the "content is deleted from [Meta's] systems." Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.2.

The TOS distinguish between user deletion of content and the deletion of content from Meta's systems. The latter–Meta's deletion of content from Meta's systems–is what ends Meta's license to user-shared content. *See* Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.2.

While the TOS provide that a user may "delete individual content . . . at any time," Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.3, they do not guarantee uninterrupted access to the platform or to the deletion function. To the contrary, Meta's products are provided "as is," and Meta expressly disclaims any guarantee that they will be "safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections," and states that it cannot "predict when issues might arise with [Facebook]." Ex. A at 10 § 4.3; Ex. B at 11-12 § 4.3. Moreover, Meta has specific "policies on disabling or deleting hacked, unused, or unconfirmed accounts," and these policies do not guarantee that locked-out users will be able to delete their accounts. TAC ¶ 38 n.6. These policies state only that Meta "*may* disable or delete your account if it appears to have

been hacked or compromised." *Id.*[2]

A user grants Meta a license when posting content and may delete that content, but the TOS unambiguously provide that the license continues until the "content is deleted *from [Meta's] systems.*" Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.2. User deletion of content may initiate a process whereby Meta deletes the content from its systems up to 90 days after Meta receives a content deletion request. Ex. A at 8 § 3.3.1; Ex. B at 9-10 § 3.3.3. But there are circumstances under the TOS in which Meta may retain the data, including:

- Where your content has been used by others in accordance with this license and they have not deleted it (in which case this license will continue to apply until that content is deleted);

- where deletion within 90 days is not possible due to technical limitations of our systems, in which case, we will complete the deletion as soon as technically feasible; or

- where immediate deletion would restrict our ability to:

  - investigate or identify illegal activity or violations of our terms and policies (for example, to identify or investigate misuse of our Products or systems);

  - protect the safety, integrity, and security of our Products, systems, services, our employees, and users, and to defend ourselves;

  - comply with legal obligations for the preservation of evidence, including data Meta Companies providing financial products and services preserve to comply with any record keeping obligations required by law; or comply with a request of a judicial or administrative authority, law enforcement or a government agency.

Ex. A at 8-9 § 3.3.1; Ex. B at 9-10 § 3.3.3. In each of these cases, Meta's "license will continue until the content has been fully deleted." Ex. A at 9 § 3.3.1; Ex. B at 10 § 3.3.3.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

---

[2] Unless otherwise indicated, emphasis is added and internal citations and quotations are omitted.

complaint must contain sufficient factual matter "to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Courts need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008). And even where facts in the pleadings are accepted as true, "[a] plaintiff may plead herself out of court" if she "plead[s] facts which establish that she cannot prevail on h[er] . . . claim." *Weisbuch* v. *Cnty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997). Additionally, "an allegation is not plausible where there is an 'obvious alternative explanation' for alleged misconduct." *Capp* v. *Cnty. of San Diego*, 940 F.3d 1046, 1055 (9th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 682).

## ARGUMENT

### I. PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS BECAUSE THE TOS DO NOT CONTAIN THE ALLEGED PROMISES (COUNT I).

Plaintiffs have not plausibly alleged any enforceable promises and instead read into the TOS promises that do not exist. They claim that in the TOS, "Meta promises users the right to delete their content and thereby revoke the license at 'any time.'" TAC ¶ 35. But the TOS promise neither that locked-out users may delete their content, nor that user-initiated deletion terminates Meta's license. Because the TOS contain neither promise, Plaintiffs' breach of contract claim must fail.

### A. The TOS Do Not Promise That Locked-Out Users Can Delete Their Content.

Plaintiffs seek to impose an affirmative obligation on Meta to enable locked-out users to delete content from their profiles, *see* TAC ¶¶ 12, 40-41, 148, but no such promise exists under the TOS. Specifically, Plaintiffs point to a statement in the TOS that users can delete content "at any time" to argue that the TOS obligated Meta to provide a way for Plaintiffs to delete their content. *See id.* ¶¶ 12, 36, 147-48; Ex. A at 8 § 3.3.1; Ex. B. at 9 § 3.3.1. They also contend that Meta has incorporated into its TOS policies that provide that Meta "may disable or delete"

accounts that "appear[] to have been hacked or compromised," and allege that these policies show that Meta was required to provide locked-out users with a means to delete their accounts. *Id.* ¶ 38 & n.6. But these provisions impose no such obligation on Meta.

First, this Court already ruled, when dismissing the SAC, that Meta's indication it "may delete or disable" hacked accounts was, at most, "an amorphous promise" that reflected "nothing more than Meta's stated goals—they do not amount to a contractual *guarantee* that Meta will respond to any particular problem in any particular manner and therefore cannot rise to the level of a contractual duty." *Isgur*, 2026 WL 194640, at *7 (emphasis in original). This Court further stated that plaintiffs "may not rely on [this] or similar provisions of the TOS as requiring Meta to take specific action." *Id.* Plaintiffs still do so.

Second, Plaintiff's interpretation of the TOS's statement that users can delete content "at any time" as a guarantee of the ability to delete content is not plausible in light of the TOS as a whole. Under California law, "the terms of a contract must be construed in a manner that takes into account the context of the language and is consistent with the contract as a whole." *Great Minds* v. *Office Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019); Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). Moreover, "[a]n interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." *Schertzer* v. *Bank of Am., NA*, 109 F.4th 1200, 1209 (9th Cir. 2024) (quoting *Carson* v. *Mercury Ins. Co.*, 210 Cal. App. 4th 409, 420 (2012)).

Read as a whole, the TOS make clear that Meta expressly disclaims any guarantee that its products will be "safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections." Ex. A at 10 § 4.3; Ex. B at 11 § 4.3. Courts have routinely found that this exact provision in the TOS forecloses claims of guaranteed access and use of Facebook—the very kind of claim asserted by Plaintiffs. *Karam* v. *Meta Platforms, Inc.*, 2025 WL 3079048, at *3-4 (N.D. Cal. Nov. 4, 2025) (the TOS "foreclose claims based on the functionality or security of Facebook"); *Young* v. *Meta Platforms, Inc.*, 2025 WL 2930979, at *3 (N.D. Cal. Oct. 15, 2025) (finding that the TOS explicitly disclaim "any guarantee that Facebook will be safe,

secure, or error-free, or operate without disruptions"); *Kennedy* v. *Meta Platforms Inc.*, 2024 WL 4565091, at *5-6 (N.D. Cal. Oct. 23, 2024) (dismissing negligence and breach of contract claims, amongst others, as foreclosed by TOS which disclaim Facebook being "safe, secure, or error-free, or operate without disruptions"). Further, the TOS never state that Meta is under any affirmative remediation obligation should it learn of "potential misuse" or "harmful conduct towards others." Ex. A at 4 § 1; Ex. B at 4 § 1.5. Rather, the TOS only state that on such occasions, Meta "*may* take appropriate action based on our assessment that may include—notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement." *Id.* Accordingly, the very terms of the TOS do not guarantee—as Plaintiffs would have it—the continued availability of users' Facebook accounts or a mechanism to access Facebook services to delete content.

And without a contractual guarantee, Plaintiffs' claims reduce to an effort to impose a new "affirmative obligation" on Meta to allow content deletion by locked-out users in all circumstances. Plaintiffs' efforts ignore this Court's prior ruling that Meta's TOS do not create an "affirmative obligation" on Meta to act on third-party conduct, and that claims seeking to hold Meta liable for third-party behavior or for immediately remedying third-party conduct "are not actionable." *Isgur*, 2026 WL 194640, at *6; *see also King* v. *Facebook, Inc.*, 2019 WL 6493968, at *2 (N.D. Cal. Dec. 3, 2019) (Orrick, J.), *aff'd*, 845 F. App'x 691 (9th Cir. 2021) (noting that several courts in this district have found that Facebook's Terms "place restrictions on users' behavior, but do not create affirmative obligations on Facebook"). Yet, Plaintiffs improperly seek to impose—contrary to this Court's prior ruling—an affirmative obligation on Meta to enable Plaintiffs to access Facebook to delete content from their profiles to remedy the misconduct of third parties responsible for locking out Plaintiffs.

**B.      The TOS Do Not Promise That Plaintiffs Can Revoke Meta's License To Use Their Information.**

As discussed above, the TOS do not promise locked-out users uninterrupted access, and therefore, the uninterrupted right to delete content from Meta's systems. It necessarily follows that the TOS do not promise locked-out users that they can revoke Meta's license at any time by

deleting content.

Setting that aside, Plaintiffs' breach of contract claim would fail for the independent reason that no provision of the TOS establishes that user deletion of content, on its own, terminates Meta's license.

Plaintiffs attempt to read into the TOS a promise that does not exist—that the TOS "promises users the right to delete their content and thereby revoke the license." TAC ¶ 146. But the TOS nowhere states that user deletion of content automatically revokes Meta's license to that content. Therefore, this cannot be the basis for a breach of contract claim because "a claim for breach of contract . . . must be based on the non-performance of express promises or legal duties contained in a contract." *Traumann* v. *Southland Corp.*, 858 F. Supp. 979, 982 (N.D. Cal. 1994) (citing 4 A. Corbin, *Corbin on Contracts*, § 943 at 807, n.1 (1951)); *see also Bodenburg* v. *Apple Inc.*, 146 F.4th 761, 767 (9th Cir. 2025) ("To allege breach, a plaintiff must identify a specific contract provision breached by the defendant."); *Joude* v. *WordPress Found.*, 2014 WL 3107441, at *5 (N.D. Cal. July 3, 2014) (finding no breach of terms of service for failure to remove misleading blog post where defendant did not promise to remove offending content).

Plaintiffs are incorrect that the TOS states that user deletion of content, on its own, revokes Meta's license to that content. TAC ¶¶ 7, 35, 37, 146, 148-49. While the TOS state, "You can delete individual content you share, post, and upload at any time," Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.3, the TOS do not state that such user deletion terminates Meta's license to user content.

Rather, distinct from such user deletion, the TOS specify when Meta's license ends: "when your content is deleted from our systems." Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.2. Interpreting the TOS to mean that user deletion automatically terminates Meta's license would render this phrase superfluous—an approach disfavored by contract law. *Schertzer*, 109 F.4th at 1209. Rather, under the canon against surplusage, every contractual provision should be given independent meaning. *See, e.g.*, *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir. 1992) ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." (quoting *Restatement (Second) of Contracts* §

203(a) cmt. b (1979))); Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). Applying that canon here, the TOS's specification that Meta's license ends when content is "deleted from [Meta's] systems" must mean something distinct from a user's act of deletion. To read user deletion as automatically terminating the license would collapse the two concepts into one, rendering the "deleted from our systems" language superfluous.

Moreover, the TOS describe several circumstances where a user's deletion of content might not result in content being deleted from Meta's system. Ex. A at 8 § 3.3.1; Ex. B at 9-10 § 3.3.3. For example, the TOS provide that if an individual deletes content, but that "content has been used by others . . . and they have not deleted it," then, the "license will continue to apply until that content is deleted." Ex. A at 8 §3.3.1; Ex. B at 9 § 3.3.3. Likewise, Meta will not delete content deleted by an individual when deletion would, *inter alia*, restrict Meta's ability to "investigate . . . violations of [Meta's] terms and policies." Ex. A at 8 §3.3.1; Ex. B at 9 § 3.3.3. The TOS also specify that user content will not be deleted if such content is needed to "comply with legal obligations for the preservation of evidence" or for compliance with any other request from "a judicial or administrative authority, law enforcement or [ ] government agency." Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.3. Content will also not be deleted if deletion would prevent Meta from "investigat[ing] or identify[ing] illegal activity or violations of [the] terms and policies" or if the content is needed for Meta to "protect the safety, integrity, and security of [its] Products, systems, services, [ ] employees, [ ] users, and to defend [Meta itself]." Ex. A at 8 §3.3.1; Ex. B at 9 §3.3.3. The TOS provide that "[i]n each of the above cases, this license will continue until the content has been fully deleted," even if users identify such content for deletion. Ex. A at 9 §3.3.1; Ex. B at 10 §3.3.3.

In short, there is a distinction between (1) user deletion of content and (2) deletion of that content from Meta's system. And Meta retains a license to user content until such content is deleted from Meta's system. Plaintiffs gloss over the distinction between these two categories even though this Court admonished in its Order dismissing Plaintiffs' SAC that "deletion is distinct from full 'deletion of content from Meta's systems'—a distinction that plaintiffs will

need to address in any amended complaint." *Isgur*, 2026 WL 194640, at *6 n.3.[3]

Accordingly, Meta makes no contractual "promise" to users that they can revoke Meta's license by deleting content. Nor could Meta make such a blanket promise considering that, under the TOS, Meta may retain content on its systems even after users request deletion. Therefore, Plaintiff's "license revocation" theory—which is premised on the notion that the TOS gives locked-out users the ability to terminate Meta's license by deleting content—is fatally flawed, and Plaintiff's breach of contract claim must be dismissed.

## II.   PLAINTIFFS FAIL TO PLAUSIBLY PLEAD BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT II).

Plaintiffs attempt to circumvent the express terms of the Terms of Service by pleading an implied covenant claim. But for the reasons set forth below, Plaintiffs' implied covenant claim must fail.

### A.   Plaintiffs' Implied Covenant Claim Seeks To Impose Obligations Beyond The Terms Of The Contract.

Plaintiffs' implied covenant claim rests on the same "license revocation" theory that underlies Plaintiffs' breach of contract claim—Plaintiffs argue that Meta breached the covenant by keeping user licenses without providing locked-out users with the ability to revoke Meta's license. *E.g.* TAC ¶ 155. This Court held in its prior Order that Plaintiffs "must expressly and adequately plead" their license revocation theory to proceed on their implied covenant claim, *Isgur*, 2026 WL 194640, at *8. But as shown above, they have not adequately pled this theory. Rather, Plaintiffs' license revocation theory seeks to impose obligations on Meta that go beyond the scope of the TOS by seeking to obligate Meta to provide locked-out users with the ability to delete content and instantaneously terminate Meta's license. The implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Appling* v. *State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 779 (9th Cir. 2003). Accordingly, Plaintiffs' implied covenant claim must be dismissed.

---

[3]   Plaintiffs acknowledge the distinction, TAC ¶ 8 but fail to address its significance.

### B.      Plaintiffs Fail To Plausibly Allege That Meta Acted In Bad Faith.

Even if Plaintiffs could proceed on their license revocation theory, Plaintiffs cannot make out their implied covenant claim because they have failed to plausibly allege bad faith. Plaintiffs' implied covenant and breach of contract claims are near identical, *compare* ¶¶ 146-51, 153 *with* ¶¶ 155, 159-62, 166-67, 173, and when there is "significant overlap between a breach of contract and breach of covenant of good faith and fair dealing claim, courts typically allow both claims to proceed when, in addition to the required breach of contract elements, a plaintiff additionally alleges bad faith on the part of defendant(s)." *Isgur*, 2026 WL 194640, at *8. When there is no bad faith, there cannot be a separate implied covenant claim because "[t]he implied covenant may not . . . duplicate a breach of contract claim." *Richards* v. *Centripetal Networks, Inc.*, 709 F. Supp. 3d 914, 922 (N.D. Cal. 2024).

This Court ruled that Plaintiffs may show bad faith if they allege an "intentional act on Meta's behalf to maintain a license while plaintiffs themselves cannot revoke said license." *Isgur,* 2026 WL 194640, at *8. To plausibly allege an intentional act, Plaintiffs must show that Meta's conduct demonstrates "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act." *Schertzer*, 109 F.4th at 1213; *Anderson* v. *Apple Inc.*, 500 F. Supp. 3d 993, 1029 (N.D. Cal. 2020) (Orrick, J.); *Careau & Co.* v. *Sec. Pac. Bus. Credit, Inc.,* 222 Cal. App. 3d 1371, 1395 (1990). None of Plaintiffs' allegations of bad faith illustrate any "conscious and deliberate act[s]" that show intentional conduct on Meta's part.

*First*, Plaintiffs contend that Meta had "discretion to revoke" Meta's license to Plaintiffs' content, and that "Meta exercised this discretion in bad faith," TAC ¶ 161, by not "adopt[ing] steps or procedures for users who are locked out of their accounts to take to regain access or to modify or revoke the license to user personal information associated with hacked accounts, despite having sole discretion over suspending accounts or returning a user's access after hacking." *Id.* ¶ 166, *see also id.* ¶167 (claiming Meta acted in bad faith because "Meta . . . failed to . . . provide the ability to delete the content it maintains a license over for accounts taken over by hackers"). Plaintiffs claim that Meta does not provide such capabilities because it would

result in a "decrease of its ad revenue." *Id.* ¶ 151. But this Court's prior ruling forecloses this theory. Plaintiffs are trying to hold Meta liable for failing to take action to remedy third-party conduct, and the Court held that Meta's TOS do not create an "affirmative obligation" on Meta to act on third-party conduct, and that claims seeking to hold Meta liable for third-party behavior or for immediately remedying third-party conduct "are not actionable." *Isgur*, 2026 WL 194640, at *6. Moreover, Plaintiffs' own allegations render the notion that Meta acted in "bad faith" implausible. Meta does offer steps or procedures for locked-out users to regain access to their accounts and, in some circumstances, deletion of accounts that have been taken over. *See, e.g.*, TAC ¶¶ 38, 54, 72, 78, 87. Moreover, the TAC specifically alleges that Plaintiff Edwards was able to regain access to his account with the help of Meta's account recovery tools. TAC ¶ 78. Regardless, the TOS nowhere obligate Meta to provide access to locked-out users, and the TOS explicitly state that Meta "make[s] no guarantees that [Facebook] always will be safe, secure, or error-free, or that [Facebook] will function without disruptions, delays, or imperfections." Ex. A 10 § 4.3; Ex. B at 11 § 4.3. Plaintiffs' attempt to write into the TOS an implicit duty to restore access violates these express terms. *See Donohue* v. *Apple, Inc.*, 871 F. Supp. 2d 913, 932 (N.D. Cal. 2012) ("[T]he implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations by the contract."); *see also TopDevz, LLC* v. *LinkedIn Corp.*, 2021 WL 6113003, at *10 (N.D. Cal. Dec. 27, 2021) (dismissing claim for breach of implied covenant based on conduct for which LinkedIn expressly disclaimed liability in agreement at issue); *Ebeid* v. *Facebook, Inc.*, 2019 WL 2059662, at *8 (N.D. Cal. May 9, 2019) (dismissing breach of implied covenant claim premised on conduct that "Facebook had the contractual right [to do in its] . . . sole discretion").

*Second*, Plaintiffs contend that Meta acted in bad faith by failing to "suspend hacked accounts" in order to "promote their own revenue generated by the hacked accounts." TAC ¶ 161. Again, this theory is foreclosed by the fact that Plaintiffs here are trying to hold Meta liable for third-party behavior, and the Court has held that such claims "are not actionable." *Isgur*, 2026 WL 194640, at *6. Furthermore, Plaintiffs include no allegations that show that Meta "conscious[ly] and deliberate[ly]" failed to suspend accounts that were taken over. *Anderson* v.

*Apple Inc.*, 500 F. Supp. 3d 993, 1029 (N.D. Cal. 2020) (Orrick, J.). To the contrary, the TAC contains numerous allegations that Meta does, at times, suspend accounts that have been taken over. *See* TAC ¶ 40 ("Meta does occasionally suspend an account lost from hacking[.]"); *id.* ¶ 9 (alleging only that Meta does not suspend a "majority" of accounts that have been taken over, thereby acknowledging that Meta does suspend some accounts). Moreover, the very Facebook Help Center page that Plaintiffs cite in their complaint makes clear that Meta is not obligated to suspend accounts that have been taken over—Meta *may,* but is not *required* to do so. *Id.* ¶ 38 & n.6. As alleged, that Help Center page states that Meta "may disable or delete your account if it appears to have been hacked or compromised and we are unable to confirm ownership of the account after a year, or if the account is unused and remains inactive for an extended period of time." *Id.* ¶ 38. Again, an implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Appling*, 340 F.3d at 779. Finding that Meta acted in bad faith by failing to suspend accounts that were taken over when Meta had no obligation to do so would impose extracontractual obligations on Meta.

*Third*, Plaintiffs contend that Meta acted in bad faith by "laying off . . . its existing customer service team members" because "Meta increased its bottom line while decimating its own ability to restore account access." TAC ¶ 164. Plaintiffs allege that in 2022 "Meta laid off approximately 11,000 people" and in 2023 Meta "laid off another 10,000 employees concentrated in the customer service and support communities," which thus "remov[ed] opportunities for human intervention and abandon[ed] users to ineffective automated support systems." *Id.* at ¶ 41. Plaintiffs ask this Court to conclude that Meta's decision to lay off employees was intended to enable Meta to profit from accounts that have been taken over, rather than a business act with which Plaintiffs do not agree. This is an inferential leap that is unsupported by the TAC or common sense. There is nothing to support the inference that these layoffs were a "conscious and deliberate act" to frustrate the terms of the TOS, as opposed to general business cost cutting measures. Plaintiffs themselves allege that these layoffs occurred during Meta's "year of efficiency" in which Meta sought to "cut[] projects that aren't

performing." TAC ¶ 41 & n.9. As such, Plaintiffs' own Complaint makes clear there is an "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for the layoffs, and the Court need not accept such the unwarranted inference proffered by Plaintiffs. *Somers* v. *Apple*, 729 F.3d 953, 965 (9th Cir. 2013) (dismissing plaintiffs' claims, in part, because there were "obvious alternative explanations" for alleged wrongdoing); *In re Google RTB Privacy Litig.*, 606 F. Supp. 3d 935, 945 (N.D. Cal. 2022) (dismissing breach of the implied covenant claim where bad faith only conclusorily alleged). Moreover, finding that such layoffs constitute a breach of the covenant would contradict the plain language of the TOS, which make clear that Meta *does not* have an obligation to restore user access, as the TOS state that Facebook is provided "as is." Ex. A at 10 § 4.3; Ex. B at 11-12 § 4.3.

Because Plaintiffs have failed to show bad faith, Plaintiffs cannot maintain their implied covenant claim as it is duplicative of their breach of contract claim.

**C.      Plaintiffs Fail To Allege That Meta Deprived Them Of Any Benefit In Violation Of The Parties' Expectations.**

Plaintiffs cannot maintain their implied covenant claim for the independent reason that Plaintiffs failed to sufficiently allege that Meta "deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting." *Isgur*, 2026 WL 194640, at *8 (quoting *Mulato* v. *Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 949 (N.D. Cal. 2014)). Neither of the claimed benefits—continuous access to their Facebook accounts or the ability to unilaterally revoke or modify Meta's license—have any basis in the TOS.

Plaintiffs claim that Meta violated their expectations at the time of contracting because they "do not have use of their accounts on the Facebook platform, and cannot even gain entry to revoke or modify Meta's license over their information[.]" TAC ¶¶ 3, 162-63, 167. But as explained *supra*, the TOS do not promise users continuous access to Facebook, nor do they promise users the ability to unilaterally "revoke or modify" Meta's license. Therefore, there was no basis for Plaintiffs to have an expectation of access to Facebook to revoke Meta's license while locked out.

Plaintiffs also claim that Meta violated Plaintiffs' contractual expectations because Meta "keep[s] the license to monetize user information while no longer providing users with Facebook access." *Id.* ¶ 155. This theory contradicts the plain language of the TOS: Meta expressly states that the license granted by Plaintiffs is "*solely* for the purposes of providing and improving our Products and services[.]" Ex. A at 7 § 3.3.1; Ex. B at 8 § 3.3.1. These "Products and services" include, for example, "advanced technologies - such as artificial intelligence, machine learning systems, and augmented reality," "sophisticated network and communication technology," "automated systems to improve our ability to detect and remove abusive and dangerous activity." Ex. A at 4 §1; Ex. B at 4-5 § 1.6. The TOS explain, therefore, that the licenses are used for providing and improving Meta's services and products generally. Consequently, Plaintiffs' allegation that Meta frustrates the purpose of the contract by retaining the license to "monetize Plaintiffs' and putative Class members' personal information," TAC ¶ 159, is inconsistent with the plain language of the TOS, which makes explicit Meta may utilize personal information for purposes other than Plaintiffs' "access[] and us[e] of Facebook." *Id.* ¶ 6.

## III. <u>PLAINTIFFS FAIL TO PLEAD A VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (COUNT III).</u>

Plaintiffs' UCL claim fails because Plaintiffs have not alleged an injury sufficient to confer standing to bring a UCL claim. Even if Plaintiffs could meet this threshold standing requirement (which they cannot), Plaintiffs cannot maintain their claim for violation of the unlawful prong of the UCL. Moreover, Plaintiffs' attempt to base a claim under the unfair prong of the UCL on the same conduct as the unlawful prong is impermissible. Lastly, Plaintiffs cannot satisfy either the "balancing" or "tethering" tests required to bring a claim under the unfair prong.

### A.   Plaintiffs Have No Standing To Bring A UCL Claim.

Standing to bring a private claim under the UCL is limited to any "person who has suffered injury in fact and has lost money or property as a result of unfair competition." Cal. Bus. & Prof. § 17204. In 2004, the California electorate voted "to materially curtail the universe of those who may enforce the UCL in a private action by confining standing to those actually

injured by a defendant's business practices." *Lagrisola* v. *N. Am. Fin. Corp.*, 96 Cal. App. 5th 1178, 1187 (2023) (cleaned up). In dismissing Plaintiffs' SAC, this Court held that "harms involving personal data can constitute economic injury under three distinct theories: (1) unfair benefit-of-the-bargain, (2) diminished value of personal information, and (3) reduced right to exclude others from accessing personal data." *Isgur*, 2026 WL 194640, at *9. Plaintiffs attempt to allege economic injury under all three theories, TAC ¶¶ 18, 182-86, but fail to meet the requirements of any.

*First*, Plaintiffs allege that they were unfairly deprived of the benefit-of-the-bargain "when they gave Meta a broad license to their information," which Meta maintained when Plaintiffs lost access to their accounts. *Id.* ¶ 184. But this Court already ruled in its Order on Meta's prior Motion to Dismiss that the "benefit of the bargain" theory requires "allegations that a 'user originally paid for the business's service as part of the transactions,'" "even in the context of loss of personal data." *Isgur*, 2026 WL 194640 at *9 (citing *In re Meta Pixel Tax Filing Cases,* 724 F. Supp. 3d 987, 1024 (N.D. Cal. 2024); *see also In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *31-32 (N.D. Cal. May 27, 2016) (noting that, to have UCL standing, a party "must show that he has lost money or property," "a requirement [that] may, in some circumstances, impose a more stringent standard . . . as compared to Article III"). Plaintiffs do not make any such allegation. In fact, they admit that "users did not pay money or expend money in their dealings with Meta." TAC ¶ 186. Recognizing this inherent flaw in their claim, Plaintiffs allege that they "paid Meta with their personal information, which is worth millions to Meta, in exchange for use of Meta's Facebook service." TAC ¶ 34. But, Plaintiffs made this exact same allegation in their previous complaint, SAC ¶ 32, and the Court already found this allegation "falls flat." *Isgur*, 2026 WL 194640 at *9.

Plaintiffs attempt to arbitrarily assign economic value to their ability to restrict access to personal information by alleging that a "Willingness to Accept" ("WTA") study, which supposedly illustrates "the compensation that would have to be paid for an individual to give up the item in question," represents the economic loss Plaintiffs suffered. TAC ¶¶ 105, 153. But this study measures only what consumers hypothetically would require in exchange for sharing

certain data—Plaintiffs do not allege that this analysis reflects what they themselves would have required in exchange for their data. It is thus inherently untethered from the benefit-of-the-bargain inquiry, which asks whether a plaintiff has "surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she would have otherwise." *Isgur*, 2026 WL 194640, at *8 (quoting *Kwikset Corp.* v. *Superior Ct*, 51 Cal. 4th 310, 323 (2011)).

*Second*, Plaintiffs allege that they were injured due to the diminished value of their information because they "received less than they would have (the ability to use Facebook in exchange for the license)" and because "exchanging something of value to gain something else of value constitutes participation in a market for personal information." TAC ¶¶ 107, 185-86. These theories fail for the same reason they failed in the SAC—the TAC is still missing any allegation that Plaintiffs' Facebook account had economic value *to Plaintiffs* or that *Plaintiffs* sought to commercially exploit or monetize their information.

As the Court previously explained, to plead injury due to diminished value of information, Plaintiffs must allege "that they either attempted or intended to participate in the market for their data, or otherwise to derive economic value from their personally identifiable information." *Isgur*, 2026 WL 194640, at *9. "'[T]hat the information has external value, but no economic value to plaintiff[s], cannot serve to establish that plaintiff[s] ha[ve] personally' suffered an economic injury." *Id.* (quoting *Bass* v. *Facebook*, 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019) (finding no UCL standing where data breach led to loss of access tokens, which, despite external value did not have alleged value to plaintiff) ); *see also Hazel* v. *Prudential Fin., Inc.*, 2023 WL 3933073, at *6 (N.D. Cal. June 9, 2023) ("[J]ust because Plaintiffs' data is valuable in the abstract, and because [Defendant] might have made money from it, does not mean that Plaintiffs have lost money or property as result."); *Huynh* v. *Quora, Inc.*, 2019 WL 11502875, at *7 (N.D. Cal. Dec. 19, 2019) (for the purposes of a UCL injury, "even if Quora may have gained money through its sharing or use of the plaintiffs' information, that's different from saying the plaintiffs lost money" (cleaned up)).

Plaintiffs nowhere allege in the TAC that they intended to participate in the market for their data or otherwise derive economic value from their information. Plaintiffs' assertion that

they "exchang[ed] something of value" in the form of their "personal data" to gain something else of value and therefore "participat[ed] in a market for personal information," TAC ¶¶ 107, 186, is insufficient under this Court's prior Order because Plaintiffs do not allege that they sought an economic benefit from their personal information.

Plaintiffs attempt to skirt this requirement by relying on a WTA analysis. TAC ¶¶ 105-06, 186, 189. But, again, this analysis measures only what consumers hypothetically would require in exchange for sharing certain data—it does not establish that Plaintiffs intended to participate in any market for their personal information. *See Libman* v. *Apple, Inc.*, 2024 WL 4314791, at *19 (N.D. Cal. Sept. 26, 2024) (granting motion to dismiss UCL claim when "Plaintiffs [did] not allege they intended to sell the data [Defendant] collected or otherwise allege that someone else would have bought the data" despite citations to studies valuing the relevant data at $4.20 a year).

*Third*, Plaintiffs' claim that they suffered from a "reduced right to exclude others from accessing their personal data" also fails. TAC ¶¶ 182, 185-88. Plaintiffs voluntarily granted Meta a "worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works [from]" their content. *Id.* ¶¶ 1, 7, 35; Ex. A at 8 § 3.3.1; Ex. B at 9 § 3.3.2. Plaintiffs' grievance is that they cannot revoke the license they already voluntarily granted, TAC ¶ 148, but that cannot serve as the basis for UCL standing under the "right to exclude" theory. Plaintiffs never allege that their personal information was disclosed to any unauthorized party—a critical factual predicate for a right to exclude theory. *Contrast In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1003, 1024-25 (denying motion to dismiss UCL claim where Meta allegedly collected confidential tax information *w*ithout consent because plaintiffs "were deprived of their right to exclude Meta" from their property); *In re Tiktok Inc., Minor Priv. Litig.*, 2025 WL 3628598, at *21 (C.D. Cal. Nov. 5, 2025) (denying motion to dismiss UCL claim because plaintiffs "did not have adequate knowledge and consent of the extent of information being collected from them or that their information would be disclosed to third parties"). Moreover, to the extent there was any alleged loss of the "right to exclude," it was caused by the third parties that gained unauthorized access to Plaintiffs' accounts. Plaintiffs here

are complaining that Meta failed to remedy a situation created by third parties, which the Court has already held is not actionable. *Isgur*, 2026 WL 194640, at *6.

### B.    Plaintiffs Cannot Base An Unlawful Claim On A Breach Of Contract.

Even if Plaintiffs were able to allege an economic injury sufficient to bring a UCL claim, they have not sufficiently alleged that Meta's conduct is unlawful. The unlawful prong "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Hadley* v. *Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017). Plaintiffs assert that Meta violated the unlawful prong of the UCL "by violating California contract law." TAC ¶ 178. But it is well established that a plaintiff cannot base a claim under the unlawful prong of the UCL on an alleged breach of contract. *Ndulue* v. *Fremont-Rideout Health Grp.*, 770 F. App'x 335, 338 (9th Cir. 2019) ("Because a breach of contract cannot satisfy the 'unlawful' prong of California's UCL, [defendant] is entitled to summary judgment[.]"); *Dameron Hosp. Ass'n.* v. *Geico Gen. Ins. Co.*, 2024 WL 4581685, at *4 (E.D. Cal. Oct. 25, 2024) (dismissing UCL unlawful claim where plaintiff "does not go beyond alleging common law contract violations"); *Wright* v. *Charles Schwab & Co., Inc.*, 2021 WL 1056838, at *8 (N.D. Cal. Mar. 18, 2021) (dismissing UCL claim because "[t]he breach-of-contract claim is not a predicate for the UCL unlawful claim. . . . there must be something more"); *Shroyer* v. *New Cingular Wireless Servs.*, 622 F.3d 1035, 1044 (9th Cir. 2010) ("a common law violation such as breach of contract is insufficient" to support a violation of the unlawful prong of the UCL); *see also Puentes* v. *Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638, 645 (2008) (finding a breach of contract is not itself an unlawful act for purposes of the UCL).

Because Plaintiffs do not allege any violation of any other law in connection with their unlawful claim, the unlawful claim must be dismissed.

### C.    Plaintiffs' Allegations Do Not Establish That Meta's Conduct Is Unfair.

Plaintiffs' claims also fail under the unfair prong of the UCL. "[T]his district has held that 'where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL,

the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive.'" *NorthBay Healthcare Grp.-Hosp. Div.* v. *Blue Shield of Cal. Life & Health Ins.*, 342 F. Supp. 3d 980, 988-89 (N.D. Cal. 2018) (Orrick, J.) (quoting *Hadley*, 243 F. Supp. 3d at 1104-05); *Hammerling* v. *Google LLC*, 615 F. Supp. 3d 1069, 1094 (N.D. Cal. 2022). That is the case here. Plaintiffs' claims under the unfair prong are based on the same conduct as Plaintiffs' claims under the unlawful prong, which fails, and Plaintiffs do not bring a claim under the fraudulent prong. TAC ¶¶ 178, 180-86, 188. Plaintiffs' claim under the unfair prong therefore also fails. Moreover, Plaintiffs' claim under the unfair prong cannot be based on Meta's alleged breach of contract. *See Textron Fin. Corp.* v. *Nat'l Union Fire Ins. Co.*, 118 Cal. App. 4th 1061, 1072 (2004), disapproved on another ground in *Zhang* v. *Superior Court*, 57 Cal. 4th 364, 382 (2013) ("[R]eliance on general common law principles to support a cause of action for unfair competition is unavailing.").

Even if Plaintiffs could overcome these threshold issues, Plaintiffs' claim for violation of the unfair prong would still fail. The Ninth Circuit evaluates unfairness in consumer actions under two tests: the "balancing test" and the "tethering test."[4] *Hadley*, 243 F. Supp. 3d at 1104. The balancing test asks "whether the alleged business practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum* v. *San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). Meta's business practices are not unfair under the balancing test. Courts are unwilling to recognize unfairness where, as here, consumers knew the truth regarding the relevant transaction. *S. Bay Chevrolet* v. *Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 887-88 (1999) (finding that lender's interest calculation practices were not unfair because the borrower was aware of them and they were widely used); *see also Davis* v. *HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168-70 (9th Cir. 2012) (finding challenged business practice not against public policy, immoral, unethical, oppressive, or

---

[4]   As applied to consumer suits, the Ninth Circuit rejected a third approach, the "FTC test," which is based on a three-pronged test contained in the FTC Act. *See Amacker* v. *Bank of Am.*, 2014 WL 4771668, at *10 (N.D. Cal. Sept. 24, 2014). Plaintiffs do not allege that Meta's business practices were unfair under the FTC test. TAC ¶¶ 180-81.

unscrupulous where possibility of alleged injury was disclosed and reasonably avoidable). As described above, the TOS make clear that there is a distinction between (1) user deletion of content and (2) deletion of that content from Meta's system, but also that Meta retains a license to user content until such content is fully deleted from Meta's system. Ex. A at 8-9 § 3.3.1; Ex. B at 9 § 3.3.2-3 (explaining Meta's license to content "will end when [users'] content is deleted from [Meta's] systems"). And, as also explained above, the TOS enumerate specific circumstances in which content may not be deleted from Meta's systems. *See* Ex. A at 8-9 § 3.3.1; Ex. B at 9-10 § 3.3.3 (describing instances where a user's deletion of content may not result in content being fully deleted from Meta's system); *see supra* at 5-6. Additionally, Plaintiffs ignore the larger framework that must be considered and "balanced." Meta seeks to facilitate the operation, safety and security of Facebook (and its user base) as a whole, and employs automated processes that facilitate its ability to service its billions of users, who are located in time zones across the globe.

Under the second approach, the "tethering test," Plaintiffs must plead that a practice violates public policy "tethered to specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 257. Plaintiffs fail to tether the business conduct they complain about to any specific constitutional, statutory, or regulatory provisions. Instead, they allege that Meta's actions "violated fundamental public policies . . . expressed by the California Legislature and the Federal Trade Commission." TAC ¶ 181. Invoking general "fundamental public policies" does not satisfy the test, which requires tethering the claimed harm to "specific constitutional, statutory, or regulatory provisions." *Hodsdon* v. *Mars., Inc.*, 162 F. Supp. 3d 1016, 1027 (N.D. Cal. 2016), *aff'd*, 891 F.3d 857 (9th Cir. 2018); *see also Hodges* v. *Apple Inc.,* 2013 WL 6698762, at *9 (N.D. Cal. Dec. 19, 2013) (Orrick, J.) *aff'd*, 640 F. App'x 687 (9th Cir. 2016) (finding "vague allusions to deceit, consumer protection, and unfair competition" insufficient under unfair prong).

### CONCLUSION

The Court should dismiss the Third Amended Complaint in its entirety. Because Plaintiffs failed to translate the license revocation theory—their final theory—into a justiciable

claim, the complaint cannot be saved by any amendment and should be dismissed with prejudice. *See, e.g.*, *Jackson* v. *Fischer*, 2015 WL 5569133, at *8, *20 (N.D. Cal. Sept. 21, 2015).

Dated: April 13, 2026

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: */s/ Walter F. Brown, Jr.*
Walter F. Brown Jr. (SBN: 130248)
wbrown@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile:  (628) 232-3101

Melissa F. Zappala
mzappala@dirllp.com
DUNN ISAACSON RHEE LLP
401 9th Street NW
Washington, DC 20004
Telephone: (202) 240-9700
Facsimile: (202) 240-2050

Meredith R. Dearborn (SBN: 268312)
mdearborn@dirllp.com
DUNN ISAACSON RHEE LLP
345 California Street, Suite 600
San Francisco, CA 94104
Telephone: (202) 240-2900

Attorneys for Defendant Meta Platforms, Inc.